Dan Stormer, Esq. [S.B. #101967]
Shaleen Shanbhag, Esq. [S.B. #301047]
Tanya Sukhija-Cohen, Esq. [S.B. #295589]
Theresa Zhen, Esq. [S.B. #300710]
HADSELL STORMER RENICK & DAI LLP
128 N. Fair Oaks Avenue
Pasadena, California 91103
Telephone: (626) 585-9600
Facsimile: (626) 577-7079
Emails: dstormer@hadsellstormer.com
         sshanbhag@hadsellstormer.com
         tanya@hadsellstormer.com
         tzhen@hadsellstormer.com

Barrett S. Litt, Esq. [S.B. #45527]
Lindsay B. Battles, Esq. [S.B. #262862]
KAYE, MCLANE, BEDNARSKI, & LITT, LLP
975 E. Green Street
Pasadena, CA 91106
Telephone: (626) 844-7660
Facsimile: (626) 844-7670
Email: blitt@kmbllaw.com
       lbattles@kmbllaw.com

Attorneys for Petitioners/Plaintiffs

[Additional Counsel continued on next page]

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RODNEY CULLORS, DENEAL YOUNG, JESSICA HAVILAND, RANY UONG, MARK AVILA, CAROLE DUNHAM, LEANDREW LEWIS, VICTOR GUTIERREZ, JEREMIAH FARMER, on behalf of themselves and all others similar situated, DIGNITY AND POWER NOW, YOUTH JUSTICE COALITION,<br><br>     *Plaintiffs*,<br><br> vs.<br><br>COUNTY OF LOS ANGELES, LOS ANGELES COUNTY SHERIFF ALEX VILLANUEVA, and DOES 1-10, inclusive,<br><br>     *Defendants*. | Case No.:<br><br>**CLASS ACTION**<br><br>**CLASS ACTION PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**<br><br>1.    Unconstitutional Conditions of Confinement in Violation of the Fourteenth Amendment of the U.S. Constitution (42 U.S.C. § 1983/28 U.S.C. 2241)<br><br>2.    Unconstitutional Punishment in Violation of the Fourteenth Amendment of the U.S. Constitution (42 U.S.C. § 1983/28 U.S.C. 2241)<br><br>3.    Unconstitutional Conditions of Confinement in Violation of the Eighth Amendment of the U.S. Constitution (42 U.S.C. § 1983/28 |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

|  |  |
|---|---|
| | U.S.C. 2241) |
| 4. | Failure to Accommodate in Violation of the Americans with Disabilities Act (42 U.S.C. § 12132) |
| 5. | Discrimination in Violation of the Americans with Disabilities Act (42 U.S.C. § 12132) |
| 6. | Failure to Accommodate in Violation of the Rehabilitation Act (29 U.S.C. § 794) |
| 7. | Discrimination and Disparate-Impact Discrimination in Violation of the Rehabilitation Act (29 U.S.C. § 794) |
| 8. | Cal. Gov't Code § 11135 |
| 9. | Unruh Act (Cal. Civ. Code § 51(f)) |
| 10. | Cal. Disabled Persons Act (Cal. Civ. Code § 54(c)) |
| 11. | California Bane Act (Cal. Civ. Code § 52.1) |
| 12. | Violation of California Constitution Art. I §7 |
| 13. | Violation of California Constitution Art. I § 17 |
| 14. | Declaratory Relief (Cal. Code Civ. Proc. § 1060) |

**IMMEDIATE RELIEF SOUGHT**

CLASS ACTION PETITION FOR WRIT OF
HABEAS CORPUS-COMPLAINT FOR
INJUNCTIVE & DECLARATORY RELIEF

[Additional Counsel continued from first page]

Peter J. Eliasberg, Esq. [S.B. #189110]
ACLU OF SOUTHERN CALIFORNIA
1313 W. 8th St.
Los Angeles, CA 90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5299
Email: peliasberg@aclu.sc.org

Alec Karakatsanis*
Katherine C. Hubbard, Esq. [S.B. #302729]
CIVIL RIGHTS CORPS
1601 Connecticut Ave. NW, Ste. 800
Washington, DC 20009
Telephone: (202) 894-6126
Facsimile: (202) 609-8030
Email: alec@civilrightscorps.org
          katherine@civilrightscorps.org

Catherine Sweetser, SBN 271142
Alicia Virani, SBN 281187
Aaron Littman, SBN 330283
UCLA LAW CLINICS
385 Charles E. Young Drive East
Los Angeles, CA 90095
(310) 825-9562
Email: csweetser@sshhlaw.com
          virani@law.ucla.edu
          littman@law.ucla.edu

Eric Balaban, Esq.*
AMERICAN CIVIL LIBERTIES UNION
NATIONAL PRISON PROJECT
915 15th St., N.W.
Washington, D.C. 20005
Telephone: (202) 393-4930
Facsimile: (202) 393-4931
Email: ebalaban@aclu.org

Andrea Woods, Esq.*
AMERICAN CIVIL LIBERTIES UNION
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2528
Facsimile: (212) 607-3329
Email: awoods@aclu.org

*pro hac vice applications forthcoming

## CLASS ACTION PETITION FOR WRIT OF HABEAS CORPUS AND
## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

1.      Jails and prisons are rapidly becoming the epicenter of this country's fight against the novel Coronavirus Disease 2019 ("COVID-19") and its resulting disease. The rate at which this disease is ravaging the globe is unprecedented in modern society, and an outbreak in Los Angeles County's jails will cause death and devastation to countless lives, including the people jailed, the people who work in the jail, and their families. Understanding the need for immediate action to slow the spread of this virus and to protect public health, medical experts have urged sweeping protective measures in everyday life.[1] Yet the very steps they deem necessary—such as remaining at least six feet apart from other persons through "social distancing," regular handwashing, adequately cleaning their surroundings, having access to testing and prompt medical attention, and wearing protective gear[2]—cannot be followed by the people jailed in the Los Angeles County's correctional and detention facilities due to the actions and inaction by the Los Angeles County and those officials responsible for prisoners' health and safety.

2.      As Los Angeles is the State's most populous county, Los Angeles County has become the epicenter of the COVID-19 pandemic in California. Both the Governor and Los Angeles County officials have declared emergencies and issued "Safer at Home" orders. However, measures to protect the general population from COVID-19 have not been implemented with equal force to protect Los Angeles County's prison population.

3.      Given reports that 44 Los Angeles County jail prisoners and 59 Los Angeles

---

[1] *See, e.g.*, Centers for Disease Control and Prevention, *Interim Guidance for Administrators of US K-12 Schools and Child Care Programs*, https://cutt.ly/ItRPq5n; Centers for Disease Control and Prevention, *Interim Guidance for Administrators and Leaders of Community-and Faith-Based Organizations to Plan, Prepare, and Respond to Coronavirus Disease 2019 (COVID-19)*, https://cutt.ly/KtRPk1k (last accessed Apr. 19, 2020).

[2] *See, e.g.*, World Health Organization, *Coronavirus*, https://cutt.ly/ztWyf7e (last accessed Apr. 19, 2020); Centers for Disease Control and Prevention, *How Coronavirus Spreads*, https://cutt.ly/CtYRkkC (last accessed Apr. 19, 2020).

County Sheriff's Department employees have already tested positive for COVID-19,[3] an outbreak in the County's jails already appears to be underway, with the full scope of infection unclear due to limited testing. However, the Los Angeles County and the officials responsible for operating the Los Angeles County jails have failed to respond to the obvious and urgent threats posed by this growing pandemic. The nearly 12,000 people in the Los Angeles County's jails are forced to suffer unconstitutional conditions that deny them the precautions and protections necessary to mitigate against the risks of COVID-19.

4.     In contradiction to public claims by Los Angeles County officials, the people confined inside the jail do not have adequate soap, have no safe way to dry their hands or to maintain a distance of at least six feet of one another, are not being tested for infection even when showing symptoms. They must wait days or even weeks to receive medical attention for COVID-19 related symptoms, share with dozens of other people high-touch surfaces that are infrequently cleaned, and are denied basic hygienic supplies. They also lack access to medical and public health information that they require to understand how this disease is contracted and how the spread can be prevented. Disregarding known, obvious risks of illness and death and needlessly exposing people to a highly fatal infectious disease violates the Eighth and Fourteenth Amendment rights under the U.S. Constitution and rights under other federal and state laws of the people jailed at in the Los Angeles County's facilities. This indifference also puts the broader community at risk from the creation of a site of widespread contagion.

5.     People confined in jails and prisons must "be furnished with the basic human needs, one of which is 'reasonable safety.'" *Helling v. McKinney*, 509 U.S. 25, 33-34 (1993) (citations omitted). Yet Petitioners/Plaintiffs, as well as the class and subclasses they represent, all face imminent risk of serious injury or death due to COVID-19 at Los Angeles County jails. In the midst of a public health crisis, the people confined at the County jails have not been provided adequate safeguards against the severe threat of

---

[3] Los Angeles County Sheriff's Department, *Coronavirus Information Updates* (last updated Apr. 23, 2020), https://lasd.org/covid19updates/ (last accessed Apr. 23, 2020).

COVID-19. They ask to be treated humanely while they are in the Los Angeles County's custody during this perilous time, and decarcerated to the extent possible.

6.     Petitioners/Plaintiffs are nine individuals held at the Los Angeles County jail facilities. They include persons who are elderly and/or have serious pre-existing medical conditions which the Centers for Disease Control and Prevention ("CDC") has determined place them at significantly higher risk of severe diseases and death if they contract COVID-19. They claim that the conditions of confinement at the jails create a heightened and unreasonable risk of contracting COVID-19, and a substantial risk of serious illness and death for those who by reason of their age or other medical condition are particularly vulnerable per CDC guidelines. They seek a writ of habeas corpus to secure immediate release of all individuals 55 and older and those with medical conditions that place them at heightened health risk from COVID-19, coupled with appropriate support and conditions upon release, as informed by public health expertise. Release of these vulnerable prisoners will both remove them from a life-threatening situation and permit social distancing measures recommended by the CDC and other public health officials to be implemented for those who remain at the jail.  Petitioners/Plaintiffs further seek class-wide relief requiring Defendants to implement CDC and public health measures to prevent the spread of the virus. If the Court does not grant immediate release on the basis of this Petition/Complaint, Petitioners/Plaintiffs request a hearing as soon as possible, given the imminent risks.[4]

## JURISDICTION AND VENUE

7.     This is a civil rights action arising under 42 U.S.C. § 1983, 22 U.S.C. § 2241, and 28 U.S.C. § 2201, *et seq.*, 42 U.S.C. § 1232, 29 U.S.C. § 794, as well as the Eighth and Fourteenth Amendments to the United States Constitution.

8.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and

---

[4] To the extent the Court declines to release all members of the Medically Vulnerable Subclasses, the Court should release at minimum (1) those for whom bail has been set because a court has already made the determination that they can be safely released notwithstanding bail; and (2) those whose sentences are nearly completed.

1343(a), 28 U.S.C. § 2241, Article I, § 9, cl. 2 of the U.S. Constitution, and 28 U.S.C. § 1651.

9.     Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to these claims occurred and continue to occur in this district.

## **PARTIES**

10.     Petitioner/Plaintiff Rodney O. Cullors is a fifty-eight-year-old man who currently resides in Los Angeles County, California. At all times relevant to this Complaint, Mr. Cullors was in the custody of Los Angeles County at Men's Central Jail. He has several physical and mental health conditions including hypertension; heart problems; spinal damage requiring use of a wheelchair, cane, and leg brace; schizophrenia; bipolar disorder; and manic depression. He is awaiting trial and is presumptively innocent.

11.     Petitioner/Plaintiff DeNeal Young is a forty-nine-year-old man who currently resides in Los Angeles County, California. At all times relevant to this Complaint, Mr. Young was in the custody of Los Angeles County at Men's Central Jail. He has several health conditions, including blood clots in his legs, which have caused him to lose the ability to walk and confined him to a wheelchair. These blood clots also put him at risk of heart attack, pulmonary embolism, and stroke. He is awaiting a resentencing hearing.

12.     Plaintiff Jessica Haviland is a thirty-nine-year-old woman who currently resides in Los Angeles County, California. At all times relevant to this Complaint, Ms. Haviland was in the custody of Los Angeles County at Century Regional Detention Facility. Ms. Haviland has been exhibiting symptoms commonly associated with COVID-19 but has not been tested for COVID-19. She is awaiting trial and is presumptively innocent.

13.     Plaintiff Rany Uong is a thirty-seven-year-old woman who currently resides in Los Angeles County, California. At all times relevant to this Complaint, Ms. Uong was in the custody of Los Angeles County at Century Regional Detention Facility. She is

serving a sentence.

14.     Petitioner/Plaintiff Mark Avila is a thirty-three-year-old man who currently resides in Los Angeles County, California. At all times relevant to this Complaint, Mr. Avila was in the custody of Los Angeles County at Men's Central Jail. He has severe chronic asthma, diabetes, liver disease, and a blood disorder. He is awaiting trial and is presumptively innocent.

15.     Petitioner/Plaintiff Carole Dunham is a thirty-year-old woman who currently resides in Los Angeles County, California. At all times relevant to this Complaint, Ms. Dunham was in the custody of Los Angeles County at Century Regional Detention Facility. She has Type I diabetes. She is serving a sentence.

16.     Plaintiff LeAndrew Lewis is a twenty-eight-year-old man who currently resides in Los Angeles County, California. At all times relevant to this Complaint, Mr. Lewis was in the custody of Los Angeles County at North County Correctional Facility. He has diabetes, high blood pressure, and has suffered recurrent bouts of bronchitis. He is awaiting trial and is presumptively innocent.

17.     Petitioner/Plaintiff Victor Gutierrez is a twenty-two-year-old man who currently resides in Los Angeles County, California. At all times relevant to this Complaint, Mr. Gutierrez was in the custody of Los Angeles County at Twin Towers Correctional Facility. He has asthma, sclerosis, inflamed spinal discs, a caloric deficiency, and is pre-diabetic. He is awaiting trial and is presumptively innocent.

18.     Plaintiff Jeremiah Farmer is a nineteen-year-old man who currently resides in Los Angeles County, California. At all times relevant to this Complaint, Mr. Farmer was in the custody of Los Angeles County at North County Correctional Facility. He is serving a sentence. He is also awaiting trial on other charges and is presumptively innocent of those charges.

19.     Petitioner/Plaintiff Dignity and Power Now is a 501(c)(3) non-profit organization based in South Central Los Angeles that advocates for the dignity and power of all incarcerated people, their families, and communities. Dignity and Power Now

1   provides healing and wellness support for all families affected by incarceration through

2   organizing and advocating for policies that improve the lives of affected communities in

3   Los Angeles County and beyond. Dignity and Power Now works to address the short and

4   long term needs and concerns that their community members face inside and outside of

5   jail. Dignity and Power Now has standing on behalf of its members, whose rights have

6   been violated by Defendants' conduct. Dignity and Power Now has organizational

7   standing because it diverted and expended its resources to advocate for the

8   implementation of protective measures for prisoners in Los Angeles County jails during

9   the COVID-19 pandemic and to seek the release of medically vulnerable prisoners,

10  including devoting significant staff time to the issue. The mission of Dignity and Power

11  Now is also frustrated by the acts of Defendants.

12          20.     Petitioner/Plaintiff Youth Justice Coalition is a 501(c)(3) non-profit

13  organization based in Los Angeles that works to build a youth, family and prisoner-led

14  movement to challenge race, gender and class inequality in California's detention systems

15  through organizing, advocacy, political education and transformative justice. The Youth

16  Justice Coalition is a grass-roots abolition centered organization that is primarily

17  composed of incarcerated and formerly incarcerated people and that advocates for

18  decarceration. Youth Justice Coalition also provides family support and community

19  engagement through political education, court support (participatory defense), helping

20  youth and adults challenge their placement on the Cal Gang Data Base, know your rights

21  workshops, and free community legal clinics. Youth Justice Coalition has standing on

22  behalf of its members, whose rights have been violated by Defendants' conduct. Youth

23  Justice Coalition has organizational standing because it diverted and expended its

24  resources to advocate for the implementation of protective measures for prisoners in Los

25  Angeles County jails during the COVID-19 pandemic and to seek the release of medically

26  vulnerable prisoners, including devoting significant staff time to the issue. The mission of

27  Youth Justice Coalition is also frustrated by the acts of Defendants.

28          21.     Defendant Los Angeles County ("County") is a public entity organized and

CLASS ACTION PETITION FOR WRIT OF
HABEAS CORPUS-COMPLAINT FOR          -6-
INJUNCTIVE & DECLARATORY RELIEF

existing under the laws of the State of California. The LASD is, and at all times alleged herein, was an agency of the County of Los Angeles. Defendant County controls and operates the County's jails via is LASD and Sheriff Alex Villanueva. The County is responsible for the custody and care of all persons detained or incarcerated in the County's jails, and it currently has immediate custody over Petitioners/Plaintiffs (hereinafter "Plaintiffs") and other putative class members. Los Angeles County, through the LASD, maintains and operates the following detention and correctional facilities: Men's Central Jail ("MCJ"); Century Regional Detention Facility ("CRDF"); Twin Towers Correctional Facility ("TTCF") which includes the Inmate Reception Center ("IRC") and Correctional Treatment Center ("CTC"); and Pitchess Detention Center ("PDC"), which is comprised of four different facilities including the PDC-North, PDC-South, PDC-East, and North County Correctional Facility ("NCCF").

22.   Defendant Sheriff Alex Villanueva is the Sheriff of the Los Angeles County Sheriff's Department ("LASD") and is being sued in his official and individual capacities. As the Sheriff, Defendant Villanueva has immediate custody of Plaintiffs, and all people incarcerated in County facilities. Sheriff Villanueva is the highest ranking official and policymaker for the County, and is responsible for developing, administering, and enforcing County policies, including those that relate to health and safety. He is responsible for the promulgation of the policies and procedures of the LASD.

## THE GRAVE RISK OF HARM POSED BY THE COVID-19 PANDEMIC REQUIRES AN EMERGENCY RESPONSE

23.   For over a month, Los Angeles County has been in the throes of an unprecedented global health emergency.[5] On March 11, 2020, the World Health Organization declared the outbreak of COVID-19 a global pandemic.[6] Citing "deep[] concern[] both by the alarming levels of spread and severity, and by the alarming levels of

_____

[5] *See* World Health Organization, *Director-General Opening Remarks* (March 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (last accessed Apr. 13, 2020).
[6] *Id.*

inaction," it called for countries to take "urgent and aggressive action."[7]

24.     The number of people infected by COVID-19 is growing exponentially.[8] On January 1, 2020, the first confirmed COVID-19 case was diagnosed in the United States.[9] As of April 22, 2020, 828,441 people have been diagnosed with COVID-19 in the United States, with 46,379 deaths confirmed.[10] Nationally, CDC projections indicate that over 200 million individuals in the United States could be infected with COVID-19 over the course of the epidemic without effective public health intervention,[11] with the White House estimating as many as 240,000 deaths in the worst projections.[12]

25.     As of April 22, 2020, 37,369 people have tested positive for COVID-19 and 1,469 people have died in California.[13] As of April 23, 2020, 17,508 people have been

---

[7] *Id.*; *see also Coronavirus: COVID-19 Is Now Officially A Pandemic, WHO Says*, NPR (Mar. 11, 2020), https://www.npr.org/sections/goatsandsoda/2020/03/11/814474930/coronavirus-covid-19-is-now-officially-a-pandemic-who-says (last accessed Apr. 13, 2020).

[8] The death toll in Italy, which began experiencing this epidemic about a week earlier than the first diagnosed American case, saw a rise of 30% overnight in the 24 hours between March 5, 2020, and March 6, 2020 and a rise of 25% on March 15 alone—a day that killed 368 people in Italy. Crispian Balmer & Angelo Amante, *Italy coronavirus deaths near 200 after biggest daily jump*, REUTERS (Mar. 6, 2020), https://www.reuters.com/article/us-health-coronavirus-italy/italy-coronavirus-deaths-near-200-after-biggest-daily-jump-idUSKBN20T2ML (last accessed Apr. 13, 2020).

[9] Derrick Bryson Taylor, *A Timeline of the Coronavirus*, N.Y. TIMES (Mar. 2020), https://www.nytimes.com/article/coronavirus-timeline.html (last accessed Mar. 24, 2020).

[10] Centers for Disease Control and Prevention, *Coronavirus 2019*, https://www.cdc.gov/coronavirus/2019-ncov/cases-in-us.html (last accessed Apr. 23, 2020).

[11] James Glanz, et al., *Coronavirus Could Overwhelm U.S. without Urgent Action, Estimates Say*, N.Y. TIMES (Mar. 20, 2020), *available at* https://www.nytimes.com/interactive/2020/03/20/us/coronavirus-model-us-outbreak.html (last accessed Apr. 13, 2020).

[12] Rick Noack, et al., *White House Task Force Projects 100,000 to 240,000 Deaths in U.S., Even with Mitigation Efforts*, WASH. POST. (April 1, 2020, 12:02 a.m.), https://cutt.ly/5tYT7uo (last accessed Apr. 19, 2020).

[13] California Department of Public Health, *COVID-19 Updates* (last updated Apr. 23, 2020),

---

diagnosed with COVID-19 in Los Angeles County, with 797 deaths confirmed.[14]

26.    COVID-19 is highly contagious. The virus is thought to spread through respiratory droplets or by touching a surface or object that has the virus on it.[15] COVID-19 is thought to survive for three hours in the air in droplet form, up to twenty-four hours on cardboard, up to two days on plastic, and up to three days on steel.[16]

27.    Infected people—who may be asymptomatic and not even know they are infected—can spread the disease even through indirect contact with others.[17] Given that many people are asymptomatic transmitters and very few people have been tested,[18] the number of people diagnosed with COVID-19 reflects only a small portion of those

/ / /

---

https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Immunization/ncov2019.aspx (last accessed Apr. 23, 2020).

[14] Los Angeles County Department of Public Health, *Novel Coronavirus in Los Angeles County* (Apr. 23, 2020), http://publichealth.lacounty.gov/media/Coronavirus/ (last accessed Apr. 23, 2020).

[15] Centers for Disease Control and Prevention, *Coronavirus Factsheet* (Mar. 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf (last accessed Apr. 13, 2020).

[16] Neeltje van Doremalen et al., *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, NEW ENGLAND J. MEDICINE (Mar. 17, 2020), https://www.nejm.org/doi/full/10.1056/NEJMc2004973 (last accessed Apr. 13, 2020).

[17] *See, e.g.,* Allison Aubrey, *The New Coronavirus Can Live On Surfaces For 2-3 Days — Here's How To Clean Them*, NPR, (Mar. 14, 2020), https://www.npr.org/sections/health-shots/2020/03/14/811609026/the-new-coronavirus-can-live-on-surfaces-for-2-3-days-heres-how-to-clean-them (last accessed Apr. 13, 2020); Cai J, Sun W, Huang J, Gamber M, Wu J, He G. *Indirect virus transmission in cluster of COVID-19 cases, Wenzhou, China, 2020*. 26 EMERG INFECT DIS. 6, (2020), https://doi.org/10.3201/eid2606.200412 (last accessed Mar. 20, 2020).

[18] Roni Caryn Rabin, *They Were Infected with the Coronavirus. They Never Showed Signs*, N.Y. Times (Feb. 26, 2020, updated Mar. 6, 2020), https://www.nytimes.com/2020/02/26/health/coronavirus-asymptomatic.html (last accessed Apr. 13, 2020); Aria Bendix, *A Person Can Carry And Transmit COVID-19 Without Showing Symptoms, Scientists Confirm*, SCIENCE ALERT (Feb. 24, 2020), https://www.sciencealert.com/researchers-confirmed-patients-can-transmit-the-coronavirus-without-showing-symptoms (last accessed Apr. 13, 2020).

infected.[19]

28.     Everyone is at risk of contracting COVID-19, but certain populations are at higher risk for severe illness from COVID-19. People of any age with lung disease or other conditions like asthma, chronic liver or kidney disease, serious heart conditions, diabetes, compromised immune systems, severe obesity, epilepsy, hypertension, blood disorders, inherited metabolic disorders, history of stroke, developmental disabilities, and pregnancy face increased risk of serious COVID-19 disease.[20] Older individuals also face greater chances of serious illness or death from COVID-19.[21]

29.     The experiences of those infected with COVID-19 are "a lot more frightening" than the flu.[22]  The sensation of acute respiratory distress syndrome has been compared to "essentially drowning in [one's] own blood."[23] Even relatively young people with minimal health history can be "wiped out" by the virus, "like they've been hit by a truck," and people who are infected by the virus can "all of a sudden" go into complete respiratory failure.[24]

---

[19] Melissa Healy, *True Number of US Coronavirus Cases is Far Above Official Tally, Scientists Say*, L.A. TIMES (Mar. 10, 2020), https://www.msn.com/en-us/health/medical/true-number-of-us-coronavirus-cases-is-far-above-official-tally-scientists-say/ar-BB110qoA (last accessed Apr. 13, 2020).

[20] Centers for Disease Control and Prevention, *People Who Need To Take Extra Precautions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html (last accessed Apr. 14, 2020); Xianxian Zhao, et al., *Incidence, clinical characteristics and prognostic factor of patients with COVID-19: a systematic review and meta-analysis* (Mar. 20, 2020), https://www.medrxiv.org/content/10.1101/2020.03.17.20037572v1 (last accessed Apr. 23, 2020).

[21] Centers for Disease Control and Prevention, *People Who Need To Take Extra Precautions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html (last accessed Apr. 14, 2020).

[22] Lizzie Presser, *A Medical Worker Describes Terrifying Lung Failure From COVID-19 — Even in His Young Patients*, Propublica (Mar. 21, 2020), https://www.propublica.org/article/a-medical-worker-describes--terrifying-lung-failure-from-covid19-even-in-his-young-patients (last accessed Apr. 13, 2020).

[23] *Id.*

[24] *Id.*

---

30.     Patients who do not die from serious cases of COVID-19 may require hospitalization for supportive treatment with intravenous fluids and supplemental oxygen, or more serious care such as ventilation and intravenous antibiotics.

31.     The current estimated incubation period is between 2 and 14 days.[25] Approximately 20% of people infected require hospitalization, and of those infected, between 1% and 3.4% die.[26] According to recent estimates, the fatality of people infected with COVID-19 is about ten times higher than a severe seasonal influenza, even in advanced countries with highly effective health care systems.[27]

32.     There is neither a vaccine nor any known medication to prevent or cure infection from the virus.[28] A vaccine is likely at least 12 months away.[29]

33.     In the absence of a vaccine or treatment, officials and experts urge "social distancing"—isolating oneself from other people as much as possible, and keeping at least a six foot distance between oneself and other people at all times.[30] For this reason,

---

[25] *Coronavirus Disease COVID-19 Symptoms*, Centers for Disease Control and Prevention (updated: Mar. 20 2020), https://www.cdc.gov/coronavirus/2019-ncov/about/symptoms.html (last accessed Apr. 13, 2020).

[26] *Why COVID-19 is worse than the flu, in one chart*, Vox (Mar. 18, 2020), https://www.vox.com/science-and-health/2020/3/18/21184992/coronavirus-covid-19-flu-comparison-chart (last accessed Apr. 13, 2020); World Health Organization, *Q&A on Coronaviruses (COVID-19)*, *"Should I Worry About COVID-19?,"* https://cutt.ly/YtEyrxl (last accessed Apr. 19, 2020).

[27] Betsy McKay, *Coronavirus vs. Flu Which Virus is Deadlier*, WALL ST. J. (Mar. 10, 2020), https://www.wsj.com/articles/coronavirus-vs-flu-which-virus-is-deadlier-11583856879 (last accessed Apr. 13, 2020).

[28] World Health Organization, *Coronavirus*, https://cutt.ly/ztWyf7e (last accessed Apr. 19, 2020) ("At this time, there are no specific vaccines or treatments for COVID-19.").

[29] Saralyn Cruickshank, *Experts Discuss COVID-19 and Ways to Prevent Spread of Disease*, John Hopkins Mag. (Mar. 17, 2020), https://hub.jhu.edu/2020/03/17/coronavirus-virology-vaccine-social-distancing-update (last accessed Apr. 13, 2020).

[30] *The President's Coronavirus Guidelines for America*, Whitehouse.gov (Mar. 16, 2020), https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf (last accessed Apr. 13, 2020); *see also* Saralyn

---

governors and mayors across the country are ordering entire cities and states to "shelter in place" and "stay at home."[31] Other federally recommended precautions include frequent hand-washing, use of alcohol-based hand sanitizers, frequent cleaning and disinfecting of any surfaces touched by any person, and use of PPE such as masks.[32]

34.     California Governor Gavin Newsom declared a state of emergency on March 4, 2020 due to the presence of COVID-19 in California.[33] On March 19, 2020, Governor Newsom issued a statewide "Safer at Home Order," requiring all Californians to stay at home unless performing essential activities.[34]

35.     On March 4, 2020, the Los Angeles County Board of Supervisors and the

---

Cruickshank, *Experts Discuss COVID-19 and Ways to Prevent Spread of Disease*, JOHN HOPKINS MAG. (Mar. 17, 2020), https://hub.jhu.edu/2020/03/17/coronavirus-virology-vaccine-social-distancing-update (last accessed Apr. 13, 2020).

[31] The governors of California, Colorado, Connecticut, Delaware, Hawaii, Idaho, Illinois, Indiana, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Montana, New Hampshire, New Jersey, New Mexico, New York, Ohio, Oklahoma, Oregon, Vermont, Washington, West Virginia, and Wisconsin, as well as local officials of numerous counties in Florida, Georgia, Kansas, Missouri, North Carolina, Pennsylvania, Tennessee, and Texas, have all ordered residents to "shelter in place" or stay at home. *See Which States and Cities Have Told Residents to Stay at Home*, N.Y. TIMES (Mar. 27, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-stay-at-home-order.html (last accessed Apr. 13, 2020).

[32] Centers for Disease Control and Prevention, *Steps to Prevent Illness*, https://www.cdc.gov/coronavirus/2019-ncov/about/prevention.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fabout%2Fprevention-treatment.html (last accessed Apr. 13, 2020); *see also* Saralyn Cruickshank, *Experts Discuss COVID-19 and Ways to Prevent Spread of Disease*, JOHN HOPKINS MAG. (Mar. 17, 2020), https://hub.jhu.edu/2020/03/17/coronavirus-virology-vaccine-social-distancing-update (last accessed Apr. 13, 2020).

[33] Office of Governor Gavin Newsom, *Governor Newsom Declares State of Emergency to Help State Prepare for Broader Spread of COVID-19* (Mar. 4, 2020), https://www.gov.ca.gov/2020/03/04/governor-newsom-declares-state-of-emergency-to-help-state-prepare-for-broader-spread-of-covid-19/ (last accessed Apr. 10, 2020).

[34] Office of Governor Gavin Newsom, *Governor Gavin Newsom Issues Stay at Home Order* (Mar. 19, 2020), https://www.gov.ca.gov/2020/03/19/governor-gavin-newsom-issues-stay-at-home-order/ (last accessed Apr. 9, 2020).

Department of Public Health declared a local and public health emergency to respond to the threat posed by COVID-19, which remains in effect.[35] The Los Angeles County Health Officer also issued an order mirroring the Governor's March 19 "Safer at Home Order."[36] On April 10, 2020, the Los Angeles County Health Officer issued an enhanced order requiring people outdoors to wear face coverings when out in public.[37]

## INCARCERATED PEOPLE AND CORRECTIONAL STAFF ARE AT HEIGHTENED RISK DURING THE COVID-19 PANDEMIC

36.     Substantial epidemiological research "shows that mass incarceration raises contagion rates for infectious disease—both for people in jails, and for the community at large."[38] During pandemics, jail facilities become "ticking time bombs" as "[m]any people crowded together, often suffering from diseases that weaken their immune systems, form a potential breeding ground and reservoir for diseases."[39]

37.     Although the California Department of Public Health issued a Guidance

---

[35] Los Angeles County Department of Public Health, *County of Los Angeles Declares Local Health Emergency in Response to New Novel Coronavirus Activity* (Mar. 4, 2020), http://www.publichealth.lacounty.gov/phcommon/public/media/mediapubhpdetail.cfm?prid=2248 (last accessed Apr. 10, 2020).

[36] Los Angeles County Department of Public Health, *Safer at Home Order for the Control of Covid-19* (Mar. 21, 2020), http://publichealth.lacounty.gov/media/coronavirus/COVID-19_March%2021-HOOrder-7_00_FINAL2.pdf (last accessed Apr. 10, 2020).

[37] Los Angeles County Department of Public Health, *Los Angeles County Announces 18 New Deaths Related to 2019 Novel Coronavirus (COVID-19) - 475 New Cases of Confirmed COVID-19 in Los Angeles County* (Apr. 10, 2020), http://publichealth.lacounty.gov/phcommon/public/media/mediapubdetail.cfm?unit=media&ou=ph&prog=media&cur=cur&prid=2309&row=25&start=1 (last accessed Apr. 22, 2020).

[38] Sandhya Kajeepeta & Seth J. Prins, *Why Coronavirus in Jails Should Concern All of Us*, THE APPEAL (Mar. 24, 2020), https://theappeal.org/coronavirus-jails-public-health/ (last accessed Apr. 13, 2020).

[39] *See* St. Louis Univ., "Ticking Time Bomb," *Prisons Unprepared For Flu Pandemic*, SCIENCEDAILY (2006), https://www.sciencedaily.com/releases/2006/09/060915012301.htm (last accessed Apr. 13, 2020).

About Novel Coronavirus (COVID-19) for California Prisons recommending the provision of sanitization supplies for prisoners to clean their cells and masks to symptomatic prisoners, increased cleaning of common spaces, and social distancing of six feet; these measures have not prevented the virus from spreading in California prisons.[40] As of April 23, 2020, 149 prisoners[41] and at least 105 staff[42] in the California Department of Corrections and Rehabilitation ("CDCR") facilities tested positive. News media reported that in April in the California prison system, over the course of just over a week, the number of prisoners testing positive for COVID-19 grew by 700% and the number of staff testing positive nearly tripled.[43]

38. The risk of exposure to and transmission of infectious diseases, as well as the potential harm to those become infected, is significantly higher in jails than in the community, putting prisoners and correctional staff at high risk of contracting COVID-19. This is due to a number of factors, including: close living quarters; often overcrowded conditions in jails; that large numbers of people are closely confined and forced to share sleeping areas, bathrooms, cafeterias, and other enclosed spaces; prisoners' inability to practice social distancing; food preparation is centralized and communal; ventilation systems that encourage the spread of airborne diseases; movement of prisoners within facilities and outside of facilities to court; that jail medical facilities are rarely equipped to

---

[40] California Department of Public Health, *Guidance about Novel Coronavirus (COVID-19) for California Prisons* (Mar. 24, 2020), https://www.cdcr.ca.gov/covid19/wp-content/uploads/sites/197/2020/03/R_CDPH-COVID-19-Guidance-for-Prisons-3.30.20.pdf (last accessed Apr. 10, 2020).

[41] California Department of Corrections and Rehabilitations, *Population COVID-19 Tracking*, https://www.cdcr.ca.gov/covid19/population-status-tracking/ (last accessed Apr. 23, 2020).

[42] California Department of Corrections and Rehabilitation, *CDCR/CCHCS COVID-19 Employee Status*, https://www.cdcr.ca.gov/covid19/cdcr-cchcs-covid-19-status/ (last accessed Apr. 23, 2020).

[43] Holly Yan, *Prisons and Jails Across the US are Turning into 'Petri Dishes' for Coronavirus. Deputies are falling ill, too*, CNN (Apr. 10, 2020), https://www.cnn.com/2020/04/09/us/coronavirus-jails-prisons/index.html (last accessed Apr. 12, 2020).

handle an outbreak of an infectious disease and must rely on outside medical facilities to provide intensive medical care; if jail staff become sick they do not come to work, resulting in understaffing and compromised medical treatment; the enhanced susceptibility of the jail population to chronic health conditions; and difficulties in quarantining individuals who become ill.

39.     Correctional settings further increase the risks from COVID-19 for those who are vulnerable to the disease due to the concentration of persons with chronic, often untreated, illnesses in a setting with minimal levels of sanitation, limited access to personal hygiene, limited access to medical care, the presence of many high contact surfaces, and no possibility to stay at a safe distance from others.

40.     Additional reasons for the increased risk of transmission and infection include the constant cycling of people in and out of the jail (including correctional staff)[44] and inadequate medical care within the jail itself.

41.     Jail screening procedures alone cannot stop the virus from entering and spreading among the jails. COVID-19 poses a particular threat to public health because a person can be asymptomatic yet spread the disease to others. Most people do not show symptoms for two to 14 days even while being contagious. Others never exhibit any symptoms at all. Thus, while screening for fevers and other symptoms associated with COVID-19 may stop some infected people from entering general population housing units or otherwise having close contact with prisoners and jail staff, it cannot catch many of those actively spreading the virus. The drastic social distancing measures that have been imposed across the country are designed to combat exactly this problem. By staying at home, we are able to limit our contact with other persons, even the asymptomatic. But every day hundreds of jail employees, working on multiple different shifts, travel into and out of the jails. Any one of those employees can be asymptomatically carrying and

---

[44] *See* Peter Wagner & Emily Widra, *No need to wait for pandemics: The public health case for criminal justice reform*, Prison Policy Initiative (Mar. 6, 2020), https://www.prisonpolicy.org/blog/2020/03/06/pandemic (last accessed Apr. 13, 2020).

1    transmitting COVID-19. The only way to stop the expansive spread of the disease is

2    through a comprehensive approach.

3        42.    The guidance from the CDC for correctional and detention facilities,

4    including local jails, was published on March 23, 2020.[45] The guidance acknowledges that

5    incarcerated people are forced to exist "within congregate environments" that "heighten[]

6    the potential for COVID-19 to spread once introduced," especially given that "[t]here are

7    many opportunities for COVID-19 to be introduced into a correctional or detention

8    facility," including "daily staff ingress and egress" as well as "high turnover" of

9    "admit[ted] new entrants."[46] In light of these concerns, the guidance recommends, among

10   other steps, that each correctional facility:

11          a.    Post signage throughout the facility communicating COVID-19

12                symptoms and hand hygiene instructions, ensure such signage is

13                understandable for non-English speaking people as well as those with

14                low literacy, and provide clear information about the presence of

15                COVID-19 cases within a facility and the need to increase social

16                distancing and maintain hygiene precautions;

17          b.    Ensure sufficient stocks of hygiene and cleaning supplies, including

18                tissues, liquid soap where possible, hand drying supplies, alcohol-

19                based hand sanitizer, cleaning supplies effective against the

20                coronavirus, and recommended personal protective equipment ("PPE")

21                like face masks, disposable medical gloves, and N95 respirators;

22          c.    Provide a no-cost supply of soap sufficient to allow frequent hand

23                washing, providing liquid soap where possible;

24          d.    Provide incarcerated people running water, hand drying machines or

25   _____

26   [45] Centers for Disease Control and Prevention, *Interim Guidance on Management of
     Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities,* (Mar.

27   23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-
     detention/guidance-correctional-detention.html (last accessed Apr. 12, 2020).

28   [46] *Id.*

CLASS ACTION PETITION FOR WRIT OF
HABEAS CORPUS-COMPLAINT FOR                    -16-
INJUNCTIVE & DECLARATORY RELIEF

disposable paper towels for hand washing, tissues, and no-touch trash receptacles for disposal;

e.  Consider relaxing restrictions on allowing alcohol-based hand sanitizer where security concerns allow;

f.  Suspend co-pays for incarcerated people seeking medical evaluation for respiratory symptoms;

g.  Even if COVID-19 cases have not been identified locally or inside, implement "intensified cleaning and disinfecting procedures" that clean and disinfect high-touch surfaces and objects "[s]everal times per day," and ensure adequate supplies to support intensified cleaning and disinfection practices";

h.  Perform pre-intake screening and temperature checks for all new entrants;

i.  If an individual has symptoms of COVID-19 (fever, cough, shortness of breath), require the individual to wear a face mask and place them under medical isolation;

j.  Implement social distancing strategies to increase the physical space between incarcerated people, ideally a distance of six feet "regardless of the presence of symptoms"; and

k.  Implement daily temperature checks in housing units where COVID-19 cases have been identified.

43.  Correctional officials around the country agree that particular care must be taken to stop the spread of COVID-19 within the nation's jails. For example, Leann Bertsch, the Director of the North Dakota Department of Corrections and Rehabilitation, concluded that "ignoring the health of those living and working inside the walls of our nation's correctional facilities poses a grave threat to us all" and that "putting public health first is the best, and only, way to effectively achieve [a department of correction's]

/ / /

public safety mission during the COVID-19 pandemic."[47]

44.     The global path of the virus confirms that jails and prisons are epicenters for transmission. Approximately one month into the pandemic in the province of Hubei, China, over half of reported COVID-19 cases were from jails.[48] In South Korea, which has had tremendous success in slowing and stopping the spread of the virus, "the single largest COVID-19 outbreak and mortality cluster was from the Daenam Prison Hospital, where 101 prisoners were infected and seven died."[49]

45.     COVID-19 has already started to spread inside other prisons, jails, and detention centers in the United States. Experts predict that a mass contagion is only a matter of time and that "[a]ll prisons and jails should anticipate that the coronavirus will enter their facility."[50]

46.     Once the virus enters a jail or prison, infection rates are much higher than in the broader community. In New York City, for example, the COVID-19 infection rate in the city's jails is about eight times higher than the rest of the city, which already sits at one

/ / /

---

[47] Brie Williams and Leanne Bertsch, *A public health doctor and head of corrections agree: we must immediately release people from jails and prisons*, THE APPEAL (Mar. 27, 2020), https://theappeal.org/a-public-health-doctor-and-head-of-corrections-agree-we-must-immediately-release-people-from-jails-and-prisons/ (last accessed Apr. 13, 2020).

[48] Zi Yang, *Cracks in the System: COVID-19 in Chinese Prisons*, DIPLOMAT (Mar. 9, 2020), https://thediplomat.com/2020/03/cracks-in-the-system-covid-19-in-chinese-prisons/ (last accessed Apr. 13, 2020).

[49] Nancy Gertner and John Reinstein, *Compassionate Release Now for Prisoners Vulnerable to the Coronavirus*, BOSTON GLOBE (Mar. 23, 2020), https://www.bostonglobe.com/2020/03/23/opinion/compassionate-release-now-prisoners-vulnerable-coronavirus/ (last accessed Apr. 13, 2020).

[50] Evelyn Cheng and Huileng Tan, *China Says More than 500 Cases of the New Coronavirus Stemmed from Prisons*, CNBC, (Feb. 20, 2020), *available at* https://www.cnbc.com/2020/02/21/coronavirus-china-says-two-prisons-reported-nearly-250-cases.html (quoting Tyler Winkelman, co-director of the Health, Homelessness, and Criminal Justice Lab at the Hennepin Healthcare Research Institute in Minneapolis) (last accessed Apr. 13, 2020).

of the highest rates in the world.[51] The first case of COVID-19 on Rikers Island, New York City's largest jail complex, was confirmed on March 18, 2020.[52] By Thursday, April 2, 2020, 231 people incarcerated at Rikers as well as 223 jail staff had tested positive;[53] two jail officers have died; and more than 800 incarcerated people were held in isolation or quarantine.[54] Rikers saw its first prisoner death on April 5, 2020.[55]

47.     Recent reports indicate that the Cook County jail in Chicago is currently one of the largest known source of U.S. infections, even though Chicago has otherwise been effective at flattening the curve.[56] As of April 8, 2020, the Cook County Jail was reported to be the single largest-known source of COVID-19 infections in the country, with over 238 prisoners and 115 staff members having tested positive.[57] The next day, a federal

---

[51] These numbers likely underestimate the infection rate on Rikers Island, as they do not include the number of people contracted COVID-19 on Rikers Island but who have already been released. The rates of infection rely on publicly released data collected by the Legal Aid Society. The Legal Aid Society NYC, *COVID-19 Infection Tracking in NYC Jails*, https://www.legalaidnyc.org/covid-19-infection-tracking-in-nyc-jails/ (last accessed Apr. 13, 2020).

[52] *21 Inmates, 17 Employees Test Positive for COVID-19 on Rikers Island: Officials*, NBC New York (last updated: Mar. 22, 2020), https://www.nbcnewyork.com/news/coronavirus/21-inmates-17-employees-test-positive-for-covid-19-on-rikers-island-officials/2338242/ (last accessed Apr. 13, 2020).

[53] Julia Craven, *Coronavirus Cases Are Spreading Rapidly on Rikers Island*, SLATE (Apr. 2, 2020) https://slate.com/news-and-politics/2020/04/rikers-coronavirus-cases-increase.html (last accessed Apr. 13, 2020).

[54] Jay Ransom and Alan Feuer, *'We're Left for Dead': Fears of Virus Catastrophe at Rikers Jail*, N.Y. TIMES (last updated: Mar. 31, 2020), https://www.nytimes.com/2020/03/30/nyregion/coronavirus-rikers-nyc-jail.html.

[55] Josiah Bates, N*ew York's Rikers Island Jail Sees First Inmate Death from COVID-19*, TIME (Apr. 6, 2020), https://time.com/5816332/rikers-island-inmate-dies-coronavirus/ (last accessed Apr. 12, 2020).

[56] Cate Cauguiran, *Coronavirus Chicago: COVID-19 data shows city is 'flattening the curve,' Mayor Lori Lightfoot says*, ABC7 (Apr. 15, 2020), https://abc7chicago.com/health/covid-19-data-shows-city-is-flattening-the-curve-officials-say/6105532/ (last accessed Apr. 22, 2020).

[57] Timothy Williams and Danielle Ivory, *Chicago's Jail Is Top U.S. Hot Spot as Virus Spreads Behind Bars*, N.Y. TIMES (last updated: Apr. 8, 2020),

---

judge observed that the jail had a confirmed infection rate of 50 per 1,000 people,

dwarfing Cook County's overall rate of 1.56 confirmed infections per 1,000 people. Three

people who tested positive while incarcerated in the jail have died.[58] That number may be

growing, and it likely does not include people who were infected in the jail and died after

their bail was paid. As of April 13, over 500 detainees and staff have tested positive.[59]

48.     For these reasons, medical and public health experts have urged emergency

action to fight the spread of COVID-19 in jails and other carceral facilities, including

decarceration, improved access to medical care, and compliance with CDC guidelines.[60]

49.     Correctional facilities largely lack the medical care infrastructure that would

be necessary to deal with a COVID-19 outbreak. Jails often rely on outside medical

facilities to provide intensive medical care. However, during an epidemic these outside

facilities may themselves be over capacity. Model estimates predict that, if current

infection and incarceration trends hold, two-fifths of California's hospital beds may be

required by prisoners in mid-May.[61] Reducing the size of the jail's population is critically

---

[58] https://www.nytimes.com/2020/04/08/us/coronavirus-cook-county-jail-chicago.html (last accessed Apr. 19, 2020).

[58] Cook County Sheriff's Office, *COVID-19 Cases at CCDOC*, https://www.cookcountysheriff.org/covid-19-cases-at-ccdoc/ (last accessed Apr. 19, 2020).

[59] Cheryl Corley, *The COVID-19 Struggle In Chicago's Cook County Jail  Facebook  Twitter  Flipboard  Email*, NPR NEWS (last updated: Apr. 13, 2020), https://www.npr.org/2020/04/13/833440047/the-covid-19-struggle-in-chicagos-cook-county-jail (last accessed Apr. 19, 2020).

[60] *See, e.g.*, Brad Lander, *Doctors in NYC Hospitals, Jails, and Shelters Call on the City to Take More Aggressive Action to Combat the Spread of Coronavirus*, MEDIUM (Mar. 12, 2020), https://medium.com/@bradlander/doctors-in-nyc-hospitals-jails-and-shelters-call-on-the-city-to-take-more-aggressive-action-to-fb75f0b131c2 (last accessed Apr. 13, 2020); *Letter from Johns Hopkins faculty to Governor Hogan* (Mar. 25, 2020), https://bioethics.jhu.edu/wp-content/uploads/2019/10/Johns-Hopkins-faculty-letter-on-COVID-19-jails-and-prisons.pdf (last accessed Apr. 13, 2020).

[61] Oliver Hinds, *Emptying Prisons to Prevent the Spread of Coronavirus Will Save Lives on the Outside, Too*, THE APPEAL (last updated: Apr. 15, 2020), https://theappeal.org/coronavirus-jails-prisons-model-hospital-beds/ (last accessed Apr. 19, 2020).

---

1   important to reduce the risk of transmission of the disease.

2       50.    Numerous public health experts, including Dr. Gregg Gonsalves,[62] Ross

3   MacDonald,[63] Dr. Marc Stern,[64] Dr. Oluwadamilola T. Oladeru and Adam Beckman,[65] Dr.

4   Anne Spaulding,[66] Homer Venters,[67] and Josiah Rich[68] have all strongly cautioned that

5   people booked into and held in jails are likely to face serious, even grave, harm due to the

6   outbreak of COVID-19.

7       51.    The only viable strategy to combat the spread of COVID-19 and prevent

8   serious harm or death to class members is risk mitigation. Even with the most

9   comprehensive plan to address the spread of COVID-19 in correctional facilities, the

10  release of individuals who can be considered at high risk from the virus is a key part of a

11  risk mitigation strategy. Immediate release of medically vulnerable persons not only

12  protects them from transmission of COVID-19, but also allows for greater risk mitigation

---

[62] Kelan Lyons, *Elderly Prison Population Vulnerable to Potential Coronavirus Outbreak,* CONNECTICUT MIRROR (Mar. 11, 2020), https://cutt.ly/BtRSxCF (last accessed Apr. 13, 2020).

[63] Craig McCarthy and Natalie Musumeci, *Top Rikers Doctor: Coronavirus 'Storm is Coming,'* NEW YORK POST (Mar. 19, 2020), https://nypost.com/2020/03/19/top-rikers-doctor-coronavirus-storm-is-coming/ (last accessed Apr. 13, 2020).

[64] Marc F. Stern, MD, MPH, *Washington State Jails Coronavirus Management Suggestions in 3 "Buckets,"* Washington Assoc. of Sheriffs & Police Chiefs (March 5, 2020), https://www.themarshallproject.org/documents/6796536-Suggestions-for-Jails-3-5-20 (last accessed Apr. 13, 2020).

[65] Oluwadamilola T. Oladeru, et al., *What COVID-19 Means for America's Incarcerated Population – and How to Ensure It's Not Left Behind*, (Mar. 10, 2020), https://cutt.ly/QtRSYNA (last accessed Apr. 13, 2020).

[66] Anne C. Spaulding, MD MPDH, *Coronavirus COVID-19 and the Correctional Jail,* Emory Center for the Health of Incarcerated Persons (Mar. 9, 2020), http://www.chip.sph.emory.edu/documents/For%20Correctional%20Facility%20Leadership_2020.pdf (last accessed Apr. 14, 2020).

[67] Madison Pauly, *To Arrest the Spread of Coronavirus, Arrest Fewer People*, MOTHER JONES (Mar. 12, 2020), https://cutt.ly/jtRSPnk (last accessed Apr. 13, 2020).

[68] Amanda Holpuch, *Calls Mount to Free Low-risk US Inmates to Curb Coronavirus Impact on Prisons*, THE GUARDIAN (Mar. 13, 2020), https://cutt.ly/itRSDNH (last accessed Apr. 13, 2020).

---

CLASS ACTION PETITION FOR WRIT OF
HABEAS CORPUS-COMPLAINT FOR                -21-
INJUNCTIVE & DECLARATORY RELIEF

for people held or working in the jail and the broader community. Furthermore, it is the only viable mechanism by which to protect medically vulnerable prisoners from COVID-19.

52.     Release of the most vulnerable persons from custody also reduces the burden on the regional health care system by reducing the likelihood that there will be an influx of prisoners who become seriously ill from COVID-19 at the same time.

53.     Jail and prison administrators and public officials around the country have likewise concluded that widespread jail release is a necessary and appropriate public health intervention: New York;[69] New Jersey;[70] Washington;[71] Cuyahoga County, Ohio,[72] among others. Several Sheriffs from across the country have also come together to issue a joint statement committing to reduce jail populations, including by releasing those within six months of completion of their sentence, and following CDC guidelines to ensure safe and dignified conditions that will prevent the spread of COVID-19 among prisoners, among other measures.[73]

---

[69] Brendan Lyons, *NY to release 1,100 parole violators as coronavirus spreads*, TIMES UNION (Mar. 27, 2020), https://www.timesunion.com/news/article/Deaths-surge-again-in-New-York-from-coronavirus-15160973.php (last accessed Apr. 13, 2020).

[70] *1,000 Inmates Will Be Released From N.J. Jails to Curb Coronavirus Risk*, N.Y. TIMES (Mar. 23, 2020), https://www.nytimes.com/2020/03/23/nyregion/coronavirus-nj-inmates-release.html (last accessed Apr. 13, 2020).

[71] Jim Brunner and Mary Hudetz, *Washington Department of Corrections names 1,100+ inmates to be released in coming days due to coronavirus concerns*, SEATTLE TIMES (Apr. 16, 2020), https://www.seattletimes.com/seattle-news/crime/washington-department-of-corrections-lists-names-of-hundreds-of-inmates-to-be-released-in-coming-days-due-to-coronavirus-concerns/ (last accessed Apr. 19, 2020).

[72] Scott Noll, *Cuyahoga County Jail releases hundreds of low-level offenders to prepare for coronavirus pandemic*, NEWS 5 CLEVELAND (Mar. 20, 2020), https://www.news5cleveland.com/news/local-news/oh-cuyahoga/cuyahoga-county-jail-releases-hundreds-of-low-level-offenders-to-prepare-for-coronavirus-pandemic (last accessed Apr. 13, 2020).

[73] *Joint Statement from Elected County Sheriffs on COVID-19*, https://lawenforcementactionpartnership.org/national-sheriffs-covid-19/ (last accessed Apr. 12, 2020).

54.     Internationally, governments have also responded to the threat posed by COVID-19 by releasing people from incarceration. To take one of many examples, in Iran, more than 80,000 people were temporarily released from prison in the early stages of the pandemic to protect them and to protect the community from propagation of an outbreak.[74] In Ethiopia, more than 4,000 people were pardoned and released from incarceration to help prevent the spread of COVID-19.[75]

55.     States and other local jurisdictions have also made changes to existing carceral policies in response to the COVID-19 pandemic, including eliminating medical co-pays for incarcerated people and waiving fees for phone calls and video communication.[76] Others have required facilities to distribute and make available sanitation supplies and hand sanitizer to everyone who is incarcerated, arranged for the immediate evaluation and treatment of anyone with symptoms, and enacted screening procedures for everyone who enters the jail or prison.[77]

56.     Over the past few weeks, multiple courts have also acknowledged the severe and urgent threats posed by COVID-19 and have accordingly ordered the release of detained and incarcerated persons.[78] Immediate release of medically vulnerable Plaintiffs,

---

[74] Parisa Hafezi, *Iran Temporarily Frees 85,000 From Jail Including Political Prisoners*, REUTERS (Mar. 17, 2020), https://www.reuters.com/article/us-health-coronavirus-iran-prisoners/iran-temporarily-frees-85000-from-jail-including-political-prisoners-amid-coronavirus-idUSKBN21410M (last accessed Apr. 13, 2020).

[75] Bukola Adebayo, *Ethiopia pardons more than 4,000 prisoners to help prevent coronavirus spread*, CNN (Mar. 26, 2020), https://www.cnn.com/2020/03/26/africa/ethiopia-pardons-4000-prisoners-over-coronavirus/index.html (last accessed Apr. 13, 2020).

[76] *Responses to the COVID-19 Pandemic*, PRISON POLICY INITIATIVE (Mar. 27, 2020), https://www.prisonpolicy.org/virus/virusresponse.html (last accessed Apr. 13, 2020).

[77] *See, e.g.*, *Preparedness and Response Plan 5-8*, Indiana Dep't of Correction (2020), https://www.in.gov/idoc/files/IDOC%20Pandemic%20Response%20Plan%203-3-2020.pdf#response%20plan (last accessed Apr. 13, 2020).

[78] *See, e.g.*, *Castillo et al. v. Barr*, 5:20-cv-00605, ECF Doc. 32 (C.D. Cal. Mar. 27, 2020) (ordering petitioners be released from immigration detention in light of COVID-19 and noting "the risk of infection in immigration detention facilities – and jails – is particularly high"); *USA v. Garlock.*, No. 18 Cr 00418, 2020 WL 1439980, at *1 (N.D.

---

as well as the subclasses of medically vulnerable people they represent, is an urgently-needed public health intervention.

57.     Correctional medical and public health experts have urged the release of medically vulnerable people from incarceration given the heightened risk of transmission and infection. Dr. Jonathan Giftos, the former Medical Director for Correctional Health Services at Riker's Island, has urged "releasing as many people as possible with a focus on those at highest risk of complication."[79] A group of doctors who work in New York City's jails, hospitals and shelters,[80] as well as a group of more than 200 Johns Hopkins faculty in public health, bioethics, medicine, and nursing have also urged the release of medically vulnerable people from incarceration.[81]

---

Cal. Mar. 25, 2020) (ordering, sua sponte, extension of convicted defendant's surrender date and noting "[b]y now it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided"); *Xochihua-Jaimes v. Barr*, No. 18-71460 (9th Cir. Mar. 24, 2020) (ordering, sua sponte, that petitioner be immediately released from immigration detention "[i]n light of the rapidly escalating public health crisis" related to COVID-19 that "public health authorities predict will especially impact immigration detention centers"); *U.S. v. Stephens,* 15 Cr. 95 (AJN), 2020 WL 1295155 (S.D.N.Y. Mar. 19, 2020) (granting motion for reconsideration of defendant's bail conditions and releasing him from jail to home confinement, explaining that "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic has become apparent" and that "inmates may be at a heightened risk of contracting COVID-19 should an outbreak develop"); *In re. Extradition of Alejandro Toledo Manrique*, 2020 WL 1307109, (N.D. Cal. Mar. 19, 2020) (ordering release on bond despite government assertions that facility has preparedness plan in place and no cases have been confirmed).

[79] *Recipe for disaster: The spread of corona virus among detained populations*, MSNBC (Mar. 18, 2020), https://www.msnbc.com/all-in/watch/-recipe-for-disaster-the-spread-of-coronavirus-among-detained-populations-80947781758.

[80] Brad Lander, *Doctors in NYC Hospitals, Jails, and Shelters Call on the City to Take More Aggressive Action to Combat the Spread of Coronavirus*, MEDIUM (Mar. 12, 2020), https://medium.com/@bradlander/doctors-in-nyc-hospitals-jails-and-shelters-call-on-the-city-to-take-more-aggressive-action-to-fb75f0b131c2 (last accessed Apr. 13, 2020).

[81] *Letter from Johns Hopkins faculty to Governor Hogan* (Mar. 25, 2020), https://bioethics.jhu.edu/wp-content/uploads/2019/10/Johns-Hopkins-faculty-letter-on-COVID-19-jails-and-prisons.pdf (last accessed Apr. 13, 2020).

1
2
3

**PUBLIC HEALTH OFFICIALS FOR LOS ANGELES COUNTY HAVE RECOMMENDED COMPLIANCE WITH CDC GUIDANCE AND CALLED FOR OTHER MEASURES TO ADDRESS COVID-19 AT THE COUNTY'S JAILS**

4
5
6
7

58.     On March 31, 2020, the County of Los Angeles Department of Public Health issued a letter to Los Angeles County Sheriff Alex Villanueva, recommending that the LASD follow the CDC's Interim Guidance on Management of Coronavirus in Correctional and Detention Facilities, and implement the following additional measures:

8
9

   a.     Develop predictions for the impact of COVID-19 spread in each jail facility;

10
11
12
13

   b.     Continue to reduce the incarcerated population of the County jails so the County jails can adhere to the standards set forth in the CDC and State's guidelines, giving priority to those with underlying health conditions, older prisoners, and pregnant women; and

14
15
16

   c.     Release individuals from the County jails with adequate shelter and supportive services if necessary and release them in a manner that minimizes any risk to the community.[82]

17
18
19
20
21
22

59.     On April 9, 2020, the Los Angeles County Department of Public Health issued its own Guidance for Correctional and Detention Facilities to prevent and reduce the spread of COVID-19 at entry into facilities and within facilities.[83] The recommendations include, but are not limited to, requiring staff to wear masks and gloves at all times, providing soap available at no cost, liquid soap available when possible, paper towels, tissues at no cost, no-touch trash receptacles, masks to symptomatic prisoners;

23
24
25
26
27
28

---

[82] *Letter from Los Angeles County Health Officer to Los Angeles County Sheriff* (Mar. 31, 2020), http://www.ph.lacounty.gov/media/Coronavirus/DPH_NecessaryAppropriateMeasuresinJails_033120.pdf (last accessed Apr. 10, 2020).

[83] Los Angeles County Department of Public Health, *Guidance for Correctional and Detention Facilities* (Apr. 9, 2020), http://publichealth.lacounty.gov/media/Coronavirus/GuidanceCorrectionalDetentionFacilities.pdf (last accessed Apr. 12, 2020).

ensuring access to running water; enabling social distancing; positioning beds at least six feet apart; increasing cleaning of common spaces; eliminating appointment co-pays; reducing the prison population in order to abide by social distancing guidelines; and prioritizing early release of medically vulnerable prisoners.[84]

60.     Civil rights advocates have publicly called on Defendants to take more extensive measures to minimize the spread of COVID-19. Several community-based organizations in Los Angeles called on the LASD, the Los Angeles County Department of Health Services-Correctional Health Services, the Los Angeles County District Attorney, the Los Angeles Superior Court, and the Los Angeles County Board of Supervisors to take several measures to reduce the jail population and ensure jail conditions minimize the spread of COVID-19 among the County jails and staff.[85] The ACLU of Southern California separately called on the LASD to reduce the jail population, ensure that those quarantined are not held beyond their release date, cite and release, provide adequate and free hygiene supplies including warm water and soap, providing medical treatment, ensuring adequate staffing even if jail staff become sick, screening staff for COVID-19, providing extra care for vulnerable populations, and collecting data.[86]

## DEFENDANTS' RESPONSES TO THE COVID-19 PANDEMIC ARE CONSTITUTIONALLY DEFICIENT AND PLACE THE PEOPLE IN ITS CUSTODY AT HEIGHTENED RISK

61.     Despite the multiple guidelines and statements issued on preventing the spread of COVID-19 in correctional facilities and Los Angeles County jails in particular, many of these measures have not been implemented across County jails.

---

[84] *Id.*

[85] *Advocacy Groups Urge Los Angeles County Officials to Take Immediate Action to Stop Spread of COVID-19 Through Jails and Communities* (Mar. 13, 2020), https://www.hrw.org/news/2020/03/16/advocacy-groups-urge-los-angeles-county-officials-take-immediate-action-stop-spread# (last accessed Apr. 12, 2020).

[86] *Letter from ACLU of Southern California to Los Angeles County Sheriff's Department* (Mar. 12, 2020), https://www.aclusocal.org/en/letter-covid19-la-jail-conditions (last accessed Apr. 12, 2020).

62.     As of April 23, 2020, 44 prisoners in the Los Angeles County jail system have tested positive for COVID-19, 29 of whom are currently positive;[87] 73 prisoners are isolated; and 1,643 prisoners are quarantined.[88] There have been 144 negative tests.[89] The limited testing that is administered to incarcerated people in the County jail system makes it difficult to determine the true prevalence of the disease in the County jails. Of those in isolation, 8 are in the CTC, 61 are in TTCF, and 4 are in the Los Angeles County Medical Center ("LCMC").[90] Of those in quarantine, 36 are in the IRC, 289 are in MCJ, 118 are in TTCF, 195 are in PDC-South, and 1,005 are in NCCF.[91] Also as of April 23, 2020, 59 LASD employees have tested positive for COVID-19 and 313 are currently quarantined, with another 539 who were exposed or positive now back at work.[92]

63.     All people incarcerated in the Los Angeles County jails face a significant risk of exposure to COVID-19. Defendants are aware of the heightened threat of COVID-19 in the jails—the CDC, the Mayor of Los Angeles, the County Board of Supervisors, medical experts, and various advocates have already directly alerted them of this risk as well as the preventive measures needed to protect against the further spread of COVID-19. Los Angeles County Sheriff Alex Villanueva has personally spoken at press conferences regarding LASD's response to COVID-19 in the County jails.[93]

64.     Despite these widespread warnings, Defendants remain woefully unprepared

---

[87] Fifteen have recovered. Los Angeles County Sheriff's Department, *Coronavirus Information Updates* (last updated Apr. 23, 2020), https://lasd.org/covid19updates/ (last accessed Apr. 23, 2020).

[88] *Id.*

[89] *Id.*

[90] *Id.*

[91] *Id.*

[92] *Id.*

[93] Los Angeles County Sheriff's Department, *Sheriff Alex Villanueva Provides LASD Status Update in the Face of COVID-19* (Apr. 14, 2020) https://lasd.org/sheriff-lasd-status-covid-19/ (last accessed Apr. 23, 2020); Los Angeles County Sheriff's Department, *Sheriff Alex Villanueva to discuss Safety Precautions regarding COVID-19* (Mar. 16, 2020), https://www.youtube.com/watch?v=FPZQY2KU9zg (last accessed Apr. 10, 2020).

and have failed to take necessary precautions to protect the people in their custody against this unprecedented, life-threatening public health crisis.

65.     Even though the County has reduced its prisoner population from 17,076 on March 16, 2020[94] to 11,990 as of April 23, 2020,[95] the County's prison population is still too high to give Class Members the ability to practice safe social distancing. The total population is still close to the jail's maximum capacity (based on normal circumstances, not taking into account social distancing needs).[96] Conditions force prisoners to sit, stand, walk, eat, and sleep within six feet of another person.[97] Vulnerable populations remain jailed. Essential medical services including testing for COVID-19 are not provided because there are too many people jailed. There is an inadequate supply of PPE to meet the needs of the existing population.

66.     Although the LASD Department Operation Center has issued some guidelines on how to deal with COVID-19 across the Department, these primarily appear to address testing and PPE for LASD personnel, not protections for prisoners.[98] Defendants do not follow their own COVID-19 protocols, the recommendations and guidelines issued by Los Angeles and California public health officials, or the CDC COVID guidance for correctional facilities.

---

[94] Los Angeles County Sheriff's Department, *Sheriff Alex Villanueva to discuss Safety Precautions regarding COVID-19* (Mar. 16, 2020), https://www.youtube.com/watch?v=FPZQY2KU9zg (last accessed Apr. 10, 2020).
[95] Los Angeles County Sheriff's Department, *Coronavirus Information Updates* (last updated Apr. 23, 2020), https://lasd.org/covid19updates/ (last accessed Apr. 23, 2020).
[96] Los Angeles County Sheriff's Department, *Custody Division Population Quarterly Report* (Oct. – Dec. 2019), https://lasd.org/transparency%20data/custody%20reports/Custody%20Division%20Population%202019%20Fourth%20Quarter%20Report.pdf (last accessed Apr. 22, 2020).
[97] Alene Tchekmedyian, *L.A. Jail Inmates Say Lack of Soap and Toilet Paper Heightens Coronavirus Fear: 'Like Slow Torture,'* L.A. TIMES (Mar. 30, 2020), https://www.latimes.com/california/story/2020-03-30/coronavirus-inmates-hygiene-supply-shortage-la-jails (last accessed Apr. 12, 2020).
[98] Los Angeles County Sheriff's Department, *Coronavirus Information Updates*: *Department Operations Center Guidelines*, https://lasd.org/covid19updates/#doc_guidelines (last accessed Apr. 12, 2020).

67.    Defendants have failed to implement policies and practices to address the substantial risk of transmission of COVID-19 among prisoners within the County's jails, and as a result exposed putative members of the plaintiff class to a substantial risk of serious harm and death. The unconstitutional conditions and practices that place the putative class at unreasonable risk span across the facilities that make up the County's jails. As prisoners move between facilities, deficiencies in COVID-19 practices in one facility extend to other facilities.

***Densely Populated Facilities Prevent Social Distancing***

68.    In MCJ, up to ninety-six people are forced to live in the same open bay dormitory unit where dozens of triple bunk beds are placed between one to three feet apart. Even if they sleep head to foot, prisoners housed in these dormitories remain less than six feet apart.

69.    Some incarcerated individuals with medical conditions are placed in small, cramped medical cells at MCJ with three beds, a toilet, and a sink. It is not possible for each person to be six feet apart from their cell mates even in a medical cell. Individuals of advanced age and with a history of respiratory disease jailed at MCJ in a medical cell are being moved to general population cells even though they have preexisting conditions which place them at high risk of mortality if they contract COVID-19. When these individuals plead to stay in smaller cells to minimize their exposure, Defendants have issued disciplinary reports against them citing "noncompliance".

70.    Even individuals housed in one-man cells in MCJ are in cells that are lined up one next to the other, and these prisoners cannot maintain six feet of distance from the individuals in adjacent cells. Some of these units are equipped with barred doors that allow other prisoners to make physical contact. It is not possible to avoid air circulation between the one-man cells.

71.    In CRDF, the County's women's correctional facility, there are two different types of housing; some women are housed in cells on the sides of the module and some women are housed in the dayroom of the module. In the day room of the modules, 12-30

women share space without any partitions or dividers, and their beds are roughly 1.5 feet apart. People who are kept in cells share their cells with one other person without any possibility to keep six feet away from that other person. Even where people are housed in the cells of some modules, they are sharing a dayroom with the people who are in the dayroom, and they are in bunk beds with two beds, sharing the cells with another person. The only thing that divides the cells from the dayroom is a single glass door, through which food is passed. The people staying in the cells must go through the dayroom, where the other people sleep, to shower.

72.     In NCCF, up to sixty-six people are forced to live in the same dormitory-style unit where triple bunk beds are stacked next to each other with no more than 3 feet separating each bunk and less than two feet from one bunk to the bunk beneath it. The bunks are spaced so close to one another that at least one Plaintiff can bump into another bunk simply by reaching his arms out while lying down.

73.     With the population size and the close quarters, it is impossible for the incarcerated people in these units to remain six feet apart. When it is meal time, Defendants require the incarcerated individuals to line up (without spacing apart) to retrieve their meals. It would be impossible for the line up to occur where each person is six feet apart from another person, given the size and configuration of the unit. In multiple facilities when it is meal time, the Defendants require prisoners to line up.

74.     In the TTCF, trustees and disabled prisoners that need Americans with Disabilities Act ("ADA") accommodations share a 16-person "pod". In the pod, there are 8 trustees and 8 ADA prisoners. The trustees sleep on bunk beds, where the person on the top bunk sleeps only 5 feet above the person on the bottom bunk. The bunk beds are only 2 ½ or 3 feet apart from each other.

75.     In all of the facilities, Defendants house individuals awaiting trial in the same jail cells as those who have been convicted and serving their sentences.

***Movement of Prisoners and Risks from Staff***

76.     Defendants are responsible for transporting incarcerated individuals to their

1    court dates in courthouses across Los Angeles County.

2        77.    In the transport process, Defendants require incarcerated individuals to stand

3    in close proximity to corrections staff and to other incarcerated individuals. At various

4    stages of the transport process, staff handcuffs incarcerated individuals who are housed in

5    different jail facilities to one another, facilitating the exchange of respiratory vapors and

6    droplets.

7        78.    Defendants transport incarcerated individuals in vans or other motor vehicles

8    where incarcerated individuals are seated right next to each other and in some cases,

9    squeezed in to fit the high number of people who require transport.

10       79.    Defendants force incarcerated individuals into small "court tanks" in the

11   courthouses while they wait for their court appearance and for the Defendants to "process"

12   the incarcerated individuals. Defendants will force individuals from different facilities to

13   be assigned to the same "holding tank". Those with medical conditions rendering them

14   vulnerable to COVID-19 are not separated. These practices and customs facilitate the

15   transmission of COVID-19 from one facility to another or from housing unit to housing

16   unit.

17       80.    In these small holding tanks, people are packed in so tightly that it is often

18   standing room only and people are breathing close to one another. Defendants will leave

19   incarcerated individuals in these holding tanks for hours at a time. Due to the small size of

20   the tank and the large numbers of people in them, if someone in the holding tank is

21   coughing and/or has a contagious illness, it is virtually certain that the illness would

22   spread like wildfire to the others who are crammed inside. It is impossible to give each

23   person six feet of room in these holding tanks.

24       81.    There is currently no COVID-19 testing performed on all County Jail

25   employees who work at the facilities. Upon information and belief, the Jail does not take

26   daily the temperatures or screen for symptoms of staff when they arrive for work at the jail

27   facilities. Even if such screening were implemented, there would remain a risk of staff-to-

28   prisoners transmission. Even if the jail did, not all individuals infected with COVID-19

present with fever in the early stages of the infection, and some remain asymptomatic carriers. The risk of asymptomatic transmission means that monitoring staff for fever or other active symptoms is inadequate to identify all who may be infected and can thereby infect others. As of April 19, 2020, the LASD website appears to only encourage staff to self-report symptoms of COVID-19. That measure is inadequate, given that many persons infected with COVID-19 have mild or no symptoms.

82.   When people are transported within the facility, they are often in spaces (cells, elevators, vehicles) crowded with people, some who are newly arrested and have not been tested, and there is no way to keep six feet apart from the other people nearby. In addition, prisoners are not kept far enough apart while being taken to attorney visits. One plaintiff reported being ordered to stand less than six feet apart while being held in a confined space on the way to his attorney visit. At least one person in the space was coughing.

83.   Class member Jeffrey Livotto was taken to court for a probation hearing on or around March 26, 2020. He was transported on Defendants' bus along with dozens of other prisoners. Not a single one had masks, and the person he was cuffed and chained to was coughing uncontrollably.

84.   On April 8, 2020, Plaintiff Mark Avila was transported to court and observed holding tanks with as many as 30 people standing in a small cell. The tank is filthy and the prisoners are not provided disinfectant supplies to wipe down any surfaces they touch. He and others can sometimes in there for hours, thus putting them at risk of disease transmission if someone in the holding cell is positive for COVID-19.

85.   In early April 2020, Plaintiff Rodney Cullors was transported by Defendants to a medical facility for a MRI. There were three people chained to the wheelchair van, all of whom were over the age of 50. None of the other men had masks and some were coughing.

86.   On March 16, 2020, Class Member Catrina Balderrama was transported to court for a hearing at the Clara Shortridge Foltz Criminal Justice Center in Downtown Los

Angeles. When she was transported back to CRDF, she was placed in a holding tank with an older woman dressed in a brown uniform, which she knows to signify a hospital housing designation. The woman was coughing a lot and having trouble breathing. There was not enough room to appropriately socially distance from this woman.

*LASD Staff Shortages and Vacancies*

87.   Defendants are experiencing significant staff shortages due to quarantining of employees and medical staff. The precipitous decline in the staff who are available to work drastically reduces the operational capacity of the jail and creates challenges in handling the nearly 12,000 prisoner population.

88.   On March 17, 2020, the LASD reported that there were 43 employees who were self-quarantined; 21 of them were believed to have been exposed on-duty.

89.   As of April 23, 2020, at 9:00 AM, that number had sky-rocketed to 313 LASD employees who were quarantined and 59 employees who have tested positive.

90.   Staff vacancies occasioned by COVID-19 create an unreasonable risk of facilities becoming dangerously understaffed, which comprises medical care. Healthcare staff who provide treatment are unavailable. Correctional staff also play a vital role in delivering medical services, by escorting prisoners, responding to and alerting medical of medical emergencies, and providing security to health care staff while they provide services. Their absence also compromises treatment.

*Lack of Protective Personal Equipment*

91.   Until April 10, 2020, Defendants did not provide any PPE for the people jailed at Los Angeles County jails, even if they exhibited symptoms of COVID-19, were within close proximity of someone exhibiting symptoms of COVID-19, or requested such equipment. As such, people were fashioning their own makeshift masks to protect themselves against the growing dangers of contracting the virus in the jail setting. At MCJ, such activity is considered destruction of jail property and subject to a write up, loss of privileges, or other disciplinary action. In CRDF, at one point, Defendants made those individuals take off their makeshift face masks, stating that they would be sent to 23-hour

disciplinary lockdown if they kept on those face coverings. Defendants did not respond immediately to grievances submitted by prisoners at the end of March seeking face masks.

92.    On April 10, 2020, Defendants first started providing one cloth face mask per prisoner to incarcerated people in MCJ and CRDF. Later, on or around April 15, 2020, Defendants distributed face masks to individuals in NCCF. No instructions were provided as to when to wear the face masks at NCCF.

93.    For the majority of the individual plaintiffs, Defendants provided no instructions for regular cleaning of the masks. There is a uniform policy in the jails that prisoners only have access to laundry once a week, and only for uniforms they are willing to exchange. Prisoners are not reissued the same uniforms or towels. Thus, there is no appropriate laundry system for masks, which should be laundered daily per CDC recommendations.

94.    Defendants have not replenished the supply of face masks and, as such, prisoners have had to reuse their face masks despite the fact that some of the face masks distributed at MCJ are single-use only. Plaintiff Rodney Cullors' single-use mask's elastic broke, rendering it unusable.

95.    Many of the Named Plaintiffs have not received more than one mask.

96.    Defendants have also not provided access to gloves except for those prisoners assigned to cleaning. In addition, on several occasions at MCJ and NCCF Defendants have denied prisoner requests to use gloves.

97.    Deputies often do not wear protective personal equipment like gloves or masks when interacting with people jailed at MCJ, and there have been shortages in protective personal equipment for all people incarcerated and working in the jails.

*Lack of Hygiene and Sanitation Supplies*

98.    Contrary to Sheriff Villanueva's statements that cleaning crews are doing more to keep facilities clean and that prisoners have access to soap and running water, prisoners do not in fact have adequate access to sanitization supplies such as soap or other

/ / /

cleaning supplies for jail facilities such as showers.[99]

99.     Defendants do not provide free unrestricted hygiene or personal sanitation supplies to many individuals jailed at MCJ beyond some people receiving a one-time provision of one small bar of soap that is insufficient for the routine handwashing and cleaning necessary to mitigate against the spread of COVID-19. After that bar of soap is used up or for people who have not received this one-time provision, the only access to hygiene or sanitary products is by purchase through the jail's commissary system. Those without access to the jail's commissary due to lack of funds or status are unable to access more substantial anti-bacterial soap during the growing escalation of COVID-19. Even those with access to commissary are confronted with inflated prices for soap or other personal hygiene supplies, e.g., $1.45 for a bar of Irish Spring, $2.11 for a bar of Dove, or $5.05 for a bar of Neutrogena.

100.   In some facilities, Defendants provide incarcerated individuals with a small bar of soap once a week, which is insufficient to last the week if one washes their hands with it every day. The soap is labeled "Freshscent Deodorant Soap". Nowhere on the label does it say that the soap is anti-bacterial. Defendants do not provide hand sanitizer or gloves. Soap is not automatically replenished upon request; in some dorms, the deputies have complete discretion to give soap upon request or to deny such requests.

101.   Defendants have also not provided access to hand sanitizer, or have denied requests to use hand sanitizer. In response to prisoner requests and grievances, for instance, incarcerated people at MCJ have been told by deputies that they may not have hand sanitizer.

102.   Defendants do not provide adequate cleaning supplies, free of charge and in the proper concentrations of strength to prevent transmission of the virus.

103.   Defendants have not provided tissues, paper towels, napkins, or toilet paper

_____

[99] Alene Tchekmedyian, *L.A. Jail Inmates Say Lack of Soap and Toilet Paper Heightens Coronavirus Fear: 'Like Slow Torture,'* L.A. TIMES (Mar. 30, 2020), https://www.latimes.com/california/story/2020-03-30/coronavirus-inmates-hygiene-supply-shortage-la-jails (last accessed Apr. 12, 2020).

CLASS ACTION PETITION FOR WRIT OF
HABEAS CORPUS-COMPLAINT FOR       -35-
INJUNCTIVE & DECLARATORY RELIEF

above their normal allotment to wipe one's hands after handwashing. Prisoners have to wipe their hands on their uniforms after handwashing.

104.   None of the individual plaintiffs have been provided with paper towels, Kleenex, tissues, or other materials to dry their hands since the County public health order issued on March 16, 2020. Nor has any Named Plaintiff been provided with hand sanitizer.

105.   Plaintiff Jeremiah Farmer does not have hand sanitizer or regular access to soap in his dorm that he shares with over 50, maybe over 60, people. He has to routinely ask to borrow another prisoner's soap. He often sees jail officials wearing masks and then taking them off when they come into his dorm.

***Insufficient Cleaning of Communal Areas and High Touch Surfaces***

106.   Defendants do not provide adequate cleaning supplies so that prisoners can clean their own personal living spaces or high-touch surfaces or objects, creating an unreasonable risk ensuring that the dozens of people who share the same cell will quickly transmit the illness to each other.

107.   In each sixty-six person unit in NCCF, incarcerated people are forced to share four toilets, two urinals, and two showers. They also share the same phones, exercise area and the same communal tables. Every surface in the cell is high-touch, even the railings on the stairs. Defendants do not provide people with disinfectant supplies in this high-touch area, nor do they provide for the cleaning of exercise equipment or tables between each use. Each person must therefore risk COVID-19 infection when using the phones, eating at the same table, or exercising with the same equipment.

108.   If the sinks, toilets, and showers are broken, there are only a handful of each available for everyone in the cell or dorm. The toilets and showers are not cleaned or disinfected between each use, and Defendants do not provide supplies for disinfection or cleaning between each use. In NCCF, a prisoner is assigned to clean the shower once a day, but on any given day, twenty or thirty people can use a shower before it is cleaned. Showers at CRDF do not have hot water.

109.   In each open dormitory, the people incarcerated in MCJ are forced to share a limited number of phones, approximately five to six, when calling family members, loved ones, or lawyers. They also share the same exercise area and the same communal tables. Defendants do not provide people with adequate disinfectant supplies in this high-touch areas, nor do they provide for the cleaning of phones, exercise equipment, or tables between each use. "Trustees" will clean the dormitories about once a week, but any daily cleaning is up to the prisoners living in the dormitory, who are not provided the supplies they need to clean between uses. Each person must therefore risk COVID-19 infection when touching and speaking through the phone, eating at the same table, or exercising with the same equipment.

110.   "Trustees" who are assigned to clean the cells and common areas in CRDF about once a week spray Citracide on a rag and then use the same rag to wipe down the table tops and the phones. They do not wipe down the kiosks, sinks, vending machines, shower handles, or stairway railings, which are surfaces that everyone touches on a daily basis. The phones are not cleaned between individual use. There is no regular schedule for cleaning the showers, and it is done by volunteers housed in the unit.

111.   Plaintiff DeNeal Young is medically vulnerable, confined to a wheelchair because of blood clots in his legs, and is not even provided his own soap, let alone paper towels, clean towels every day, or hand sanitizer. Even though he is in a wheelchair, he has been told that he has to wipe down the shared shower himself before and after use by using his foot to drag aside the trash, e.g., wet clothes, hair, dirty diapers. He is not given cleaning supplies to clean his cell or the shared shower.

112.   Plaintiff Victor Gutierrez is medically vulnerable and is a "trustee" assigned to clean the public visiting area and floors of the jail where other prisoners have tested positive for COVID-19. He is provided a dust mask and a jump suit made out of paper that tears easily. On April 9, 2020, he was assigned to clean the cell of a person who tested positive for COVID-19, but was not provided adequate safety equipment to do so. As a result, his paper suit tore while he was cleaning and the dirty liquid from the cleaning

product, feces, and urine that he had mopped seeped through his suit and his socks.

113.   Plaintiff Carole Dunham is medically vulnerable and was required to clean a cell from which a prisoner had been removed to quarantine, even though she complained to a deputy that she did not feel safe doing so. The jail staff are aware of her medical vulnerability. She was not given a mask or jumpsuit to clean the room. Not long after cleaning the room, she developed a cough.

***Infrequent Provision of Clean Laundry***

114.   Individuals do not have daily access to clean laundry and prisoners in at least one facility are forced to do their own laundry with cleaning supplies purchased with their own funds from the commissary.

115.   In most facilities, Defendants provide clean uniforms only once per week even though incarcerated individuals are being told to cough on their sleeves. Although clean sheets, t-shirts, and thermals are to be provided once a week, many incarcerated individuals including Plaintiffs LeAndrew Lewis and Jeremiah Farmer, and Class Member Jeffrey Livotto have to wait weeks to get them. Defendants also provide a clean towel only once a week through this same laundry service. This towel is the only thing prisoners have besides their clothes to dry their hands on; as a result, both the towel and the clothes accumulate aerosols and droplets all week. With the releases due to the virus that have already occurred, less laundry is being done per week; yet the jail has not increased the frequency of laundry services to protect the remaining prisoners.

116.   At NCCF, individuals are not given even weekly clean laundry. Clean towels are provided only once a month, which means for one whole month, incarcerated individuals use the same uniforms, sheets, and the single towel they are given. All of those items come in close contact with other people. The sheets and clothes are exposed to other people in the jail, ensuring that any respiratory aerosols or droplets remain on the clothing long after they are transmitted.

117.   Plaintiff LeAndrew Lewis receives a change of bedding or clothing every 30 days. He has not received fresh laundry since approximately the end of March 2020.

*Medically Vulnerable Prisoners and Lack of Medical Care*

118.   Defendants' failure to implement adequate practices and customs to detect and contain COVID-19 places incarcerated people who have pre-existing medical conditions at an imminent and unreasonable risk of severe illness and death from COVID-19. These conditions include advance age, moderate to severe asthma, chronic lung disease, hypertension, diabetes, epilepsy, compromised immune systems due to cancer treatment, asthma, diabetes, and seizures. The imminent risk of serious illness and death to medically vulnerable prisoners cannot be fully remediated other than by the release of these prisoners to the fullest extent possible.

119.   Individuals like Class Member Albert Kirk Jones who require daily breathing treatments for obstructive breathing or sleep apnea have had their CPAP (continuous positive airway pressure) machines confiscated. These individuals have been provided no other alternatives to the vital medical treatment that those machines provide them.

120.   Defendants charge a co-pay for medical services as well as for medication such as Sudafed. In addition, Defendants do not always have medications available that prisoners need, and it is hard for prisoners to get doses adjusted.

121.   Plaintiffs have faced wait times of up to 3 weeks to see a doctor after submitting a medical request.

122.   Individuals have had time-sensitive surgeries delayed indefinitely due to COVID-19. Plaintiff DeNeal Young has severe obesity, an undiagnosed heart condition, and blood clots in his legs that put him at risk of a heart attack or stroke. Defendants have told him that they will not transfer him to the hospital for an urgent surgery due to COVID-19.

123.   Class Member Albert Kirk Jones, a 64-year-old African American man who has a history of bronchitis, pneumonia and a heart condition, was told that he would be moved from his 3-man cell to a dorm in general population where there is a greater likelihood of transmission of COVID-19. When he pleaded to stay for fear of contracting the illness, he was disciplined for "noncompliance" and told that he would lose his

privileges to commissary, visitation, and vending.

124.   Plaintiff Mark Avila has chronic asthma and has been hospitalized due to his chronic asthma about 30 times in his lifetime. Defendants fail to provide him with the extensive medical care regiment he had when he was free, including 2 inhalers at all times, access to necessary medications at all times, and access to breathing treatments daily. While incarcerated, his asthma is exacerbated by the dust and grime inside his jail cell.

125.   Class Member Benito Venegas has asthma and epilepsy. He is housed in a dorm with 80+ people, who all leave for court appearances, medical visits, attorney visits, and other mandatory transports from time to time and come back to the dorm. Due to the arrangement of the beds being less than three feet apart from one another, he is forced to sleep in close proximity to other people who are coughing loudly.

126.   Plaintiff LeAndrew Lewis is diabetic, suffers from high blood pressure, and is prone to bronchitis. He is in a dorm with 30 or so people where it is impossible to keep six feet apart from one another. The people that are in the beds that surround him are regularly coughing within a few feet of him.

127.   Plaintiff Victor Gutierrez is housed in a dorm in TTCF. He has asthma, hypertension, and a metabolic disorder. He has been forced to clean the cells of individuals who tested positive for COVID-19.

128.   Plaintiff Carole Dunham has Type I diabetes and receives insulin shots four times a day. Ms. Dunham has been directed to clean the phones, common areas, and cells in the module, including the cell of at least one quarantined prisoner.

129.   Class Member Holly Davidson was diagnosed with lymphoma in February of 2016 and underwent partial chemotherapy. She also has asthma. There are 12 to 13 women in the dayroom outside her cell, which is an area she must cross in order to shower or use the phone. She has not been instructed on cleaning her cell or provided any cleaning solution.

130.   Class Member Jeffrey Livotto is an asthmatic and has suffered serious asthma

1  attacks. He has been transferred between a four-person cell in MCJ and two 60+ person

2  dorms in NCCF all in the span of two weeks between the end of March and the beginning

3  of April 2020.

4  ***Inadequate Intake Process***

5  131.   At the IRC where new arrestees are booked and processed, arrestees are

6  placed in a single enclosed cell with about 25 other people while being processed through

7  the jail system. In this cell, it is not possible to be six feet apart from another prisoner. At

8  various points, prisoners are told to stand shoulder to shoulder or right behind one another.

9  Prisoners also stand in line to walk through metal detectors. They wit on benches right

10 next to each other while waiting to be interviewed by Defendants. They are also instructed

11 to shower right next to one another in a single shower room with no walls or dividers

12 between each person.

13 132.   With regard to new jail admittees, Defendants screen incoming prisoners for

14 symptoms of COVID-19, but only quarantine those who have active symptoms, or who

15 report close contact with an infected person before arrest.

16 133.   These screening processes are inadequate, and create an unreasonable risk

17 that infected new admittees are cleared for placement in general population housing, and

18 thus expose other prisoners and staff to infection.

19 134.   Some 25% of infected people are asymptomatic, and asking them screening

20 questions will fail to identify them so they can be isolated, tested, and treated if positive.

21 Also, symptoms screening alone is ineffective since it may take several days after

22 becoming infected for symptoms to appear. Therefore, all new admittees must be

23 quarantined for 14 days and monitored on at least a daily basis for fever and symptoms of

24 COVID-19 so that those are infected will no longer carry the virus (and those who become

25 infected remain separated) before being placed in a housing unit with other prisoners.

26 Without quarantining all newly-admitted prisoners, it is inevitable that some percentage of

27 new admittees will carry the virus and infect others housed in the jail.

28 / / /

*Failure to Timely Isolate Individuals Who Exhibit Symptoms of COVID-19 or Were Exposed to Another Person with Symptoms of COVID-19; Underutilization of Testing*

135.   When people exhibit symptoms of COVID-19, it can take weeks for jail personnel to respond to their requests for a medical appointment. Many incarcerated people experiencing symptoms of COVID-19, including coughs, fevers, and difficulty breathing will not get adequate or timely assessment for COVID-19 infection or treatment for their symptoms, nor have they been isolated from asymptomatic people. Testing is not regularly provided to those who have symptoms. Even with severe symptoms, it takes days before prisoners are taken to medical for testing. Once at medical, those who are coughing are not necessarily tested for COVID-19.

136.   Numerous incarcerated individuals at MCJ have been exposed to individuals who exhibit visible symptoms of COVID-19, e.g., fever and cough. However, Defendants do not timely isolate people who exhibit symptoms and do not provide information to those of us who have been exposed to that person on how to protect themselves against the spread of COVID-19. Persons exposed to prisoners suspected of COVID-19 are not timely assessed if they are infected.

137.   If there is a prisoner suspected of COVID-19, that prisoner is removed from their unit or cell. Defendants will place the rest of the unit or cell under "quarantine." However, deputies will continue to do their walk-throughs in quarantined pods and floors. The same deputies will go straight from a quarantined area of the jail into a non-quarantined area of the jail. Because of the perforated metal walls and gaps in doors that separate quarantined areas from non-quarantined areas, prisoners are at risk for being exposed to the virus whenever prisoners walk past a quarantined area. Moreover, this method of quarantine is insufficient to prevent the spread of COVID-19 because if a presumptively positive person has been in close quarters with his dorm mates, isolating large numbers of people without being able to space them six feet apart does not lessen the likelihood of COVID-19 spread.

138.   With the exception of one Plaintiff who was isolated weeks after symptoms

appeared, Plaintiffs have not had access to testing despite showing symptoms of COVID-19 infection.

139.   Incarcerated individuals who exhibit symptoms for COVID-19 are not treated in a timely fashion or provided a minimally acceptable level of medical care.

140.   Requests to see medical staff due to COVID-19 symptoms are not responded to immediately, even when grievances complaining about the inadequacy of medical response are filed.

141.   In late March, a woman was diagnosed with COVID-19 in one of the modules of the jail. That woman was complaining of symptoms for days but did not have access to timely testing. The woman was housed in a two-man cell and her roommate also began coughing and told the deputies that she had a fever. Neither woman was issued a mask or gloves until the moment they were taken out of the module to be quarantined, days after symptoms first began. Both women moved between the dayroom and their cell during that time, and there were a number of prisoners, including Plaintiff Carole Dunham, housed in the dayroom.

142.   After the woman was removed from the module, Plaintiff Carole Dunham, a prisoner worker, was assigned to clean the cell. She was not given a mask and was only given gloves and Citracide with which to clean the cell. Plaintiff Dunham has diabetes and voiced concerns for her safety to the jail staff but was told that the cell needed cleaning. After that time, Plaintiff Dunham developed a cough. Plaintiff Dunham has requested testing, but when she was taken to the medical unit, she was not provided with a test. She has still not been tested. There are other diabetics in the module and none of them were provided with masks before April 10.

143.   Likewise, Plaintiff Haviland has been reporting symptoms to the jail staff for days. She has been provided with cold medicine but has not been given a test.

144.   Plaintiff Young developed a fever and cough on or around March 15, 2020 after being exposed to another prisoner who was coughing aggressively. He was not provided access to a test, although the nursing staff were the ones who noted his fever.

145.    Class Member Albert Kirk Jones developed a cough, fever, and body aches at MCJ on or around the end of January 2020. He was transferred to the TTCF where he was not tested for COVID-19 despite his symptoms.

146.    A prisoner in Plaintiff Victor Gutierrez's pod was showing symptoms of COVID-19. The whole pod was locked down on quarantine, but since Plaintiff Victor Gutierrez was at work at the time, Defendants allowed him to move to a different pod despite the fact that he was previously exposed to the presumptively positive prisoner that same morning.

147.    On or around March 2020, Plaintiff Rodney Cullors was taken to medical for an unrelated illness and, for 30 to 45 minutes, was exposed to a patient he was informed had COVID-19, without any mask, gloves, or even a dividing curtain separating him from the patient.

**Lack of Adequate Care for Prisoners Who Test Positive for COVID-19**

148.    Defendants place individuals who are presumptively positive for COVID-19 in single person cells that do not have toilet paper, soap, or any other sanitizing supplies. Defendants do not provide basic hygienic materials to these presumptively positive individuals while they are in the single person cells.

149.    The jail is utilizing segregation units to house persons with known or suspected COVID-19 illness. This acts to deter prisoners from reporting COVID-related symptoms, due to their fear that doing so will result in their being placed in punitive isolation conditions. Use of punitive isolation cells thus creates an unreasonable risk of hastening the spread of the disease as symptomatic prisoners will not report themselves and remain in general population units.

150.    After a person has tested positive for COVID-19, Defendants place them in single-person cells in the same facilities as other non-COVID-19 individuals. Defendants require them to be inside their cells 24 hours a day with no access to a shower. Defendants do not allow them to make phone calls. Defendants do not provide them with masks. Defendants do not provide them with soap. Defendants do not clean their cells.

CLASS ACTION PETITION FOR WRIT OF
HABEAS CORPUS-COMPLAINT FOR                    -44-
INJUNCTIVE & DECLARATORY RELIEF

1    Defendants do not provide them with access to disinfectant supplies to clean their cells.

2        151.    Public health guidelines require the Jail to conduct contract investigations to

3    identify and quarantine all persons who have come into close contact with persons with

4    known or suspected COVID-19. Monitoring of close contacts should include regular

5    symptom screening and temperature checks. Quarantine should separate high-risk and

6    low-risk inmates. The Jail has not instituted contact investigations and quarantine and

7    monitoring practices for those in close contact with symptomatic inmates consistent with

8    public health guidelines Defendants' customs and practices in this regard have created an

9    unreasonable risk of further spread of COVID-19 in the Los Angeles County jail system

10   and to the public at large.

11       152.    Class Member Catrina Baldarrama tested positive for COVID-19 in late

12   March while housed at CRDF. She was transferred to TTCF for testing because there was

13   no testing capability at CRDF itself. She was then transported back to CRDF and placed in

14   a disciplinary segregation cell where she was isolated without phone calls, sanitary

15   napkins, or soap. Her personal belongings – food and personal hygiene products – were

16   confiscated and apparently thrown away.

17       153.    Class Member Catrina Baldarrama was housed in module 3700, the module

18   where Plaintiff Carole Dunham is housed. No contact tracing was done for her, nor was

19   that module quarantined. Although she was transferred out of the module in late March,

20   prisoners in that module did not receive masks until April 10. Prisoners with coughs in the

21   module have not been able to get tested.

22       154.    Once the facility suspected she had COVID-19, Ms. Baldarrama was moved

23   to an isolation cell on a disciplinary unit, deprived of toilet paper, toothbrush and any

24   supplies to maintain basic personal hygiene. After she returned from CTC, she was placed

25   back in a disciplinary isolation cell, where she was isolated with no access to a shower for

26   12 days, no phone calls, no soap and no sanitary napkins. Deputies told her she was going

27   to die in the isolation cell. Her personal belongings – food and personal hygiene products

28   – were confiscated and apparently thrown away. Her doctors instructed CRDF to ensure

she had access to fluids and stayed well-hydrated, but many days they did not provide water. They provided milk, which she could not drink because she has a dairy allergy, and which they refused to replace with a non-dairy milk alternative. It is her understanding that she is supposed to receive a diet complete with fruits and vegetables, which she has not received.

***Transparency and Education about COVID-19***

155.   Defendants do not post or provide sufficient information about COVID-19, including protective or preventive measures to avoid transmission, to the people jailed in CRDF.

156.   Defendants have not provided any written materials that provide general updates about the COVID-19 pandemic, information on how prisoners can protect themselves from contracting COVID-19, or instructions about how to properly wash hands.

157.   Prisoners are not provided information even when their dorms or cells are on quarantine.

## **CLASS ACTION ALLEGATIONS**

158.   The named Plaintiffs bring this action on behalf of themselves and all others similarly situated as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(2).

159.   Plaintiffs Rodney Cullors, Mark Avila, LeAndrew Lewis, Jeremiah Farmer, and Jessica Haviland seek to represent a class of all current and future detainees in pretrial custody, including alleged violations of probation or parole, at all County jails ("Pretrial Equitable Relief Class"), including one sub-class of all persons who, by reason of age or medical condition as defined below, the CDC has identified as particularly vulnerable to injury or death if they were to contract COVID-19 ("Pretrial Medically Vulnerable Subclass"). Plaintiffs Rodney Cullors and Mark Avila are also representatives and members of the Pretrial Medically Vulnerable Subclass.

160.   Plaintiffs DeNeal Young, Victor Gutierrez, Rany Uong, and Carole Dunham

seek to represent a class of all current and future detainees in post-conviction custody, including those serving a term of incarceration pursuant to an adjudicated violation of probation or parole, at all County jails ("Post-Conviction Equitable Relief Class"), including one sub-class of all persons who, by reason of age or medical condition, the CDC has identified as particularly vulnerable to injury or death if they were to contract COVID-19 ("Post-Conviction Medically Vulnerable Subclass"). Plaintiffs DeNeal Young, Victor Gutierrez, and Carole Dunham are also representatives and members of the Post-Conviction Medically Vulnerable Subclass.

161.   The "Medically Vulnerable Subclasses" are defined as "all current and future [pretrial detainees/post-conviction prisoners] held in all County jails over the age of fifty-five, as well as all current and future [pretrial detainees/post-conviction prisoners] held in all County jails of any age who experience (a) lung disease, including asthma, chronic obstructive pulmonary disease (e.g. bronchitis or emphysema), or other chronic conditions associated with impaired lung function; (b) heart disease, such as congenital heart disease, congestive heart failure or coronary artery disease; (c) chronic liver or kidney disease (including hepatitis and dialysis patients); (d) diabetes or other endocrine disorders; (e) epilepsy; (f) hypertension; (g) compromised immune systems (such as from cancer, HIV, receipt of an organ or bone marrow transplant, as a side effect of medication, or other autoimmune disease); (h) blood disorders (including sickle cell disease); (i) inherited metabolic disorders; (j) history of stroke; (k) a developmental disability; (l) a current or recent (within the last two weeks) pregnancy; (m) severe obesity; and/or (n) any other condition identified either now or in the future as being a particular risk for severe illness and/or death caused by COVID-19." The medically vulnerable subclasses seek both injunctive relief and, if and to the extent necessary, release pursuant to a writ of habeas corpus.

162.   This action is brought and may properly be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. This action satisfies the requirements of numerosity, commonality, typicality, and adequacy. Fed. R. Civ. P. 23(a).

163.   As of April 23, 2020, the County jails confined 11,990 people, all of whom are eligible members of the classes and subclasses. The class meets the numerosity requirement of Federal Rule of Civil Procedure 23(a).

164.   Joinder of all members is impracticable. Demographic data regarding the health of correctional populations indicates that the subclasses are likely to contain hundreds of people.[100]

| Health condition | Prevalence of health condition by population | | | |
|---|---|---|---|---|
| | Jails | State prisons | Federal prisons | United States |
| Ever tested positive for Tuberculosis | 2.5% | 6.0% | | 0.5% |
| Asthma | 20.1% | 14.9% | | 10.2% |
| Cigarette smoking | n/a | 64.7% | 45.2% | 21.2% |
| HIV positive | 1.3% | 1.3% | | 0.4% |
| High blood pressure/hypertension | 30.2% | 26.3% | | 18.1% |
| Diabetes/high blood sugar | 7.2% | 9.0% | | 6.5% |
| Heart-related problems | 10.4% | 9.8% | | 2.9% |
| Pregnancy | 5.0% | 4.0% | 3.0% | 3.9% |

*Health conditions that make respiratory diseases like COVID-19 more dangerous are far more common in the incarcerated population than in the general U.S. population. Pregnancy data come from our report, Prisons neglect pregnant women in their healthcare policies, the CDC's 2010 Pregnancy Rates Among U.S. Women, and data from the 2010 Census. Cigarette smoking data are from a 2016 study, Cigarette smoking among inmates by race/ethnicity, and all other data are from the 2015 BJS report, Medical problems of state and federal prisoners and jail inmates, 2011-12, which does not offer separate data for the federal and state prison populations. Cigarette smoking may be part of the explanation of the higher fatality rate in China among men, who are far more likely to smoke than women.*

165.   Joinder is impracticable because the class members are numerous; the class includes future, unknown members; and the class is fluid due to the inherently transitory nature of pretrial incarceration. Certifying the classes and subclasses supports judicial economy.

166.   Common questions of law and fact exist as to all members of the classes and subclasses respectively. The named Plaintiffs seek common declarative and injunctive relief concerning whether Defendants' policies, practices, and procedures violate the constitutional rights of the class members. These common questions of fact and law include, but are not limited to:

    1)   What specific measures the County has implemented to protect incarcerated persons from the spread of COVID-19 in the jails

---

[100] Peter Wagner & Emily Widra, *No need to wait for pandemics: The public health case for criminal justice reform*, PRISON POLICY INITIATIVE (Mar. 6, 2020), www.prisonpolicy.org/blog/2020/03/06/pandemic/ (last accessed Apr. 13, 2020).

1   including whether Defendants have taken appropriate measures to

2   ensure adequate social distancing, to supply inmates with the necessary

3   supplies for hand washing, to screen and quarantine new bookings to

4   prevent contagious people from entering the jail population, and to

5   ensure that surfaces are routinely disinfected;

6   2)   Whether Defendants' practices during the COVID-19 pandemic

7   encompass readily available and achievable health practices;

8   3)   Whether Defendants' practices comport with the Centers for Disease

9   Control and Prevention's and Los Angeles County Health

10   Department's guidelines for preventing the spread of COVID-19 in

11   correctional facilities;

12   4)   Whether Defendants' practices during the COVID-19 pandemic expose

13   inmates at LACJ facilities to a substantial risk of serious harm;

14   167.   Additionally, members of the subclasses share the common question of their

15   particular vulnerability to the COVID-19 pandemic.

16   168.   Plaintiffs' claims are typical of the class members' claims. That typicality

17   stems from their claim that Defendants have placed them at significant risk of harm by

18   failing to take appropriate steps to address the risk of COVID-19 throughout the County's

19   jails. Every person at the Jail faces a heightened risk of contracting COVID-19 if they are

20   not adequately protected by Defendants. Plaintiffs and all class members are exposed to

21   the same policies and practices, wrongful acts, omissions of Defendants as described in

22   this Complaint. Plaintiffs' claims all arise from the same core of conduct by Defendants,

23   and are based on the same legal theories. All class members seek the same declaratory and

24   injunctive relief.

25   169.   The claims of Plaintiffs are also typical of the Medically Vulnerable subclass

26   members. The claims of Plaintiffs are typical as each member is subject to increased risk

27   as a result of their existing age or medical conditions. Plaintiffs' claims as to the

28   subclasses all arise from the same core of conduct by Defendants, and are based on the

same legal theories. All members of the Medically Vulnerable subclasses seek the same relief in the form of immediate release through *habeas corpus*.

170.   The Plaintiffs are adequate representatives of the classes and subclasses because their interests in the vindication of the legal claims they raise are entirely aligned with the interests of the other class members, each of whom has the same constitutional claims. There are no known conflicts of interest among members of the proposed classes or subclasses, and the interests of the named Plaintiffs do not conflict with those of the other class or subclass members.

171.   Plaintiffs are represented by counsel with experience and success in litigating complex civil rights matters in federal court. The interests of the members of the class will be fairly and adequately protected by the named Plaintiffs and their attorneys.

172.   Because the putative class challenges Defendants' system as unconstitutional through declaratory and injunctive relief that would apply the same relief to every member of the class, and Defendants have acted on grounds generally applicable to all proposed class members, certification under Rule 23(b)(2) is appropriate and necessary.

173.   A class action is a superior means, and the only practicable means, by which the named Plaintiffs and class members can challenge the Defendants' unconstitutional actions and obtain the necessary immediate declaratory and injunctive relief sought for themselves and all other members of the class.

## FIRST CAUSE OF ACTION

**Unconstitutional Conditions of Confinement in Violation of the Fourteenth Amendment of the U.S. Constitution (42 U.S.C. § 1983 / 28 U.S.C. § 2241)**

**(Pretrial Equitable Relief Class, Youth Justice Coalition, Dignity and Power Now vs. All Defendants)**

174.   Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1 through 173 as if fully set forth herein.

175.   Under the Fourteenth Amendment, corrections officials are required to provide for the reasonable health and safety of persons in pretrial custody. *Youngberg v.*

*Romeo*, 457 U.S. 307, 315–16, 324 (1982) (the state has an "unquestioned duty to provide adequate . . . medical care" for detained persons).

176.   A prison official's objective deliberate indifference to a substantial risk of harm to a prisoner awaiting trial violates the Fourteenth Amendment. *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018).

177.   Corrections officials have a constitutional obligation to provide for detainees' reasonable safety and to address their serious medical needs. *Youngberg v. Romeo*, 457 U.S. 307, 315–16, 324 (1982) (the state has an "unquestioned duty to provide adequate . . . medical care" for detained persons).

178.   As part of this right, the government must provide incarcerated persons with reasonable safety and address serious medical needs that arise in jail. Objective deliberate indifference to the serious risk COVID-19 poses to members of the Pretrial Equitable Relief Class, and particularly members of the Pretrial Medically Vulnerable Subclass, violates this right.

179.   Defendants have placed Plaintiffs, and the class they represent, at a substantial risk of serious harm to their health and safety due to their acts and omissions as to presence of, and spread of, COVID-19. Defendants have failed to take reasonable available measures to abate that risk, even though reasonable officials and entities in the circumstances would have appreciated the high degree of risk involved, making the consequences of Defendants' conduct obvious. By not taking all reasonable measures, Defendants have caused Plaintiffs injuries.

180.   Exposure to an infectious disease like COVID-19 without adequate preventive measures constitutes deliberate indifference to a serious risk to health and safety. *Helling*, 509 U.S. at 33-34 ("Nor can we hold that prison officials may be deliberately indifferent to the exposure of inmates to a serious, communicable disease"); *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) ("[C]orrectional officials have an affirmative obligation to protect [forcibly confined] inmates from infectious disease."); *Powell v. Lennon,* 914 F.2d 1459, 1463 (11th Cir.1990) (plaintiff's allegations that "the

defendants forced him to remain in a dormitory [whose] atmosphere was filled with friable asbestos" stated a claim for "deliberate indifference to the plaintiff's serious medical needs."); *see also Farmer v. Brennan*, 511 U.S. 825, 833 (1994) ("[H]aving stripped [prisoners] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course.").

181.   The County failed to comply with public health guidelines to prevent an outbreak of COVID-19 and failed to provide for the safety of the Classes and Subclasses. Defendants' actions and inactions result in the confinement of members of the Classes and Subclasses in a jail where Plaintiffs are not being protected from, tested for, or treated for COVID-19, which violates Plaintiffs' rights to treatment and adequate medical care.

182.   By failing to implement such guidelines, Defendants have subjected Plaintiffs to conditions of confinement that increased their risk of contracting COVID-19, for which there is no known vaccine, treatment, or care. Due to the conditions in County jails, Plaintiffs are unable to take steps to protect themselves—such as social distancing, accessing medical attention or testing, or washing their hands regularly—and Defendants have failed to provide adequate protections or mitigation measures. Defendants acted with deliberate indifference towards Plaintiffs by failing to adequately safeguard their health and safety in the midst of a potential outbreak of a contagious, infectious disease. *See* Cal. Gov't Code § 8658 ("In any case in which an emergency endangering the lives of inmates of a state, county, or city penal or correctional institution has occurred or is imminent, the person in charge of the institution may remove the inmates from the institution. He shall, if possible, remove them to a safe and convenient place and there confine them as long as may be necessary to avoid the danger, or, if that is not possible, may release them. Such person shall not be held liable, civilly or criminally, for acts performed pursuant to this section."); *see also* Cal. Penal Code § 4012 (providing for the removal of prisoners to a "safe and convenient place . . . [of] confinement" when "a pestilence or contagious disease breaks out in or near a jail . . . liable to endanger the health of the prisoners").

183.   As a direct and proximate result of Defendants' unconstitutional actions, Plaintiffs and the class members they represent will suffer irreparable injury and are entitled to immediate injunctive relief.

184.   Accordingly, Defendants, as supervisors, direct participants, and policy makers for Los Angeles County, have violated the rights of the Pretrial Equitable Relief Class and Pretrial Medically Vulnerable Subclass under the Fourteenth Amendment.

185.   In addition, Defendant Villanueva has actual knowledge of the different policies, practices, and customs promulgated by the County across Los Angeles County jails as alleged herein, and personally spoke on the issue of COVID-19 in County jails on repeated occasions. Despite having such personal knowledge and being personally involved in the inadequate response to COVID-19 in County jails, Defendant Villanueva condoned, tolerated, and through actions and inactions ratified such policies while acting under color of law.

186.   Section 2241(c)(3) allows this court to order the release of prisoners like Plaintiffs who are held "in violation of the Constitution." 28 U.S.C. 2241(c)(3); *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973) ("It is clear, not only from the language of ss 2241(c)(3) and 2254(a), but also from the common-law history of the writ, that the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody."); *Peyton v. Rowe*, 391 U.S. 54, 67 (1968) (Section 2241(c)(3) can afford immediate release for claims other than those challenging the sentence itself). Pursuant to this section, the Medically Vulnerable Subclass should be released to the maximum extent possible.

187.   The members of Youth Justice Coalition and Dignity and Power Now have had their constitutional rights violated by Defendants' conduct. The mission of both Youth Justice Coalition and Dignity and Power Now are also frustrated by the acts of Defendants, and both organizations continue to divert resources as a result of Defendants' acts to ensure that their members and the communities they serve are not subjected to

1    Defendants' unconstitutional practices.

2    ## SECOND CAUSE OF ACTION

3    **Unconstitutional Punishment in Violation of the Fourteenth Amendment of the U.S.**

4    **Constitution (42 U.S.C. § 1983 / 28 U.S.C. 2241)**

5    **(Pretrial Equitable Relief Class, Youth Justice Coalition, Dignity and Power Now vs.**

6    **All Defendants)**

7        188.   Plaintiffs incorporate by reference each and every allegation contained in

8    paragraphs 1 through 173 as if fully set forth herein.

9        189.   Under the Fourteenth Amendment persons in pretrial custody have greater

10   due process protections than those convicted and therefore cannot be punished as part of

11   their detention. *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982); *Bell v. Wolfish*, 441

12   U.S. 520, 535 n.16 (1979). Defendants punish Plaintiffs when their conduct is either not

13   related to a legitimate non-punitive governmental purpose or is excessive in relation to

14   that purpose.

15       190.   Even assuming that Defendants' provision of medical services and physical

16   plans as to spacing between prisoners normally serves a legitimate non-punitive purpose

17   of health and safety of detained persons, the County's jails, as currently operated, violate

18   Plaintiffs' constitutional rights and do not comply with public health and CDC guidelines

19   to prevent the introduction and spread of COVID-19. Therefore, continuing to detain class

20   members under these conditions at the County's jails is not rationally related to, and is

21   excessive in relation to, that purpose.

22       191.   Defendants acted with deliberate indifference toward Plaintiffs by failing to

23   adequately safeguard their health in the midst of a potential outbreak of a contagious,

24   infectious disease. *See* Cal. Gov't Code § 8658 ("In any case in which an emergency

25   endangering the lives of inmates of a state, county, or city penal or correctional institution

26   has occurred or is imminent, the person in charge of the institution may remove the

27   inmates from the institution. He shall, if possible, remove them to a safe and convenient

28   place and there confine them as long as may be necessary to avoid the danger, or, if that is

not possible, may release them. Such person shall not be held liable, civilly or criminally, for acts performed pursuant to this section."); *see also* Cal. Penal Code § 4012 (providing for the removal of prisoners to a "safe and convenient place . . . [of] confinement" when "a pestilence or contagious disease breaks out in or near a jail . . . liable to endanger the health of the prisoners").

192.   As a direct and proximate result of Defendants' unconstitutional actions, Plaintiffs and the class members they represent will suffer irreparable injury and are entitled to immediate injunctive relief.

193.   Accordingly, Defendants have subjected the Pretrial Equitable Relief Class and Pretrial Medically Vulnerable Subclass to punishment in violation of the Fourteenth Amendment.

194.   In addition, Defendant Villanueva has actual knowledge of the different policies, practices, and customs promulgated by the County across Los Angeles County jails as alleged herein, and personally spoke on the issue of COVID-19 in County jails on repeated occasions. Despite having such personal knowledge and being personally involved in the inadequate response to COVID-19 in County jails, Defendant Villanueva condoned, tolerated, and through actions and inactions ratified such policies while acting under color of law.

195.   Section 2241(c)(3) allows this court to order the release of prisoners like Plaintiffs who are held "in violation of the Constitution." 28 U.S.C. 2241(c)(3); *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973) ("It is clear, not only from the language of ss 2241(c)(3) and 2254(a), but also from the common-law history of the writ, that the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody."); *Peyton v. Rowe*, 391 U.S. 54, 67 (1968) (Section 2241(c)(3) can afford immediate release for claims other than those challenging the sentence itself). Pursuant to this section, the Medically Vulnerable Subclass should be released to the maximum extent possible.

196. The members of Youth Justice Coalition and Dignity and Power Now have had their constitutional rights violated by Defendants' conduct. The mission of both Youth Justice Coalition and Dignity and Power Now are also frustrated by the acts of Defendants, and both organizations continue to divert resources as a result of Defendants' acts to ensure that their members and the communities they serve are not subjected to Defendants' unconstitutional practices.

## THIRD CAUSE OF ACTION

**Unconstitutional Conditions of Confinement in Violation of the Eighth Amendment of the U.S. Constitution (42 U.S.C. § 1983 / 28 U.S.C. 2241)**

**(Post-Conviction Equitable Relief Class, Youth Justice Coalition, Dignity and Power Now vs. All Defendants)**

197. Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1 through 173 as if fully set forth herein.

198. Under the Eighth Amendment, post-convicted persons in carceral custody have a right to be free from cruel and unusual punishment. As part of the right, the government must provide incarcerated persons with reasonable safety and address serious medical needs that arise in jail. *See, e.g., DeShaney v. Winnebago County Dept. of Soc. Services*, 489 U.S. 189, 200 (1989) ("[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause."); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (the government has an "obligation to provide medical care for those whom it is punishing by incarceration.").

199. As part of this right under the Eighth Amendment, the government must provide incarcerated persons with reasonable safety and address serious medical needs that arise in jail. Deliberate indifference to the serious risk COVID-19 poses to members of the classes, and particularly members of the Medically Vulnerable subclasses, violates

this right.

200.   This Court need not "await a tragic event" to find that Defendants are maintaining unconstitutional conditions of confinement in the midst of a global pandemic. *See Helling*, 509 U.S. at 33. So long as the risk of serious harm is "likely," as it is here, the Eighth Amendment is violated even if "the complaining inmate shows no serious current symptoms," it is "not alleged that the likely harm would occur immediately," and "the possible infection might not affect all of those exposed." *Id.*

201.   A prison official's subjective deliberate indifference to a substantial risk of harm to a prisoner awaiting trial violates the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) ("deliberate indifference" to serious medical needs violates the Eighth Amendment).

202.   Exposure to an infectious disease like COVID-19 without adequate preventive measures constitutes deliberate indifference to a serious risk to health and safety. *Helling*, 509 U.S. at 33-34 ("Nor can we hold that prison officials may be deliberately indifferent to the exposure of inmates to a serious, communicable disease"); *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) ("[C]orrectional officials have an affirmative obligation to protect [forcibly confined] inmates from infectious disease."); *Powell v. Lennon,* 914 F.2d 1459, 1463 (11th Cir.1990) (plaintiff's allegations that "the defendants forced him to remain in a dormitory [whose] atmosphere was filled with friable asbestos" and that "defendants knew of the health danger and yet refused to move the plaintiff to an asbestos-free environment" stated a claim for "deliberate indifference to the plaintiff's serious medical needs."); *see also Farmer v. Brennan*, 511 U.S. 825, 833 (1994) ("[H]aving stripped [prisoners] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course.").

203.   With respect to an impending infectious disease like COVID-19, deliberate indifference is satisfied when corrections officials "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or

month or year," even when "the complaining inmate shows no serious current symptoms." *Helling*, 509 U.S. at 33 (holding that a prisoner "*states a cause of action . . .* by alleging that [corrections officials] have, with deliberate indifference, exposed him to conditions that pose an unreasonable risk of serious damage to future health") (emphasis added); *see also Hope v. Pelzer,* 536 U.S. 730, 738 (2002) (citing *Farmer,* 511 U.S. at 842) (court "may infer the existence of [deliberate indifference] from the fact that the risk of harm is obvious").

204.   Plaintiffs, and the class members they represent, suffer a substantial risk of serious harm to their health and safety due to the presence of, and spread of, COVID-19.

205.   The County failed to comply with public health guidelines to prevent an outbreak of COVID-19 and failed to provide for the safety of the Classes and Subclasses. Defendants' actions and inactions result in the confinement of members of the Classes and Subclasses in a jail where they are not protected from, tested for, or treated for COVID-19, which violates Plaintiffs' rights to be free from cruel and unusual punishment.

206.   Defendants knew of and disregarded the serious risks that COVID-19 poses to Plaintiffs, including severe illness, permanent physical damage, and death. These risks were well-established, known by, and obvious to Defendants.

207.   In addition, Defendant Villanueva has actual knowledge of the different policies, practices, and customs promulgated by the County across Los Angeles County jails as alleged herein, and personally spoke on the issue of COVID-19 in County jails on repeated occasions. Despite having such personal knowledge and being personally involved in the inadequate response to COVID-19 in County jails, Defendant Villanueva condoned, tolerated, and through actions and inactions ratified such policies while acting under color of law.

208.   Defendants have subjected Plaintiffs to conditions of confinement that increased their risk of contracting COVID-19, for which there is no known vaccine, treatment, or cure. This subjects Plaintiffs to cruel and unusual punishment. Due to the conditions in County jails, Plaintiffs are unable to take steps to protect themselves—such

as social distancing, accessing medical attention or testing, or washing their hands regularly—and Defendants have failed to provide adequate protections or mitigation measures. Defendants acted with deliberate indifference towards Plaintiffs by failing to adequately safeguard their health and safety in the midst of a potential outbreak of a contagious, infectious disease. *See* Cal. Gov't Code § 8658 ("In any case in which an emergency endangering the lives of inmates of a state, county, or city penal or correctional institution has occurred or is imminent, the person in charge of the institution may remove the inmates from the institution. He shall, if possible, remove them to a safe and convenient place and there confine them as long as may be necessary to avoid the danger, or, if that is not possible, may release them. Such person shall not be held liable, civilly or criminally, for acts performed pursuant to this section."); *see also* Cal. Penal Code § 4012 (providing for the removal of prisoners to a "safe and convenient place . . . [of] confinement" when "a pestilence or contagious disease breaks out in or near a jail . . . liable to endanger the health of the prisoners").

209.   As a direct and proximate result of Defendants' unconstitutional actions, Plaintiffs and the class members they represent will suffer irreparable injury and are entitled to immediate injunctive relief.

210.   Accordingly, Defendants, as supervisors, direct participants, and policy makers for the County, have violated the rights of the Post-Conviction Equitable Relief Class and Post-Conviction Medically Vulnerable Subclass under the Eighth Amendment.

211.   Section 2241(c)(3) allows this court to order the release of prisoners like Plaintiffs who are held "in violation of the Constitution." 28 U.S.C. 2241(c)(3); *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973) ("It is clear, not only from the language of ss 2241(c)(3) and 2254(a), but also from the common-law history of the writ, that the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody."); *Peyton v. Rowe*, 391 U.S. 54, 67 (1968) (Section 2241(c)(3) can afford immediate release for claims other than those challenging the sentence itself). Pursuant to

this section, the Medically Vulnerable Subclass should be released to the maximum extent possible.

212.    The members of Youth Justice Coalition and Dignity and Power Now have had their constitutional rights violated by Defendants' conduct. The mission of both Youth Justice Coalition and Dignity and Power Now are also frustrated by the acts of Defendants, and both organizations continue to divert resources as a result of Defendants' acts to ensure that their members and the communities they serve are not subjected to Defendants' unconstitutional practices.

## FOURTH CAUSE OF ACTION

### Failure to Accommodate in Violation of the Americans with Disabilities Act (42 U.S.C. § 12132)

### (Medically Vulnerable Subclasses, Youth Justice Coalition, Dignity and Power Now vs. All Defendants)

213.    Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1 through 173 as if fully set forth herein.

214.    Defendant County of Los Angeles is a public entity within the meaning of 42 U.S.C. § 12131. Public entities are required "to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7).

215.    Defendants violate the ADA, 42 U.S.C. § 12132.

216.    Plaintiffs and both Medically Vulnerable Subclasses suffer from disabilities within the meaning and scope of the ADA. In particular, Plaintiffs' disabilities put them at heightened risk of contracting COVID-19. Plaintiffs also meet the eligibility requirements for the receipt of the services, programs, or activities of the Defendants. 42 U.S.C. § 12131. Accordingly, Plaintiffs are members of the class of persons protected by 42 U.S.C. § 12132, which make it unlawful for public entities to deny the benefits of the services, programs, or activities of a public entity to persons with disabilities.

217.    As alleged herein, Defendants violated the ADA by, among other things,

their failure to provide reasonable accommodations and other services for Plaintiffs' disabilities. Defendants failed to provide adequate protections for prisoners suffering from pre-existing medical conditions that put them at higher risk of contracting COVID-19, in order to protect them from exposure. Defendants failed to release such prisoners, which is the only possible accommodation to fully protect them from COVID-19.

218.   Defendants violated the ADA, including but not limited to, by failing to "ensure that inmates or detainees with disabilities are housed in the most integrated settings appropriate to the needs of the individuals" (28 C.F.R. Section 35.152(b)(2)); "failing to implement reasonable policies, including physical modifications to additional cells in accordance with the 2010 [accessibility] Standards, so as to ensure that each inmate with a disability is housed in a cell with the accessible elements necessary to afford the inmate access to safe, appropriate housing (28 C.F.R. Section 35.152(b)(3)); failing or refusing to provide the Medically Vulnerable Subclasses with reasonable accommodations and other services related to their disabilities (28 C.F.R. section 35.130(a)); failing or refusing to provide equally effective communication (28 C.F.R. section 35.160(a)); denying the Medically Vulnerable Subclasses "the opportunity to participate in or benefit from aid, benefit, or service" provided by Defendants" (28 C.F.R. section 35.130(b)(1)(i)); failing to make "reasonable modifications in policies, practices or procedures when the modifications are necessary to avoid discrimination on the basis of disability" (28 C.F.R. 35.130(b)(7)); failing to make available information to the Medically Vulnerable Subclasses about their rights while detained in the jail (28 C.F.R. section 35.106); and failing to "maintain in operable working conditions those features of facilities and equipment that are required to be readily accessible to and usable by persons with disabilities" (28 C.F.R. section 35.133(a)).

219.   As a result of Defendants' policy and practice of failing to provide reasonable accommodations and modifications, Plaintiffs and both Medically Vulnerable Subclasses do not have equal access to protection and jail activities, programs, and services for which they are otherwise qualified.

220.   Defendants knew of and disregarded the serious risks that COVID-19 poses to Plaintiffs, including severe illness, permanent physical damage, and death. *See* Cal. Gov't Code § 8658 ("In any case in which an emergency endangering the lives of inmates of a state, county, or city penal or correctional institution has occurred or is imminent, the person in charge of the institution may remove the inmates from the institution. He shall, if possible, remove them to a safe and convenient place and there confine them as long as may be necessary to avoid the danger, or, if that is not possible, may release them. Such person shall not be held liable, civilly or criminally, for acts performed pursuant to this section."); *see also* Cal. Penal Code § 4012 (providing for the removal of prisoners to a "safe and convenient place . . . [of] confinement" when "a pestilence or contagious disease breaks out in or near a jail . . . liable to endanger the health of the prisoners").

221.   In addition, Defendant Villanueva has actual knowledge of the different policies, practices, and customs promulgated by the County across Los Angeles County jails as alleged herein, and personally spoke on the issue of COVID-19 in County jails on repeated occasions. Despite having such personal knowledge and being personally involved in the inadequate response to COVID-19 in County jails, Defendant Villanueva condoned, tolerated, and through actions and inactions ratified such policies while acting under color of law.

222.   As a direct and proximate result of Defendants' conduct as alleged herein, Plaintiffs and the class members they represent will suffer irreparable harm and are entitled to immediate injunctive relief.

223.   The members of Youth Justice Coalition and Dignity and Power Now have had their constitutional rights violated by Defendants' conduct. The mission of both Youth Justice Coalition and Dignity and Power Now are also frustrated by the acts of Defendants, and both organizations continue to divert resources as a result of Defendants' acts to ensure that their members and the communities they serve are not subjected to Defendants' unconstitutional practices.

/ / /

### FIFTH CAUSE OF ACTION

**Discrimination in Violation of the Americans with Disabilities Act (42 U.S.C. § 12132)**

**(Medically Vulnerable Subclasses, Youth Justice Coalition, Dignity and Power Now vs. All Defendants)**

224.   Plaintiffs incorporate by reference each and every allegation in paragraphs 1 through 173 as if fully set forth herein.

225.   Defendant County of Los Angeles is a public entity within the meaning of 42 U.S.C. § 12131. Public entities are required "to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7).

226.   Defendants violate the ADA, 42 U.S.C. § 12132.

227.   Plaintiffs and both Medically Vulnerable Subclasses suffer from disabilities within the meaning and scope of the ADA. In particular, Plaintiffs' disabilities put them at heightened risk of contracting COVID-19. Plaintiffs also meet the eligibility requirements for the receipt of the services, programs, or activities of the Defendants. 42 U.S.C. § 12131. Accordingly, Plaintiffs are members of the class of persons protected by 42 U.S.C. § 12132, which make it unlawful for public entities to discriminate against individuals with disabilities.

228.   As alleged herein, Defendants violated the ADA by, among other things, discriminating against members of the Medically Vulnerable Subclasses because of their disabilities and/or medical conditions. Defendants failed to provide adequate protections for prisoners suffering from pre-existing medical conditions that put them at higher risk of contracting COVID-19, in order to protect them from exposure. Defendants failed to release such prisoners, which is the only possible accommodation to fully protect them from COVID-19.

229.   As a result of Defendants' policy and practice of discriminating against Plaintiffs and the Medically Vulnerable Subclasses, Plaintiffs and the Medically

Vulnerable Subclasses do not have equal access to protection and jail activities, programs, and services for which they are otherwise qualified.

230.   Defendants knew of and disregarded the serious risks that COVID-19 poses to Plaintiffs, including severe illness, permanent physical damage, and death. *See* Cal. Gov't Code § 8658 ("In any case in which an emergency endangering the lives of inmates of a state, county, or city penal or correctional institution has occurred or is imminent, the person in charge of the institution may remove the inmates from the institution. He shall, if possible, remove them to a safe and convenient place and there confine them as long as may be necessary to avoid the danger, or, if that is not possible, may release them. Such person shall not be held liable, civilly or criminally, for acts performed pursuant to this section."); *see also* Cal. Penal Code § 4012 (providing for the removal of prisoners to a "safe and convenient place . . . [of] confinement" when "a pestilence or contagious disease breaks out in or near a jail . . . liable to endanger the health of the prisoners").

231.   In addition, Defendant Villanueva has actual knowledge of the different policies, practices, and customs promulgated by the County across Los Angeles County jails as alleged herein, and personally spoke on the issue of COVID-19 in County jails on repeated occasions. Despite having such personal knowledge and being personally involved in the inadequate response to COVID-19 in County jails, Defendant Villanueva condoned, tolerated, and through actions and inactions ratified such policies while acting under color of law.

232.   As a direct and proximate result of Defendants' conduct as alleged herein, Plaintiffs and the class members they represent will suffer irreparable harm and are entitled to immediate injunctive relief.

233.   The members of Youth Justice Coalition and Dignity and Power Now have had their constitutional rights violated by Defendants' conduct. The mission of both Youth Justice Coalition and Dignity and Power Now are also frustrated by the acts of Defendants, and both organizations continue to divert resources as a result of Defendants' acts to ensure that their members and the communities they serve are not subjected to

Defendants' unconstitutional practices.

### SIXTH CAUSE OF ACTION

**Failure to Accommodate in Violation of the Rehabilitation Act (29 U.S.C. § 794)**

**(Medically Vulnerable Subclasses, Youth Justice Coalition, Dignity and Power Now**

**vs. All Defendants)**

234.   Plaintiffs incorporate by reference each and every allegation in paragraphs 1 through 173 as if fully set forth herein.

235.   Section 504 of the Rehabilitation Act of 1973 provides in pertinent part: "[N]o otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance…." 29 U.S.C. § 794.

236.   At all relevant times to this action, Defendants were recipients of federal funding within the meaning of the Rehabilitation Act. As recipients of federal funds, they are required to reasonably accommodate prisoners with disabilities in their facilities, program activities, and services. This Act further requires the Defendants to modify their facilities, services, and programs as necessary to accomplish this purpose.

237.   Plaintiffs and both Medically Vulnerable Subclasses they represent are qualified individuals with disabilities as defined in the Rehabilitation Act. 29 U.S.C. § 705(20)(B). They are otherwise qualified to participate in the services, programs, or activities that are provided to inmates at the Los Angeles County jail facilities. 29 U.S.C. § 794(b).

238.   By their policy and practice of failing to reasonably accommodate prisoners in the Medically Vulnerable Subclasses, Defendants violate Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

239.   As a result of Defendants' conduct involving the failure to provide reasonable accommodations, Plaintiffs and members of both Medically Vulnerable Subclasses do not have equal access to jail activities, programs, and services for which they are otherwise

1   qualified.

2        240.   Defendants knew of and disregarded the serious risks that COVID-19 poses

3   to Plaintiffs, including severe illness, permanent physical damage, and death. *See* Cal.

4   Gov't Code § 8658 ("In any case in which an emergency endangering the lives of inmates

5   of a state, county, or city penal or correctional institution has occurred or is imminent, the

6   person in charge of the institution may remove the inmates from the institution. He shall,

7   if possible, remove them to a safe and convenient place and there confine them as long as

8   may be necessary to avoid the danger, or, if that is not possible, may release them. Such

9   person shall not be held liable, civilly or criminally, for acts performed pursuant to this

10  section."); *see also* Cal. Penal Code § 4012 (providing for the removal of prisoners to a

11  "safe and convenient place . . . [of] confinement" when "a pestilence or contagious disease

12  breaks out in or near a jail . . . liable to endanger the health of the prisoners").

13       241.   In addition, Defendant Villanueva has actual knowledge of the different

14  policies, practices, and customs promulgated by the County across Los Angeles County

15  jails as alleged herein, and personally spoke on the issue of COVID-19 in County jails

16  on repeated occasions. Despite having such personal knowledge and being personally

17  involved in the inadequate response to COVID-19 in County jails, Defendant Villanueva

18  condoned, tolerated, and through actions and inactions ratified such policies while acting

19  under color of law.

20       242.   As a direct and proximate result of Defendants' conduct as alleged herein,

21  Plaintiffs and the class members they represent will suffer irreparable harm and are

22  entitled to immediate injunctive relief.

23       243.   The members of Youth Justice Coalition and Dignity and Power Now have

24  had their constitutional rights violated by Defendants' conduct. The mission of both Youth

25  Justice Coalition and Dignity and Power Now are also frustrated by the acts of

26  Defendants, and both organizations continue to divert resources as a result of Defendants'

27  acts to ensure that their members and the communities they serve are not subjected to

28  Defendants' unconstitutional practices.

## SEVENTH CAUSE OF ACTION

### Discrimination and Disparate-Impact Discrimination in Violation of the

### Rehabilitation Act (29 U.S.C. § 794)

### (Medically Vulnerable Subclasses, Youth Justice Coalition, Dignity and Power Now vs. All Defendants)

244.   Plaintiffs incorporate by reference each and every allegation contained paragraphs 1 through 173 as if fully set forth herein.

245.   Section 504 of the Rehabilitation Act of 1973 provides in pertinent part: "[N]o otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance…." 29 U.S.C. § 794.

246.   At all relevant times to this action, Defendants were recipients of federal funding within the meaning of the Rehabilitation Act. As recipients of federal funds, they are required to provide equal protection to prisoners with disabilities in their facilities, program activities, and services. This Act further requires the Defendants to modify their facilities, services, and programs as necessary to accomplish this purpose. Defendant County.

247.   Plaintiffs and both Medically Vulnerable Subclasses they represent are qualified individuals with disabilities as defined in the Rehabilitation Act. 29 U.S.C. § 705(20)(B). They are otherwise qualified to participate in the services, programs, or activities that are provided to inmates at the Los Angeles County jail facilities. 29 U.S.C. § 794(b).

248.   By their policy and practice of discriminating against prisoners in the Medically Vulnerable Subclasses, Defendants violate Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. Defendants violate the Rehabilitation Act because their conduct has a discriminatory motive and disparate impact on members of the Medically Vulnerable Subclasses. *See Marshall v. McMahon*, 17 Cal.App.4th 1841, 1850 (1993) ("Claims of

discriminatory motive and disparate-impact discrimination may be brought under the Rehabilitation Act.").

249.   As a result of Defendants' conduct involving discrimination and disparate impact discrimination, Plaintiffs and members of both Medically Vulnerable Subclasses do not have equal access to jail activities, programs, and services for which they are otherwise qualified.

250.   Defendants knew of and disregarded the serious risks that COVID-19 poses to Plaintiffs, including severe illness, permanent physical damage, and death. *See* Cal. Gov't Code § 8658 ("In any case in which an emergency endangering the lives of inmates of a state, county, or city penal or correctional institution has occurred or is imminent, the person in charge of the institution may remove the inmates from the institution. He shall, if possible, remove them to a safe and convenient place and there confine them as long as may be necessary to avoid the danger, or, if that is not possible, may release them. Such person shall not be held liable, civilly or criminally, for acts performed pursuant to this section."); *see also* Cal. Penal Code § 4012 (providing for the removal of prisoners to a "safe and convenient place . . . [of] confinement" when "a pestilence or contagious disease breaks out in or near a jail . . . liable to endanger the health of the prisoners").

251.   In addition, Defendant Villanueva has actual knowledge of the different policies, practices, and customs promulgated by the County across Los Angeles County jails as alleged herein, and personally spoke on the issue of COVID-19 in County jails on repeated occasions. Despite having such personal knowledge and being personally involved in the inadequate response to COVID-19 in County jails, Defendant Villanueva condoned, tolerated, and through actions and inactions ratified such policies while acting under color of law.

252.   As a direct and proximate result of Defendants' conduct as alleged herein, Plaintiffs and the class members they represent will suffer irreparable harm and are entitled to immediate injunctive relief.

253.   The members of Youth Justice Coalition and Dignity and Power Now have

1  had their constitutional rights violated by Defendants' conduct. The mission of both Youth

2  Justice Coalition and Dignity and Power Now are also frustrated by the acts of

3  Defendants, and both organizations continue to divert resources as a result of Defendants'

4  acts to ensure that their members and the communities they serve are not subjected to

5  Defendants' unconstitutional practices.

### EIGHTH CAUSE OF ACTION

### Cal. Gov't Code § 11135

### (Medically Vulnerable Subclasses, Youth Justice Coalition, Dignity and Power Now vs. All Defendants)

10   254.   Plaintiffs incorporate by reference each and every allegation contained in

11  paragraphs 1 through 173 as if fully set forth herein.

12   255.   California Government Code section 11135(a) provides in pertinent part:

13  "No person in the State of California shall, on the basis of … disability, be unlawfully

14  denied the benefits of, or be unlawfully subjected to discrimination under, any program

15  or activity that is funded directly the state or receives any financial assistance from the

16  state."

17   256.   Defendants receive financial assistance from the State of California. Plaintiffs

18  and both Medically Vulnerable Subclasses are all persons with disabilities within the

19  meaning of California Government Code § 11135. They are otherwise qualified to

20  participate in the services, programs, or activities that are provided to inmates at the Los

21  Angeles County jail facilities.

22   257.   Defendant County and its jails are entities are bound to comply with section

23  11135.

24   258.   As described herein, Defendants deny Plaintiffs full access to the benefits of

25  the jail's programs and activities which receive financial assistance from the State of

26  California and unlawfully subject Plaintiffs and both Medically Vulnerable Subclasses to

27  discrimination within the meaning of California Government Code § 11135(a) on the basis

28  of their disabilities.

259.   Plaintiffs and the Medically Vulnerable Subclasses have demanded that Defendants stop their unlawful discriminatory conduct described herein but Defendants refused and still refuse to refrain from that conduct.

260.   As a result of Defendants' conduct involving discrimination and the failure to provide reasonable accommodations, Plaintiffs and members of the Medically Vulnerable Subclasses do not have equal access to jail activities, programs, benefits, and services for which they are otherwise qualified.

261.   Defendants knew of and disregarded the serious risks that COVID-19 poses to Plaintiffs, including severe illness, permanent physical damage, and death. *See* Cal. Gov't Code § 8658 ("In any case in which an emergency endangering the lives of inmates of a state, county, or city penal or correctional institution has occurred or is imminent, the person in charge of the institution may remove the inmates from the institution. He shall, if possible, remove them to a safe and convenient place and there confine them as long as may be necessary to avoid the danger, or, if that is not possible, may release them. Such person shall not be held liable, civilly or criminally, for acts performed pursuant to this section."); *see also* Cal. Penal Code § 4012 (providing for the removal of prisoners to a "safe and convenient place . . . [of] confinement" when "a pestilence or contagious disease breaks out in or near a jail . . . liable to endanger the health of the prisoners").

262.   In addition, Defendant Villanueva has actual knowledge of the different policies, practices, and customs promulgated by the County across Los Angeles County jails as alleged herein, and personally spoke on the issue of COVID-19 in County jails on repeated occasions. Despite having such personal knowledge and being personally involved in the inadequate response to COVID-19 in County jails, Defendant Villanueva condoned, tolerated, and through actions and inactions ratified such policies while acting under color of law.

263.   As a direct and proximate result of Defendants' conduct as alleged herein, Plaintiffs and the class members they represent will suffer irreparable harm and are entitled to immediate injunctive relief.

264.   The members of Youth Justice Coalition and Dignity and Power Now have had their constitutional rights violated by Defendants' conduct. The mission of both Youth Justice Coalition and Dignity and Power Now are also frustrated by the acts of Defendants, and both organizations continue to divert resources as a result of Defendants' acts to ensure that their members and the communities they serve are not subjected to Defendants' unconstitutional practices.

## NINTH CAUSE OF ACTION

### Unruh Act (Cal. Civ. Code § 51(f))

### (Medically Vulnerable Subclasses, Youth Justice Coalition, Dignity and Power Now vs. All Defendants)

265.   Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1 through 173 as if fully set forth herein.

266.   The Unruh Act provides that all persons within California are free and equal and "no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Cal. Civ. Code § 51(b). Defendant County and its jails are business establishments within the meaning of the Unruh Act, and thus bound to comply with the Unruh Act.

267.   Plaintiffs and members of both Medically Vulnerable Subclasses are persons with disabilities as defined within the meaning of the Unruh Act. They are otherwise qualified to participate in the services, programs, or activities that are provided to inmates at the Los Angeles County jail facilities.

268.   A violation of a right of any individual under the ADA also constitutes a violation of the Unruh Act under Cal. Civ. Code § 51(f). Defendants have violated the Unruh Act with respect to the Medically Vulnerable Subclasses through their violation of the ADA as alleged herein.

269.   Defendants' conduct violates the Unruh Act because their policies and practices deny Plaintiffs and both Medically Vulnerable Subclasses of the full and equal accommodations, advantages, facilities, privileges, and services they are entitled to on the basis of their disabilities.

270.   Defendants knew of and disregarded the serious risks that COVID-19 poses to Plaintiffs, including severe illness, permanent physical damage, and death. *See* Cal. Gov't Code § 8658 ("In any case in which an emergency endangering the lives of inmates of a state, county, or city penal or correctional institution has occurred or is imminent, the person in charge of the institution may remove the inmates from the institution. He shall, if possible, remove them to a safe and convenient place and there confine them as long as may be necessary to avoid the danger, or, if that is not possible, may release them. Such person shall not be held liable, civilly or criminally, for acts performed pursuant to this section."); *see also* Cal. Penal Code § 4012 (providing for the removal of prisoners to a "safe and convenient place . . . [of] confinement" when "a pestilence or contagious disease breaks out in or near a jail . . . liable to endanger the health of the prisoners").

271.   In addition, Defendant Villanueva has actual knowledge of the different policies, practices, and customs promulgated by the County across Los Angeles County jails as alleged herein, and personally spoke on the issue of COVID-19 in County jails on repeated occasions. Despite having such personal knowledge and being personally involved in the inadequate response to COVID-19 in County jails, Defendant Villanueva condoned, tolerated, and through actions and inactions ratified such policies while acting under color of law.

272.   As a direct and proximate result of Defendants' conduct as alleged herein, Plaintiffs and the class members they represent will suffer irreparable harm and are entitled to immediate injunctive relief.

273.   The members of Youth Justice Coalition and Dignity and Power Now have had their constitutional rights violated by Defendants' conduct. The mission of both Youth Justice Coalition and Dignity and Power Now are also frustrated by the acts of

Defendants, and both organizations continue to divert resources as a result of Defendants' acts to ensure that their members and the communities they serve are not subjected to Defendants' unconstitutional practices.

## TENTH CAUSE OF ACTION

### California Disabled Persons Act (Cal. Civ. Code § 54(c))

### (Medically Vulnerable Subclasses, Youth Justice Coalition, Dignity and Power Now vs. All Defendants)

274.   Plaintiffs incorporate by reference each and every allegation contained paragraphs 1 through 173 as if fully set forth herein.

275.   The California Disabled Persons Act, California Civil Code section 54(a) provides that "individuals with disabilities or medical conditions have the same right as the general public to the full and free use of the streets, highways, sidewalks, walkways, public buildings, medical facilities, including hospitals, clinics, and physicians' offices, public facilities, and other public spaces." Defendant County and its jails provide public services within the meaning of this Act and thus are bound to comply with the California Disabled Persons Act.

276.   Plaintiffs and members of both Medically Vulnerable Subclasses are persons with disabilities and/or medical conditions as defined within the meaning of California Civil Code section 54(b) and Government Code § 12926. They are otherwise qualified to participate in the services, programs, or activities that are provided to inmates at the Los Angeles County jail facilities.

277.   A violation of a right of any individual under the ADA also constitutes a violation of California Civil Code section 54 under Cal. Civ. Code § 54(c). Defendants have violated the California Civil Code section 54 with respect to the Medically Vulnerable Subclasses through their violation of the ADA as alleged herein.

278.   Defendants' conduct violates California Code section 54 because their policies and practices deny Plaintiffs and both Medically Vulnerable Subclasses of the full and equal accommodations, advantages, facilities, privileges, and services they are entitled

HABEAS CORPUS-COMPLAINT FOR
INJUNCTIVE & DECLARATORY RELIEF                    -73-

1   to on the basis of their disabilities and/or medical conditions.

2   279.   Plaintiffs and the Medically Vulnerable Subclasses have demanded that

3   Defendants stop their unlawful discriminatory conduct described herein but Defendants

4   refused and still refuse to refrain from that conduct.

5   280.   Defendants knew of and disregarded the serious risks that COVID-19 poses

6   to Plaintiffs, including severe illness, permanent physical damage, and death. *See* Cal.

7   Gov't Code § 8658 ("In any case in which an emergency endangering the lives of inmates

8   of a state, county, or city penal or correctional institution has occurred or is imminent, the

9   person in charge of the institution may remove the inmates from the institution. He shall,

10  if possible, remove them to a safe and convenient place and there confine them as long as

11  may be necessary to avoid the danger, or, if that is not possible, may release them. Such

12  person shall not be held liable, civilly or criminally, for acts performed pursuant to this

13  section."); *see also* Cal. Penal Code § 4012 (providing for the removal of prisoners to a

14  "safe and convenient place . . . [of] confinement" when "a pestilence or contagious disease

15  breaks out in or near a jail . . . liable to endanger the health of the prisoners").

16  281.   In addition, Defendant Villanueva has actual knowledge of the different

17  policies, practices, and customs promulgated by the County across Los Angeles County

18  jails as alleged herein, and personally spoke on the issue of COVID-19 in County jails

19  on repeated occasions. Despite having such personal knowledge and being personally

20  involved in the inadequate response to COVID-19 in County jails, Defendant Villanueva

21  condoned, tolerated, and through actions and inactions ratified such policies while acting

22  under color of law.

23  282.   As a direct and proximate result of Defendants' conduct as alleged herein,

24  Plaintiffs and the class members they represent will suffer irreparable harm and are

25  entitled to immediate injunctive relief.

26  283.   The members of Youth Justice Coalition and Dignity and Power Now have

27  had their constitutional rights violated by Defendants' conduct. The mission of both Youth

28  Justice Coalition and Dignity and Power Now are also frustrated by the acts of

Defendants, and both organizations continue to divert resources as a result of Defendants' acts to ensure that their members and the communities they serve are not subjected to Defendants' unconstitutional practices.

## ELEVENTH CAUSE OF ACTION

### California Bane Act (Cal. Civ. Code § 52.1)

### (All Plaintiffs vs. All Defendants)

284.   Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1 through 173 as if fully set forth herein.

285.   Defendant County and its jails are entities bound to comply with the Bane Act.

286.   The acts by Defendants violate the federal and state constitutional rights of Plaintiffs, as guaranteed by the Fourteenth and Eighth Amendments to the U.S. Constitution and by the California Constitution Article I, sections 7 and 17. Defendants used force, intimidation, coercion, and/or the threat of force, intimidation, and coercion directed toward Plaintiffs. They did so by confining Plaintiffs in County jails, where they have no freedom to take measures of their own volition to protect themselves from COVID-19. Defendants subjected Plaintiffs to conditions of confinement that deprive them of any ability to protect themselves from COVID-19 and unnecessarily exposed them to risk of contracting the virus, putting them at risk of serious illness and even death.

287.   Defendants unlawful actions were done willfully, maliciously, and with the specific intent to deprive Plaintiffs of their constitutional and statutory rights.

288.   In addition, Defendant Villanueva has actual knowledge of the different policies, practices, and customs promulgated by the County across Los Angeles County jails as alleged herein, and personally spoke on the issue of COVID-19 in County jails on repeated occasions. Despite having such personal knowledge and being personally involved in the inadequate response to COVID-19 in County jails, Defendant Villanueva condoned, tolerated, and through actions and inactions ratified such policies while acting under color of law.

289.   As a direct and proximate consequence of Defendants' actions, Plaintiffs and the class members they represent suffered a loss of their constitutional rights and injury, will suffer irreparable harm, and they are entitled to immediate injunctive relief.

290.   The members of Youth Justice Coalition and Dignity and Power Now have had their constitutional rights violated by Defendants' conduct. The mission of both Youth Justice Coalition and Dignity and Power Now are also frustrated by the acts of Defendants, and both organizations continue to divert resources as a result of Defendants' acts to ensure that their members and the communities they serve are not subjected to Defendants' unconstitutional practices.

## TWELFTH CAUSE OF ACTION

### Violation of California Constitution Art. I § 7

### (All Plaintiffs vs. All Defendants)

291.   Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1 through 171 as if fully set forth herein.

292.   Defendants owe Plaintiffs a duty under Article I, section 7 of the California Constitution to provide Plaintiffs with due process and equal protection under the law.

293.   By the conduct described herein, Defendants violated these rights guaranteed to Plaintiffs. As a direct and proximate consequence of Defendants' conduct, Plaintiffs and the class members they represent suffered a loss of their constitutional rights, will suffer irreparable harm, and are entitled to immediate injunctive relief.

294.   Defendants have been and are aware of all the deprivations complained of herein and have condoned or been deliberately indifferent to such conduct.

295.   In addition, Defendant Villanueva has actual knowledge of the different policies, practices, and customs promulgated by the County across Los Angeles County jails as alleged herein, and personally spoke on the issue of COVID-19 in County jails on repeated occasions. Despite having such personal knowledge and being personally involved in the inadequate response to COVID-19 in County jails, Defendant Villanueva condoned, tolerated, and through actions and inactions ratified such policies while acting

1  under color of law.

2    296.   The members of Youth Justice Coalition and Dignity and Power Now have

3  had their constitutional rights violated by Defendants' conduct. The mission of both Youth

4  Justice Coalition and Dignity and Power Now are also frustrated by the acts of

5  Defendants, and both organizations continue to divert resources as a result of Defendants'

6  acts to ensure that their members and the communities they serve are not subjected to

7  Defendants' unconstitutional practices.

8  **THIRTEENTH CAUSE OF ACTION**

9  **Violation of California Constitution Art. I § 17**

10  **(All Plaintiffs vs. All Defendants)**

11    297.   Plaintiffs incorporate by reference each and every allegation contained in

12  paragraphs 1 through 173 as if fully set forth herein.

13    298.   Defendants owe Plaintiffs a duty under Article I, section 17 of the California

14  Constitution not to impose cruel or unusual punishment.

15    299.   By the conduct described herein, Defendants violated these rights guaranteed

16  to Plaintiffs. As a direct and proximate consequence of Defendants' conduct, Plaintiffs

17  and the class members they represent suffered a loss of their constitutional rights, will

18  suffer irreparable harm, and are entitled to immediate injunctive relief.

19    300.   Defendants have been and are aware of all the deprivations complained of

20  herein and have condoned or been deliberately indifferent to such conduct.

21    301.   In addition, Defendant Villanueva has actual knowledge of the different

22  policies, practices, and customs promulgated by the County across Los Angeles County

23  jails as alleged herein, and personally spoke on the issue of COVID-19 in County jails

24  on repeated occasions. Despite having such personal knowledge and being personally

25  involved in the inadequate response to COVID-19 in County jails, Defendant Villanueva

26  condoned, tolerated, and through actions and inactions ratified such policies while acting

27  under color of law.

28    302.   The members of Youth Justice Coalition and Dignity and Power Now have

CLASS ACTION PETITION FOR WRIT OF
HABEAS CORPUS-COMPLAINT FOR                    -77-
INJUNCTIVE & DECLARATORY RELIEF

had their constitutional rights violated by Defendants' conduct. The mission of both Youth Justice Coalition and Dignity and Power Now are also frustrated by the acts of Defendants, and both organizations continue to divert resources as a result of Defendants' acts to ensure that their members and the communities they serve are not subjected to Defendants' unconstitutional practices.

## FOURTEENTH CAUSE OF ACTION

### Declaratory Relief (Cal. Code Civ. Proc. § 1060)

### (All Plaintiffs vs. All Defendants)

303.   Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1 through 173 as if fully set forth herein.

304.   There is an actual controversy between Plaintiffs and Defendants concerning their respective rights and duties in that Petitioner contends that the acts of Defendants, as described herein, are in violation of federal and state law, and Defendants contend in all aspects to the contrary.

305.   Plaintiffs and the class members they represent are entitled to a legal declaration of their rights and Defendants' obligations under applicable federal and state law as alleged in this petition/complaint.

306.   The members of Youth Justice Coalition and Dignity and Power Now have had their constitutional rights violated by Defendants' conduct. The mission of both Youth Justice Coalition and Dignity and Power Now are also frustrated by the acts of Defendants, and both organizations continue to divert resources as a result of Defendants' acts to ensure that their members and the communities they serve are not subjected to Defendants' unconstitutional practices.

307.   Plaintiffs request relief, as set forth below.

## PRAYER FOR RELIEF

308.   WHEREFORE, Plaintiffs and the Class Members respectfully request that the Court:

A.   Certify this case as a class action and certify the proposed classes and

1    subclasses;

2    B.    Enter a declaratory judgment that Defendants violated Named Plaintiffs' and

3          Class Members' constitutional rights by failing to adequately safeguard their

4          health and safety in the midst of a potential outbreak of a contagious,

5          infectious disease;

6    C.    Grant a writ of habeas corpus for members of the Medically Vulnerable

7          Subclasses to the maximum extent possible, absent proof of recorded judicial

8          findings that the individual poses a risk of flight or danger to others that no

9          other conditions of release can mitigate, and ordering that Defendants provide

10         these individuals with educational resources on COVID-19, including

11         instructions that they should self-isolate for the CDC-recommended period of

12         time (currently 14 days) following release;

13   D.    Enter a temporary restraining order, preliminary injunction, and permanent

14         injunction requiring Defendants, in County jails during the COVID-19

15         pandemic, to:

16         a.    Effectively communicate to all incarcerated people, including low-

17               literacy and non-English-speaking people, sufficient information about

18               COVID-19, measures taken to reduce the risk of transmission, and any

19               changes in policies or practices to reasonably ensure that individuals

20               are able to take precautions to prevent infection;

21         b.    Perform pre-intake screening for all people who are arrested and

22               booked into LASD custody for symptoms of COVID-19 upon entry (or

23               re-entry). This includes temperature screening, as well as a verbal

24               symptom check;

25         c.    Quarantine all people who are arrested for 14 days before they enter

26               the general population by cohorting daily intakes if necessary;

27         d.    Perform screening for all custody, medical and ancillary jail staff for

28               symptoms of COVID-19 every time they enter the facility. This

---

CLASS ACTION PETITION FOR WRIT OF
HABEAS CORPUS-COMPLAINT FOR                    -79-
INJUNCTIVE & DECLARATORY RELIEF

1    includes temperature screening as well as a verbal symptom check;

2    e.    Provide adequate spacing of six feet or more between incarcerated

3    people so that social distancing can be accomplished;

4    f.    Ensure that each incarcerated person receives, free of charge: (1) an

5    individual supply of liquid hand soap and paper towels sufficient to

6    allow frequent hand washing and drying each day; and (2) an adequate

7    supply of disinfectant hand wipes or disinfectant products effective

8    against the virus that causes COVID-19 for daily cleanings; and

9    (3) multiple face masks that are regularly cleaned.

10   g.    Ensure that all incarcerated people have access to hand sanitizer

11   containing at least 60% alcohol;

12   h.    Provide access to daily showers and daily access to clean laundry,

13   including clean personal towels and washrags after each shower.

14   Ensure showers are cleaned and disinfected at least daily and that

15   incarcerated persons have supplies to clean showers between uses, and

16   provide gloves to staff or incarcerated persons who clean the showers;

17   i.    Require that all jail staff and incarcerated persons wear PPE consistent

18   with CDC and LA DPH guidelines. Require that all LASD staff

19   working in County jails wear PPE, including CDC-recommended

20   surgical masks. If cloth masks are distributed, they must be laundered

21   regularly. Provide more than one cloth mask per prisoner such that if

22   masks break or cannot be laundered daily that prisoners have

23   replacements.

24   j.    Require that all LASD staff working in County jails wash their hands,

25   apply hand sanitizer containing at least 60% alcohol, or change their

26   gloves both before and after interacting with any person or touching

27   surfaces in cells or common areas;

28   k.    Take each incarcerated person's temperature (with a functioning and

properly operated thermometer) and conduct symptom screenings at all
health care appointments to identify potential COVID-19 infections;

l.   Conduct immediate testing for anyone displaying symptoms of
COVID-19;

m.   Ensure that individuals identified as having COVID-19 or having been
exposed to COVID-19 receive adequate testing, treatment, and medical
care and are properly quarantined in a non-punitive setting, with
continued access to showers, recreation, mental health services,
reading materials, phone and video calling with loved ones,
communications with counsel, and personal property. Use cohort
housing only for those persons with laboratory-confirmed COVID-19
cases, not suspected cases. Ensure that individuals identified as close
contacts of COVID-19 are quarantined pursuant to CDC and LA DPH
guidelines;

n.   Respond to all emergency (as defined by the medical community)
requests for medical attention within an hour;

o.   Ensure that staff or incarcerated workers, several times a day, clean
and disinfect high touch surfaces and objects in common areas, with
EPA-registered disinfectants. Provide sufficient disinfecting supplies—
including access to EPA-registered disinfectants or disinfectant
wipes—free of charge, so incarcerated people can clean high-touch
areas or items (including, but not limited to, phones, sinks, toilet
handles, recreation equipment, and headphones) between each use.
Facility staff must ensure there is adequate supervision of all
individuals responsible for cleaning and disinfecting these areas;

p.   Waive all medical co-pays for those experiencing COVID-19-related
symptoms;

q.   Provide opportunities for incarcerated persons to communicate free of

charge with their families and loved ones;

    r.    Submit a plan to the Court within five days, to be overseen by a qualified expert pursuant to Fed. R. Evid. 706, which outlines: (1) the specific steps taken to implement the relief entered herein, (2) all other mitigation efforts to significantly reduce the risk of contraction of COVID-19 by all class members not immediately released, (3) a housing plan for any released Class or Subclass member whose testing confirms that have been exposed or infected with COVID-19 and who do not have in place housing, and (4) an evaluation of whether the release of Subclass members permits adequate social distancing; and

    s.    Waive all charges for medical grievances during this health crisis.

E.    Order an inspection of each of Los Angeles County's jail facilities by a medical expert in infectious disease who can report to the court at the preliminary injunction hearing on his/her findings and answer questions provided in advance of the hearing[101];

F.    If immediate release is not granted to the medically vulnerable on the basis of this habeas Petition alone, then expedited review of the Petition, including oral argument, via telephonic or videoconference if necessary;

G.    Enter an order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 12133, 29 U.S.C. § 794(a), or as otherwise authorized by law;

/ / /

/ / /

/ / /

---

[101] *See, e.g.*, *Banks v. Booth*, No. 1:20-cv-849 (CKK), Dkt. No. 34 (Apr. 9, 2020) (appointing *amici curiae* jail inspectors, ordering the Department of Corrections to allow inspection of all facilities including interviews with prisoners, make documents available, and make staff and managers available for interviews, and directing *amici curiae* to answer list of questions from the Court).

CLASS ACTION PETITION FOR WRIT OF HABEAS CORPUS-COMPLAINT FOR INJUNCTIVE & DECLARATORY RELIEF    -82-

1    H.    Order such other and further relief as this Court deems just, proper, and

2          equitable.

3

4                                    Respectfully Submitted,

5    Dated: April 24, 2020          HADSELL STORMER RENICK & DAI LLP

6                                    KAYE, MCLANE, BEDNARSKI & LITT, LLP

7                                    CIVIL RIGHTS CORPS

8                                    UCLA LAW CLINICS

9                                    ACLU OF SOUTHERN CALIFORNIA

10                                   AMERICAN CIVIL LIBERTIES UNION

11

12                                   By:  /s/- Dan Stormer

13                                        Dan Stormer

14                                   Attorneys for Petitioners/Plaintiffs

15

16

17

18

19

20

21

22

23

24

25

26

27

28