1  ANDREW BAUM – SBN 190397
   abaum@glaserweil.com
2  GLASER WEIL FINK JACOBS
3    HOWARD AVCHEN & SHAPIRO LLP
   10250 Constellation Boulevard, 19th Floor
4  Los Angeles, California 90067
5  Telephone:  (310) 553-3000
   Facsimile:  (310) 556-2920
6
7  PAUL B. BEACH, SBN 166265
   pbeach@lbaclaw.com
8  JUSTIN W. CLARK, SBN 235477
9  jclark@lbaclaw.com
   LAWRENCE BEACH ALLEN & CHOI, PC
10 100 West Broadway, Suite 1200
11 Glendale, California 91210-1219
   Telephone:  (818) 545-1925
12 Facsimile:  (818) 545-1937
   *Attorneys for Defendants*
13 (Additional Counsel Listed On Following Page)
14
15              UNITED STATES DISTRICT COURT
16              CENTRAL DISTRICT OF CALIFORNIA
17                    WESTERN DIVISION
18 RODNEY CULLORS, et al.,            CASE NO.:  2:20-cv- 03760-RGK-
                                      PLA
19              Plaintiffs,
                                      Hon. Gary Klausner
20 vs.
21 COUNTY OF LOS ANGELES, et al;      **DEFENDANTS' OPPOSITION TO**
                                      **PLAINTIFFS' EX PARTE**
22              Defendants.           **APPLICATION FOR**
                                      **TEMPORARY RESTRAINING**
23                                    **ORDER**
24
25                                    [Declarations of Chief Brendan J.
                                      Corbett, Commander Daniel J. Dyer,
26                                    Assistant Sheriff Bruce Chase, Mark
                                      Allen, and Jackie Clark, R.N.
27                                    attached hereto and filed concurrently
28                                    herewith]

_____
              **DEFENDANTS' OPPOSITION TO EX PARTE APPLICATION FOR TRO**

815103

Additional Counsel for Defendants:


OFFICE OF THE COUNTY COUNSEL
MARY C. WICKHAM, County Counsel – SBN 145664
TIMOTHY J. KRAL, Principal Deputy County Counsel – SBN
200919 - tkral@lasd.org
MELODIE K. LARSEN, Senior Deputy County Counsel - SBN
110819 - mlarsen@counsel.lacounty.gov
211 West Temple Street, 8th Floor
Los Angeles California 90012
Telephone: (213) 229-3097


KAREN JOYNT, SBN 206332
joyntlaw@gmail.com
LAW OFFICES OF KAREN JOYNT
225 South Lake Avenue, Suite 300
Pasadena, California 91101
Telephone:  (213) 277-7072

# <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ...................................................................................... 2

II.     SUMMARY OF ARGUMENT ................................................................. 5

III.    STATEMENT OF THE FACTS ............................................................... 6

        A.    The Plaintiffs ................................................................................. 7

        B.    Release Of Thousands Of Inmates From Los Angeles County Jails .... 8

        C.    Screening Practices To Segregate New Arrestees Who May Have Been Exposed To COVID-19 ................................................... 9

        D.    Measures To Limit The Spread Of COVID-19 Among The Inmate Population ........................................................................ 10

        E.    Practices To Prevent Infection Of Jail Employees ............................ 11

        F.    Minimal Infection Rates Of COVID-19 At Los Angeles County Jails .......................................................................................... 12

IV.     PLAINTIFFS HAVE NOT DEMONSTRATED THAT THEY ARE LIKELY TO PREVAIL ON THE MERITS ........................................... 12

        A.    Plaintiffs Have Not Exhausted Their Administrative Remedies As Required By the Prison Litigation Reform Act, 42 U.S.C. §1997e(a) .................................................................................. 13

        B.    Plaintiffs Have Not Exhausted Their Administrative Remedies As Required By the Prison Litigation Reform Act, 42 U.S.C. §1997e(a) .................................................................................. 16

        C.    Plaintiffs Have Not Demonstrated Defendants' Deliberate Indifference To The Impact Of COVID-19 On Jail Conditions ......... 18

        D.    Plaintiffs Have Not Met The Other Requirements For A TRO .......... 34

V.      PLAINTIFFS ARE NOT ENTITLED TO THE REQUESTED PRISONER RELEASES .................................................................... 40

VI.     CONCLUSION ..................................................................................... 43

**DEFENDANTS' OPPOSITION TO EX PARTE APPLICATION FOR TRO**

# **TABLE OF AUTHORITIES**

## **FEDERAL CASES**

*3570 East Foothill Blvd., Inc. v. City of Pasadena,*
912 F.Supp. 1257 (C.D. Ca. 1995) .............................................. 18

*Azul-Pacifico, Inc. v. City of Los Angeles,*
973 F.2d 704 (9th Cir. 1992) ..................................................... 20

*Baca v. Moreno Valley Unified School District*, 936 F.Supp. 719 (C.D.Ca.
1996) ................................................................................ 17

*Banks v. Booth,*
2020 WL 1914896 (D.D.C. Apr. 19, 2020) .................................. 27

*Beaty v. Brewer,*
649 F.3d 1071 (9th Cir. 2011) ................................................... 17

*Bell v. Wolfish,*
441 U.S. 520 (1979) ............................................................... 24

*Big Sky Scientific LLC v. Idaho State Police,*
2019 WL 438336 (D.Idaho Feb. 2, 2019) ................................... 18

*Booth v. Churner,*
532 U.S. 731 (2001) ............................................................... 19

*Bronco Wine Co. v U.S. Dept. of Treasury,*
997 F.Supp. 1309 (E.D.Ca. 1996) ............................................. 18

*Cameron v. Bouchard,*
2:20-cv-10949 (E.D. Mich.) ............................................. 9, 27, 44

*Carden v. State of Montana,*
626 F.2d 82 (9th Cir. 1980) ..................................................... 23

*Castro v. County of Los Angeles,*
833 F.3d 1060 (9th Cir. 2016) .............................................. 24, 29

*Coleman v. Newsom,*
2020 WL 1675775 (E.D. Cal. Apr. 4, 2020) ............................ 30, 32

*Dominguez v. Kernan,*
906 F.3d 1127 (9th Cir. 2018) ................................................... 23

*Farmer v. Brennan,*
511 U.S. 825 (1994) ......................................................... 29, 30, 31

*Ford v. Ramirez-Palmer,*
301 F.3d 1043 (9th Cir. 2002) ................................................... 29

**DEFENDANTS' OPPOSITION TO EX PARTE APPLICATION FOR TRO**

*Garcia v. Google,*
  786 F.3d 733 (9th Cir. 2015) .................................................................... 39

*Gordon v. County of Orange,*
  888 F.3d 1118 (9th Cir. 2018) .................................................................. 24

*Gordon v. Cty. of Orange,*
  888 F.3d 1118 (9th Cir. 2018) .................................................................. 25

*Gray v. Cty. of Riverside,*
  5:13-cv-0444-VAP-OPx (C.D. Cal. Apr. 14, 2020) .................................. 27

*Gray v. Superior Court,*
  125 Cal.App.4th 629 (2005) ..................................................................... 47

*Habibi v. Barr,*
  2020 WL 1864642 (S.D. Cal. Apr. 14, 2020).................................... 25, 43

*Hayward v. Marshall,*
  603 F.3d 546 (9th Cir. 2010) .................................................................... 22

*Helling v. McKinney,*
  509 U.S. 25, 35 (1993) .............................................................................. 30

*Hines v. Youseff,*
  914 F.3d 1219 (9th Cir. 2019) .............................................................. 30, 31

*In Defense of Animals v. U.S. Dept. of Interior,*
  737 F.Supp.2d 1125 (E.D.Ca. 2010).......................................................... 18

*J.E.L. v. San Francisco Unified School District,*
  185 F.Supp.3d 1196 (N.D.Ca. 2016) ......................................................... 21

*Johnson v. Breeden,*
  280 F.3d 1308 (11th Cir. 2002) ................................................................. 45

*Klein v. City of Laguna Beach,*
  594 F.Supp.2d 1020 (C.D.Ca. 2009) ......................................................... 18

*Knudsen Corp. v. Ever-Fresh Foods, Inc.,*
  336 F.Supp. 241 (C.D.Ca. 1971) .............................................................. 18

*Lockheed Missile & Space Co., Inc. v. Hughes Aircraft Co.,*
  887 F.Supp. 1320 (N.D.Ca. 1995) ............................................................. 17

*M.H. v. County of Alameda,*
  90 F.Supp.3d 889 (N.D.Ca. 2013) ............................................................ 38

*M.S. v. County of Ventura,*
  2016 WL 11506613 (C.D.Ca. Oct. 24, 2016)............................................ 38

*Maiden v. LA County Sheriff's Dept. Men's Central Jail,*
  334 Fed.Appx. 76 (9th Cir. 2009)............................................................. 19

*Martin v. California Department of Veteran Affairs,*
  560 F.3d 1042 (9th Cir. 2009) .................................................................. 38

iii

*Matapuatuli v. Sessions,*
   714 Fed.Appx. 730 (9th Cir. 2018)..................................................... 19

*Mission Power Engineering Co. v. Continental Cas. Co.,*
   883 F.Supp. 488 (C.D.Ca. 1995) ....................................................... 29

*Missouri v. Jenkins,*
   495 U.S. 33 (1990)............................................................................. 28

*Money v. Pritzker,*
   2020 WL 1820660 (N.D. Ill. Apr. 10, 2020) ............................ 28, 32, 43

*Nettles v. Grounds,*
   830 F.3d 992 (9th Cir. 2016) ............................................................. 21

*Norwood v. Vance,*
   591 F.3d 1062 (9th Cir. 2010). .................................................. 29, 32, 33

*O'Guinn v. Lovelock Correctional Center,*
   502 F.3d 1056 (9th Cir. 2007) ........................................................... 20

*National Association of Criminal Defense Lawyers, et al. v. Gavin Newsom,*
   *et al.,* Case No. S261827.................................................................... 7

*Ohio Casualty Ins. Co. v. L.H. Engineering Co., Inc.,*
   2014 WL 1256935 (C.D.Ca. April 24, 2014) ....................................... 18

*Pedersen v. Superior Court,*
   149 Cal. 389 (1906) ........................................................................... 37

*Petersen v. Diaz,*
   2020 WL 4740538 (E.D. Ca. 2020)..................................................... 21

*Phea v. Pfeiffer,*
   2020 WL 1892427 (E.D.Ca. 2020)................................................ 21, 47

*Plata v. Newsom*
   2020 WL 1908776 (E.D. Cal. Apr. 17, 2020) ................................ 30, 42

*Porter v. Nussle,*
   534 U.S. 516 (2002)........................................................................... 19

*Preiser v. Rodriguez,*
   411 U.S. 475 (1973)........................................................................... 40

*Roman v. Wolf,*
   2020 WL 1952656 (C.D. Cal. Apr. 23, 2020) ..................................... 27

*Rutherford v. Block* ................................................................................ 35

*Sato v. U.S.Bank,*
   2014 WL 12571041 (C.D.Ca. Jan. 21, 2014) ..................................... 39

*Shorter v. Baca,*
   895 F.3d 1176 (9th Cir. 2018), .......................................................... 33

iv

**DEFENDANTS' OPPOSITION TO EX PARTE APPLICATION FOR TRO**

*Stow v. Murashige,*
  389 F.3d 880 (9th Cir. 2004) ............................................................... 22

*Swain v. Junior,*
  2020 WL 1692668 (S.D. Fla. Apr. 7, 2020) ........................................... 27

*United States v. Boone,*
  2020 WL 1865202 (E.D.Ca. April 14, 2020) ........................................ 46

*United States v. McCurin,*
  2020 WL 1700030 (E.D.Ca. April 8, 2020) .......................................... 46

*United States v. Ryan,*
  2020 WL 1861662 (C.D.Ca. April 14, 2020), ....................................... 46

*Valentine v. Collier,*
  2020 WL 1934431 (5th Cir. Apr. 2020). .............................. 9, 19, 26, 27, 31, 39, 40

*White v. Lambert,*
  370 F.3d 1002 (9th Cir. 2004) ............................................................... 22

*Wilk v. Neven,*
  2020 WL 1949281 (9th Cir. Apr. 23, 2020) ........................................... 30

*Wilkins-Jones v. City of Alameda,*
  859 F.Supp.2d  1039 (N.D.Ca. 2012) .................................................... 37

*Williams v. Los Angeles Superior Court,*
  2014 WL 2533804 (C.D.Ca. June 4, 2014) ........................................... 23

*Wolf v. Beauclair,*
  2015 WL 5768386 (D.Idaho Sept. 30, 2015) ........................................ 45

*Woodford v. Ngo,*
  548 U.S. 81, 94 (2006) .......................................................................... 40

## **STATUTES**

18 U.S.C. §1326 .................................................................................... 19

28 U.S.C. §2241 .............................................................................. 21, 22

42 U.S.C. §1983 ........................................................................ 19, 20, 21

42 U.S.C. §1997 .............................................................................. 19, 21

U.S.C. §1883 ......................................................................................... 19

# I.      __INTRODUCTION__

It has just come to Defendants' attention that on April 24, 2020 — the same date that this action and Plaintiffs' ex parte application was filed — an emergency petition for writ of mandate was filed with the California Supreme Court covering much of the same ground as does the present case.  Among the plaintiffs in the Supreme Court proceeding, *National Association of Criminal Defense Lawyers, et al. v. Gavin Newsom, et al.*, Case No. S261827 ("the Supreme Court Proceeding"), is the Youth Justice Coalition, which is also a named plaintiff in this case.  The ACLU, attorneys for Plaintiffs in this case, are also plaintiffs for the petitioners in the Supreme Court Proceeding.  None of this was disclosed in the papers filed by Plaintiffs with this Court.

The Supreme Court Proceeding requests a peremptory writ of mandate in the first instance, to be issued no later than May 4, 2020,  directing the release "of people incarcerated and detained in California's county jails and juvenile facilities by releasing sufficient persons to ensure that all remaining person are held under conditions consistent with CDC and public health guidance to prevent the spread of COVID-19, including appropriate social distancing."  Petition ¶80.  The petition specifically mentions the conditions in Los Angeles County, noting that it "is cooperating" in reducing its jail population but asserts that there are "unacceptable implementation delays."  Petition ¶40.

The California Supreme Court has already taken action in the case pending before it.  It has requested an informal response to the petition on or before 5:00 p.m. tomorrow, April 28, 2020.  Petitioners may then serve and file a reply to the informal response on or before noon on Thursday, April 30, 2020.  No requests for extension of time are contemplated or will be granted.

In view of these developments, Plaintiffs in the present case respectfully request that this Court deny Plaintiffs' application for a TRO until the California Supreme Court has acted on the matter before it or, in the alternative, set the matter

2

**DEFENDANTS' OPPOSITION TO EX PARTE APPLICATION FOR TRO**

for a noticed hearing and provide Defendants with additional time to provide more a more substantive response.

This is necessary not merely because of the Supreme Court Proceeding (which Plaintiffs herein did not disclose either to Defendants or to the Court) but also because of the nature of the TRO itself.  For the reasons set forth in Defendants' application for an extension and briefing schedule, filed with the Court over the weekend, Defendants request additional time to respond to Plaintiffs' *Ex Parte* Application for Temporary Restraining Order (the "TRO").  That filing, as the Court is by now well aware, massive.  It raises myriad claims, makes numerous legal and factual arguments, consists of dozens of documents and totals hundreds of pages ─ and was served on Defendants late on Friday, April 24, 2020.  When Defendants asked Plaintiffs for a reasonable extension of time in which to respond, Plaintiffs refused, citing the "urgency" of the situation.  Yet as Plaintiffs' papers reveal, and Defendants' extension request details, Plaintiffs have been working on their papers for weeks, undermining the notion of an urgency so great that even the smallest pause would be irreparable.

Plaintiffs' Opposition to Defendants' *Ex Parte* Application for an Order Setting a Briefing Schedule (Dkt. 26) asserts that Defendants had nine days since Plaintiffs sent the pre-litigation letter.  While the pre-litigation letter provides some authority and factual basis that is contained in Plaintiffs' Complaint and TRO application, the nine-page letter is utterly dwarfed by the 42-page TRO and more than 450 pages of declarations and evidence.

Moreover, Plaintiffs' pre-litigation letter is dated April 16, 2020.  To put that in perspective, *five* Plaintiffs had already signed their declarations. These declarations were, of course, not provided to Defendants until Friday, April 24, 2020, when the TRO was filed.  As a result, Plaintiffs' gamesmanship prevented Defendants from assessing the specific, individualized assertions made by Plaintiffs until the TRO was filed.

**DEFENDANTS' OPPOSITION TO EX PARTE APPLICATION FOR TRO**

815103

Moreover, Defendants have not had adequate time to review and respond to all of the matters in Plaintiffs' TRO, which is **essential** because Plaintiffs have failed to identify subsequent orders that affect the cases that they rely upon.[1]  Plaintiffs cite to *Cameron v. Bouchard*, Docket No. 2:20-cv-10949 (E.D. Mich.) regarding the issuance of a TRO.  Briefing Schedule Opp., Dkt. 26 at 5:10-13.  However, Plaintiffs omit that this order was **modified on rehearing**, and part of the plaintiffs' TRO was subsequently denied.  *Cameron  v. Bouchard*, No. 20-10949, 2020 WL 1952836 (E.D. Mich. Apr. 23, 2020).  Plaintiffs also failed to cite a Fifth Circuit decision staying one of the orders discussed in Plaintiffs' TRO because the Fifth Circuit determined that the government was likely to prevail on the merits. *Valentine v. Collier*, 2020 WL 1934431 (5th Cir. Apr. 22, 2020).

Plaintiffs also cite to a number of cases to show that courts have issued similar relief with a much shorter briefing schedule.  However, there is no indication that these plaintiffs engaged in the same tactics as plaintiffs—Plaintiffs gathering declarations nearly two weeks before filing the TRO, omitting pertinent subsequent history on cases cited, and submitting nearly 500 pages of documents (in addition to their Complaint) in support of the TRO.[2]  Due to the numerous fundamental issues at stake, Defendants deserve an opportunity to fully and fairly respond to Plaintiffs' inaccurate portrayal of the jails.

Absent that additional time, Defendants wish to make it clear that while these papers have not addressed and every argument and assertion made by Plaintiffs in

---

[1] Defendants are not accusing Plaintiffs or their counsel of any malfeasance.  On the contrary, these issues illustrate why the adversary process is fundamental, particularly when the parties must hastily brief such an important request.

[2] *See, e.g. Swain v. Junior*, Dkt. 1:20-cv-21457, 2020 WL 1692668 (S.D. Fla. Apr. 7, 2020) (no indication that any of the aforementioned issues were present); *Savino v. Hodgson*, No. 20-cv-10617, Dkt. 161 (D. Mass.) (TRO filing totals only 196 pages, not over 400, and no indication that other issues were present); *Williams v. Federal Bureau of Prisons*, 1:20-cv-00890, Dkt. 5 (D. D.C. Apr. 2, 2020) (TRO memorandum and declarations total 61 pages); *Costa v. Bazron*, 1:19-cv-03185, Dkt. 39 (D. D.C. Apr. 18, 2020) (TRO application and declarations total 104 pages).

4

their voluminous filing, Defendants' failure to do so is not a concession of the merit of any of Plaintiffs' positions but merely a reflection of the extraordinarily limited time which they were given to prepare a response.

## II.   <u>SUMMARY OF ARGUMENT</u>

It is particularly essential that Defendants have an adequate opportunity to provide the response necessary for the Court to make an informed decision on Plaintiffs' application because despite the undoubted importance of the issues raised, Plaintiffs are simply not entitled to the sweeping relief they request.  The application is procedurally defective and substantively without merit.  For example, before Plaintiffs can bring a challenge in this Court to the jail conditions they complain of, they are required to exhaust their administrative or state court remedies, neither of which they have done.  Thus, Plaintiffs will not even be able to survive a motion to dismiss under Fed.R.Civ.P. 12(b)(6), let alone demonstrate the likelihood of success on the merits required for a TRO.

Even assuming *arguendo* that Plaintiffs could somehow surmount the procedural bars to these claims, which Defendants vigorously dispute, they are not entitled to the relief they seek.  Their constitutional challenge to the jail conditions requires a showing, *inter alia*, that Defendants are guilty of "deliberate indifference" to the risks of COVID-19 within the jail setting.  Defendants are not.  As set forth in the accompanying declarations, in response to the COVID-19 crisis, Defendants have already reduced the jail population by 30% since February 28, 2020 to reduce overcrowding and improve physical distancing, quarantine, and isolation.  They have implemented widely accepted best practices such as increased disinfecting, masks for both staff and inmates, and physical distancing.  They have implemented rigorous screening and testing procedures, reduced transfers and intakes, provided information to both inmates and staff on measures to reduce the spread of infection, and limited visitation and group activities by the inmates.

<u>These measures are working</u>.  As of the morning of April 26, 2020, there was

**DEFENDANTS' OPPOSITION TO EX PARTE APPLICATION FOR TRO**

815103

not a single COVID-19 inmate  death at the jail, 41 patients with positive tests, and 27 who were previously positive but who have recovered in the jails.  Declaration of Jackie Clark, R.N. ("Clark Dec."), ¶9.  The additional relief Plaintiffs request, such as cohorting new inmates by day, each for 14 days, is infeasible and/or outright dangerous to both staff and inmates, since appropriate classification on the basis of factors such as gang affiliation and not the day of intake, is essential.

Plaintiffs' most extreme request — for mass, unconditional, and unsupervised release of inmates with preexisting medical conditions — has no basis in law, the facts, or common sense.  The inmates remaining in the jails (including the named plaintiffs) are largely violent offenders who represent a serious public safety risk, and who will almost surely have no outside medical care for those high risk health conditions and no housing (except that which Plaintiffs want Defendants to plan, organize, and pay for).  In addition to presenting a risk to the general public, Plaintiffs themselves are at risk of infection from the general population where the infection and death rates are far higher than in the jails.

The law does not require Defendants to make the jails into a COVID-free zone, though that is their goal.  The law only requires Defendants to take reasonable measures to protect the inmates' health, and that is precisely what they have done and are continuing to do.  Plaintiffs are not entitled to the relief  they seek.  The TRO should be denied.[3]

### III.    STATEMENT OF THE FACTS

Plaintiffs grossly mischaracterize the facts, especially but not limited to their total failure to mention the numerous procedures and practices implemented by the Los Angeles County Sheriff's Department ("LASD") to protect the inmates in Los

---

[3]Defendants recognize that these opposing points and authorities exceed even the 40+ page points and authorities filed by Plaintiffs.  Unfortunately, it takes more space to explain why arguments have no merit than it does to make the meritless arguments in the first place, especially when Plaintiffs have had weeks to prepare their papers and Defendants had a single weekend.

**DEFENDANTS' OPPOSITION TO EX PARTE APPLICATION FOR TRO**

815103

Angeles County jails from being infected by COVID-19.  LASD has taken extreme measures in the last few months to combat the spread of this virus among the new arrestees, jail staff and inmates throughout their jail facilities.  In fact, LASD was at the forefront of preparing and instituting targeted measures to protect the inmate population from COVID-19 – beginning on February 10, 2020 – even before the first known case of community transmission was recorded in Los Angeles County.  Clark Dec., ¶ 4.

The true facts are as follows:

## A.    The Plaintiffs

Like the majority of the inmates remaining in Los Angeles County Jail, most of the Plaintiffs are charged with or convicted of serious, violent felonies, and by their bail setting, have been deemed a substantial threat to public safety.  For example, Plaintiff Rodney Cullors is charged with multiple felony counts, including assault with a deadly weapon with great bodily injury, for which he was denied bail.  Allen Dec. ¶ 5.  Plaintiff Mark Avila is charged with felony conspiracy as part of Federal Task Force investigation dealing with assault, extortion, distribution of narcotics and gang conspiracy, and has a high bail of $1,425,000.00.  *Id.*  Plaintiff Victor Gutierrez is charged with felony domestic violence.  Plaintiff Carole Dunham was convicted and sentenced to 1095 days for  possession of cocaine base for sale.  *Id.*  Plaintiff Rany Oung is convicted of felony burglary, and has a no bail hold from San Bernadino County for grand theft.  *Id.*  Plaintiff Leandrew Lewis is charged with felony kidnapping and Plaintiff Jeremiah Farmer with human trafficking.  *Id.*  Plaintiff Deneal Young is a court ordered returnee serving a sentence at Soledad State Prison.  *Id.*

Similarly, the majority of putative class members providing declarations in support of Plaintiff's TRO are also in jail for violent crimes.  Declarants Holly Davidson, Albert Kirk Jones, and Benito Venegas are all charged with

**DEFENDANTS' OPPOSITION TO EX PARTE APPLICATION FOR TRO**

murder. *Id.* Declarants Catrina Balderrama and Andrew Fuentes have been released. *Id.*

Plaintiffs misstate other facts.  For example, Plaintiff Jeffrey Livotto alleges "was taken to court for a probation hearing on or around March 26, 2020.  He was transported on Defendants' bus along with dozens of other prisoners."  Complaint ¶83.  In fact, Mr. Livotto was not even transferred from LAPD custody until March 27, 2020, and when he was transported to and from Court for his hearing there were only 2-3 prisoners with him.  Declaration of Commander Daniel J. Dyer ("Dyer Dec.") ¶4.

Similarly, Plaintiff Rodney Cullors claims that in early April he was "transported by Defendants to a medical facility for a MRI.  There were three people chained to the wheelchair van, all of whom were over the age of 50."  Complaint ¶ 85.  In fact, the custody wheelchair vans can only accommodate two wheelchairs at a time; Cullors was transported to his medical appointment with only one other wheelchair inmate in the car, and he was returned to jail in the van by himself.  Dyer Dec. ¶5.

**B.      Release Of Thousands Of Inmates From Los Angeles County Jails**

LASD and Correctional Health Services ("CHS"), a division of Los Angeles County Department of Health Services ("DHS"), knew that a critical measure in preventing the spread of COVID-19 among the inmates was to promote social distancing in the jail facilities.  As a result, in early February 2020, LASD began working with CHS, the Los Angeles County District Attorney, the Los Angeles County Public Defender, as well as the Presiding Judge of the Los Angeles Superior Court – the Honorable Kevin Brazile – to reduce the inmate population in Los Angeles County jails.  Clark Dec., ¶ 48; Declaration of Bruce Chase ("Chase Dec."), ¶ 7.  As a result of the unprecedented steps taken by LASD to reduce the inmate population in an expedient manner, almost 4,000 inmates have been released from the

8

815103

1  jail facilities since February 28, 2020 – the largest depopulation of any jail system in

2  the United States during the COVID-19 pandemic.  Clark Dec., ¶ 48; Chase Dec., ¶8;

3  Declaration of Chief Brendan J. Corbett ("Corbett Dec.") ¶ 2.  The 30% reduction of

4  the inmate population in Los Angeles County jails has been conducted by LASD in a

5  careful and methodical manner to ensure both the safety of the released inmates and

6  community at large.  Clark Dec., ¶¶ 48-50; Chase Dec., ¶ 8; Corbett Dec., ¶¶ 2-10.

7        LASD has prioritized, and continues to prioritize, those inmates eligible for

8  release based on any relevant medical vulnerabilities, and CHS has provided LASD

9  with a list identifying such high-risk inmates, which is continually updated to account

10  for recent arrestees and other new inmates.  Clark Dec., ¶ 49.  Fewer than 12,000

11  inmates are housed at LA County jail facilities now.  Clark Dec., ¶ 2; Chase Dec., ¶ 8.

12  In addition, LASD significantly reduced the number of arrestees who would be

13  admitted to Los Angeles County jails by, among other things, increasing the

14  minimum bail amount by 100% – from $25,000 to more than $50,000 – and

15  temporarily refusing to accept people arrested on out-of-state warrants.  Chase Dec., ¶

16  9; Corbett Dec., ¶¶ 11-12.

17        In short, LASD and CHS have made depopulating the jail facilities one of their

18  top priorities to combat the spread of COVID-19 in order to promote social distancing

19  among the inmates.  The plaintiffs who submitted declarations in support of the TRO

20  have been determined to be unsuitable for release based on – in most cases – the

21  seriousness of their associated crimes (i.e., murder and assault with a deadly weapon).

22  *See* Allen Dec., ¶5.

23      **C.**    **Screening Practices To Segregate New Arrestees Who May Have**

24            **Been Exposed To COVID-19**

25        LASD and CHS have also implemented robust screening practices to identify

26  and isolate arrestees potentially infected by COVID-19 during the booking process

27  before these individuals enter the jails.  Clark Dec., ¶ 12.  By way of example and not

28  limitation (Clark Dec., ¶¶ 12-20; Chase Dec., ¶¶ 11-14), on February 10, 2020, CHS

9

modified the Arrestee Medical Screening Form to identify arrestees who are potentially infected by asking whether they have COVID-19 symptoms – in addition to the standard questions to detect individuals with infectious diseases.  Clark Dec., ¶¶ 13, 15; Chase Dec., ¶ 12.  Tents have also been erected in the parking lots outside of the Inmate Reception Center and the Century Regional Detention Facility where CHS registered nurses conduct clinical assessments of arrestees for COVID-19 before transporting them to a jail facility.  Clark Dec., ¶ 14; Chase Dec., ¶¶ 11, 13.

In addition, LASD and CHS plan to begin testing all new arrestees (male and female) for COVID-19 on or before May 1, 2020.  Clark Dec., ¶ 20.

### D.  Measures To Limit The Spread Of COVID-19 Among The Inmate Population

LASD and CHS have also implemented detailed procedures to isolate housed inmates and staff with positive results for COVID-19 and Persons Under Investigation for COVID-19 ("PUI's"), as well as to quarantine those who have been in contact with these individuals.[4]  Clark Dec., ¶¶ 10, 24-30; Chase Dec., ¶¶ 26-28. CHS will make available testing to a large portion of inmates who have medical conditions which make them susceptible to COVID-19, including those with serious mental illnesses.  Clark Dec., ¶ 34.

In addition, LASD continually informs inmates about COVID-19 prevention techniques, through videos displayed at intake and in each housing unit, demonstrative posters, and town hall meetings set up by CHS to educate inmates.[5] Clark Dec., ¶ 21.  During the COVID-19 crisis, all inmate group activities, non-essential medical appointments, and access by non-essential visitors have been

---

[4] Isolation is the placement of a PUI or one who has tested positive for COVID-19 into their own space and separating them from persons who are not ill.  Clark Dec., ¶ 27; Chase Dec., ¶ 26.  Quarantine is the procedure of separating and restricting the movement of a person who has been exposed to a PUI, but who is not exhibiting any symptoms related to COVID-19.  Clark Dec., ¶ 25; Chase Dec., ¶ 26.

[5] Defendants will provide copies of these posters and videos upon the Court's request.

10

815103

suspended to promote social distancing practices in the jail facilities.  Clark Dec., ¶¶ 23, 31.  Custody staff initially provided inmates in with cloth face masks on April 14, 2020.  *Id.*  CHS also provides face masks to all inmates in quarantine and isolation.  Clark Dec., ¶¶ 26-27.

LASD has also taken extra steps to keep inmate and staff areas at the jail facilities clean.  Chase Dec., ¶ 15.  Even before COVID-19, LASD had rigorous protocols to enhance sanitary conditions for inmates in the jails, including, but not limited to, providing inmates with clean clothes, bedding, showers and personal hygiene products.  *Id.*  Inmates are also issued personal kits when they first arrive at the jails that contain hygiene items, including clean linen and either a bar of soap or liquid soap.  Chase Dec., ¶ 18.  All staff have been instructed to provide inmates with bars of soap upon request.  Clark Dec., ¶ 22; Chase Dec., ¶ 19.

Moreover, since the pandemic began, jail staff has provided inmates with cleaning supplies and solution after every meal, and those supplies are available to inmates at any time.  Chase Dec., ¶ 16.  Incarcerated individuals have also been provided supplies to clean their own living space multiple times each day.  *Id.*  Inmates are provided with CitriCide and Turbo Kill to clean their housing areas, which have been rated by the federal Environmental Protection Agency to kill COVID-19.  Chase Dec., ¶ 18.  Jail staff checks the supplies daily to ensure that they are adequate and to deliver mops to each housing area upon request by an inmate.  *Id.*  Since at least mid-March 2020, jail staff has assigned inmates to work eight hours each weekday as part of "COVID-19 Clean-Up Crews."  *Id.* at ¶ 16.  "COVID-19 Clean-Up Crews" clean high traffic areas to routinely and effectively disinfect all frequently touched surfaces and objects.  Chase Dec., ¶ 17.

**E.    Practices To Prevent Infection Of Jail Employees**

CHS supplies all of their personnel with N95 or surgical masks, which are available at jail facility entrances at the beginning of each shift.  Clark Dec., ¶ 35.  Face shields and gowns are provided to staff working directly with PUI's and patients

11

1  who have tested positive for COVID-19.  *Id.*  CHS also instructed their staff to take

2  their temperature every day once in the morning and at night.  *Id.* at ¶ 38; Chase Dec.,

3  ¶ 30.

4        Signs are posted at all jail facility entrances notifying jail employees that they

5  may not enter the facility unless they have taken their temperature, if they have

6  COVID-19 symptoms, or have had contact with a COVID-19 positive person in the

7  past 14 days.  Clark Dec., ¶ 38; Chase Dec., ¶ 30.  As of April 9, 2020, all jail staff

8  are required to wear a mask while in a jail facility.  Chase Dec., ¶ 22.

9      **F.**    **Minimal Infection Rates Of COVID-19 At Los Angeles County Jails**

10        As a result of the LASD's and CHS' comprehensive and aggressive approach

11  to limit the spread of COVID-19, only a small number of inmates have contracted the

12  virus.  As of April 26, 2020, there has not been a single COVID-19 related inmate

13  death.  Clark Dec., ¶9.  By comparison, Riker's Island jail in New York City (inmate

14  population of approximately 10,000) has 304 inmates and 518 staff who have tested

15  positive for the virus.  Chase Dec., ¶ 29.  Cook County Jail in Chicago, Illinois

16  (inmate population of approximately 3,200) has 461 inmates and 363 staff members

17  who have tested positive for the virus.  *Id.*

18  **IV.**   **PLAINTIFFS HAVE NOT DEMONSTRATED THAT THEY ARE**

19        **LIKELY TO PREVAIL ON THE MERITS**

20        To obtain a temporary restraining order, the moving party must demonstrate (1)

21  that it is likely to prevail on the merits of its claim, (2) that it will suffer irreparable

22  harm in the absence of extraordinary relief, (3) that the balance of equities is in its

23  favor, and (4) that an injunction is in the public interest.  *Beaty v. Brewer*, 649 F.3d

24  1071, 1072 (9th Cir. 2011) (preliminary injunction); *Lockheed Missile & Space Co.,*

25  *Inc. v. Hughes Aircraft Co.*, 887 F.Supp. 1320, 1323 (N.D.Ca. 1995) (standards for

26  TRO are same as for preliminary injunction).

27        As the moving parties, Plaintiffs have the burden of proof on each element.

28  *Baca v. Moreno Valley Unified School District*, 936 F.Supp. 719, 726 (C.D.Ca. 1996)

815103

(preliminary injunction); *Big Sky Scientific LLC v. Idaho State Police*, 2019 WL 438336 at *4 (D.Idaho Feb. 2, 2019) (burden of proof for TRO is same as for preliminary injunction).

"A temporary restraining order is an extraordinary and drastic remedy and should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Klein v. City of Laguna Beach*, 594 F.Supp.2d 1020, 1024 (C.D.Ca. 2009); *see also In Defense of Animals v. U.S. Dept. of Interior*, 737 F.Supp.2d 1125, 1131 (E.D.Ca. 2010) ("The issuance of . . . preliminary injunctive relief is an extraordinary remedy, and Plaintiffs have the burden of proving the propriety of such a remedy by clear and convincing evidence.")

Plaintiffs' burden is even heavier than the already weighty burden imposed in most cases because the purpose of a temporary restraining order is to preserve the status quo (*Bronco Wine Co. v U.S. Dept. of Treasury*, 997 F.Supp. 1309, 1231 (E.D.Ca. 1996)),  while Plaintiffs are seeking relief which would drastically alter it. *See 3570 East Foothill Blvd., Inc. v. City of Pasadena*, 912 F.Supp. 1257, 1260 (C.D. Ca. 1995)  (since primary purpose of preliminary injunction is to preserve the status quo, those which change it are "'viewed with hesitancy and carry a *heavy burden of persuasion*.") (Emphasis in original)

Plaintiffs fall woefully short of this standard, especially given that virtually every material fact they assert is contradicted by Defendants.  *Ohio Casualty Ins. Co. v. L.H. Engineering Co., Inc.*, 2014 WL 12569352 at *2 (C.D.Ca. April 24, 2014) (denying TRO "on the basis of unproven and contradicted facts);  *Knudsen Corp. v. Ever-Fresh Foods, Inc.*, 336 F.Supp. 241, 248 (C.D.Ca. 1971) (denying preliminary injunction; "The case at bar presents material disputed issues of fact which casts reasonable doubt upon the certainty of plaintiff's prevailing at a trial on the merits.")

Plaintiffs' claims also fail as a matter of law, as Defendants now show.

**A.      Plaintiffs Have Not Exhausted Their Administrative Remedies As**

**DEFENDANTS' OPPOSITION TO EX PARTE APPLICATION FOR TRO**

815103

**Required By the Prison Litigation Reform Act, 42 U.S.C. §1997e(a)**

Plaintiffs challenge conditions in the County jails under 42 U.S.C. §1983. Complaint, ¶¶174-212.  Under the Prison Litigation Reform Act of 1995 ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. §1997e(a).  A "prisoner" includes both pretrial detainees as well as those convicted of a crime.  42 U.S.C. §1997e(h); *Matapuatuli v. Sessions*, 714 Fed.Appx. 730, 731 (9th Cir. 2018).  The PLRA applies to local jails (18 U.S.C. §1326(g)(5); *Maiden v. LA County Sheriff's Dept. Men's Central Jail*, 334 Fed.Appx. 76 (9th Cir. 2009) (affirming dismissal of prisoner's §1883 claims for failure to exhaust administrative remedies as required by the PLRA).

Section 1997e makes exhaustion of administrative remedies mandatory.  *Porter v. Nussle*, 534 U.S. 516, 524 (2002).  "The PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Id*. at 532.  They apply to claims over prison conditions during the COVID-19 crisis.  *Valentine v*. Collier, 2020 WL 1934431 at **5-7 (5th Cir. April 22, 2020).  There are no futility or other judicially created exceptions to the statutory exhaustion requirements.  *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001); *Valentine*, 2020 WL 1934431 at **5-7 (reversing district court finding that failure to exhaust administrative remedies would be "too lengthy" in view of COVID-19 crisis; no such exception to exhaustion requirement exists).

Defendants have a lengthy Custody Division Manual, with an entire volume entitled "Inmate Grievance Manual" (the "Manual").  Ex. A to Corbett Dec.  The Manual contains detailed procedures for inmate grievances, including "Emergency Grievances" (§8-03/010.00) and "Health Care Grievances" (§8-03/020.00).  There is also an entire process for appeals (§8-04/030.00), including but not limited to

14

815103

1    "Appeals of Emergency Grievances" (§8-04/030.15).

2         Plaintiffs did not satisfy the administrative remedies available to them, either in

3    the Manual or otherwise.  Of the 15 inmates who provided declarations in support of

4    the TRO, ten do not claim that they even filed a written request or grievance, which is

5    the first step under the Manual.  §8-01/005.00.  Of the remaining five, three filed (or

6    asked to file) grievances in which they requested masks.  Davidson Dec., ¶9; Young

7    Dec., ¶14; Avila Dec., ¶9.  These were provided.  Davidson Dec., ¶9; Young Dec.,

8    ¶15; Avila Dec., ¶11.  One inmate asked to see medical staff (twice), and was given

9    the opportunity to do so both times.  Haviland Dec., ¶¶12, 15.  In other cases, the

10   declarants claimed that their grievances were denied or there was no response.  Avila

11   Dec., ¶9; Balderrama Dec., ¶7; Young Dec., ¶16.  But those instances do not

12   constitute exhaustion of administrative remedies, because the Manual expressly

13   provides for appeals if the inmate is not satisfied with the disposition of their

14   grievance or if the inmate receives no response (§8-04/030.00).  This evidence is not

15   remotely adequate to constitute exhaustion of administrative remedies.

16        Plaintiffs cannot evade the exhaustion of administrative remedies requirement

17   by seeking relief on grounds other than §1983.  The Ninth Circuit does not recognize

18   a cause of action directly under the federal constitution:  "a litigant complaining of a

19   violation of a constitutional right must utilize 42 U.S.C. §1983."  *Azul-Pacifico, Inc.*

20   *v. City of Los Angeles*, 973 F.2d 704, 705 (9th Cir. 1992) (emphasis added).  And

21   Plaintiffs cannot proceed under the Americans with Disabilities Act (Complaint,

22   ¶¶213-233) or the Rehabilitation Act 1 (Complaint, ¶¶234- 253) because §1997e(a)

23   requires exhaustion of administrative remedies not only for claims under §1983 but

24   also those brought under "any other Federal law."  §1997e(a);  *O'Guinn v. Lovelock*

25   *Correctional Center*, 502 F.3d 1056, 1058, 1060 (9th Cir. 2007) (affirming dismissal

26   of prisoner's claims under ADA and Rehabilitation Act for failure to exhaust

27

28

**DEFENDANTS' OPPOSITION TO EX PARTE APPLICATION FOR TRO**

815103

1   administrative remedies as required by §1997e(a)).[6]

2      Plaintiffs' failure to exhaust their administrative remedies likewise bars relief

3   under their state law claims.  Complaint, ¶¶254-264 ( Gov.Code §11135); ¶¶265-273

4   (Civ.Code §51(f)); ¶¶265-273 (Civ.Code §54(c)).  *See, e.g.,  J.E.L. v. San Francisco*

5   *Unified School District*, 185 F.Supp.3d 1196, 1201 (N.D.Ca. 2016) (dismissing

6   §11135 claim by disabled student for failure to exhaust administrative remedies as

7   required by 22 Cal.CodeRegs. §98003**).**

8      **B.      Plaintiffs Have Not Exhausted Their Administrative Remedies As**
            **Required By the Prison Litigation Reform Act, 42 U.S.C. §1997e(a)**
9
10     Trying to evade the requirements of §1997e, which they cannot meet, Plaintiffs

11  also characterize their challenge to jail conditions as claims for habeas corpus under

12  28 U.S.C. §2241.  Complaint, ¶¶174- 212.  They are not.

13     Habeas corpus is the remedy "to attack the legality of the conviction or

14  sentence."  *Nettles v. Grounds*, 830 F.3d 992, 933 (9th Cir. 2016) (en banc).  But

15  Congress' enactment of the Prison Litigation Reform Act "indicated an intent to make

16  §1983 the exclusive remedy for 'all inmate suits about prison life.'"  *Id*. at 932.  This

17  complaint is a suit about prison life, not the legality of Plaintiffs' convictions or

18  sentences — indeed, many of them have not yet been convicted or sentenced

19  (Complaint, ¶159) —  and thus is not a case of habeas corpus.

20     Other district courts presented with similar COVID-19 prisoner cases have

21  reached the same conclusion.  *See, e.g.*, *Phea v. Pfeiffer*, 2020 WL 1892427, at *1

22  (E.D.Ca. April 16, 2020) (denying state prisoner's habeas petition based on COVID-

23  19 because it related to "the conditions of petitioner's confinement" rather than "the

24  duration or legality of his confinement" and thus was a §1983 claim); *Petersen v.*

25  *Diaz*, 2020 WL 4740538, at **1-2 (E.D. Ca. April 2, 2020) (same).

26

27  ――――――――――――

28  [6]Notably, the Manual has an entire section devoted to ADA grievances and their
    appeals (§8-03/030 .00).  No plaintiff claims to have used it.

16

1        Because this case is one under §1983, no matter how Plaintiffs style it,[7]

2   Plaintiffs are required by §1997e to exhaust their administrative remedies.  Since they

3   have not done so, they cannot show the likelihood of success on the merits required

4   for a TRO:  indeed, their claims will not survive a motion to dismiss under F.R.C.P.

5   12(b)(6).

6        Labeling their claims as ones for habeas corpus is not only incorrect as a matter

7   of law, it is pointless because habeas corpus claims have their own exhaustion

8   requirements which Plaintiffs do not satisfy, either.  Habeas petitions involving state

9   prisoners take two forms:  those brought under 28 U.S.C. §2241 and those under

10   §2254.  Section 2254(a) applies to those persons "in custody pursuant to the judgment

11   of a State court," *i.e.,* those who have already been convicted.  A writ cannot be

12   granted under §2254 unless the applicant has exhausted the remedies of the state

13   courts.  §2254(b)(1)(A).  There is no allegation, and no evidence, that any of the post-

14   conviction plaintiffs has exhausted his/her state court remedies — a requirement even

15   during the present health emergency.[8]

16        Undoubtedly for this reason, Plaintiffs assert that they are proceeding under

17   §2241 for both pretrial and post-conviction inmates.  Complaint, 50: 20-24, 54:2-6,

18   56:7-11.  They cannot do so.  <u>Pretrial detainees</u> may proceed under §2241 because

19   they are not "in custody pursuant to the judgment of a State court."  *Stow v.*

20   *Murashige*, 389 F.3d 880, 885 (9th Cir. 2004).  But for post-conviction inmates, their

21   remedy lies solely under §2254.  *White v. Lambert*, 370 F.3d 1002, 1009-1010 (9th

22   Cir. 2004), *overruled on other grounds, Hayward v. Marshall*, 603 F.3d 546 (9th Cir.

23

---

24   [7]"The label that a plaintiff places on his pleadings, however, does not determine the
nature of his cause of action."  *Rains v. Criterion Systems, Inc.*, 80 F.3d 339, 343 n.2
25   (9th Cir. 1996).

26   [8]*See, e.g.*, *Riggs v. Louisiana*, 2020 WL 1939168, at *2 (W.D.La. April 22, 2020)
(denying habeas petition by convicted state prisoner on COVID-19 grounds for
27   failure to exhaust state court remedies; "While the Court is well aware of the effects
of the Covid-19 pandemic and is concerned about its effect on those persons in the
28   prison system, Riggs has not stated a claim for relief at this time.")

815103

2010) (§2254 "is the exclusive vehicle for a habeas petition by a state prisoner in custody pursuant to a state court judgment, even when the petitioner is not challenging his underlying state court conviction."); *see also Dominguez v. Kernan*, 906 F.3d 1127, 1135 (9th Cir. 2018) (same).  The post-conviction plaintiffs must comply with §2254, and they have failed to do so.[9]

The plaintiffs who <u>are</u> pretrial detainees fare no better.  While they may proceed under §2241, those claims are also subject to an exhaustion requirement. *Dominguez*, 906 F.3d at 1135 n.9.  That requirement was largely imposed in the interests of comity, "to prevent federal interference with state adjudication, especially state criminal trials" which, in the case of pretrial detainees, of course have not even occurred yet.  *Carden v. State of Montana*, 626 F.2d 82, 83 (9th Cir. 1980); *Williams v. Los Angeles Superior Court*, 2014 WL 2533804, at *3 (C.D.Ca. June 4, 20014) (denying release under §2241 for failure to exhaust judicial remedies; state pretrial detainee had failed "to seek *any* relief" in state appellate courts) (emphasis in original).  There is no evidence that any of the Plaintiffs has sought any relief in any state court, let alone that such relief been denied, and that requirement does not disappear even in the present public health crisis.[10]

## C.   Plaintiffs Have Not Demonstrated Defendants' Deliberate Indifference To The Impact Of COVID-19 On Jail Conditions.

Plaintiffs seek relief on behalf of two distinct groups:  those inmates who have been convicted of a crime (Complaint, ¶¶160, 197-212) and those who are pretrial detainees (Complaint ¶¶159, 174-196).

---

[9]Plaintiffs cite a Tenth Circuit case, *Montez v. McKinna*, 208 F.3d 862, 865 (10th Cir. 2000), for the proposition that post-conviction prisoners may also proceed under §2241.  TRO 36 at n.22.  That is not the law in the Ninth Circuit, which has explicitly considered both the analysis and conclusion in *Montez*, and rejected them as a minority view unsupported by both statutory and U.S. Supreme Court authority. *White*, 370 F.3d at 1009-1010.

[10]*See, e.g.*, *Cuevas v. Commonwealth of Pa.*, 2020 WL 1911511, at *3 (M.D.Pa. April 20, 2020) (denying habeas petition by pretrial detainee in county jail on COVID-19 grounds for failure to exhaust state judicial remedies:  "To exhaust a claim, a petitioner must 'fairly present' it to each level of the state courts.")

18

815103

### 1.    The Pretrial Detainees Have Not Shown Deliberate Indifference.

"Inmates who sue prison officials for injuries suffered while in custody may do so under the Eighth Amendment's Cruel and Unusual Punishment Clause or, if not convicted, under the Fourteenth Amendment's Due Process Clause." *Castro v. County of Los Angeles*, 833 F.3d 1060, 1067-68 (9th Cir. 2016) (en banc) *citing Bell v. Wolfish*, 441 U.S. 520, 535 (1979). "Under both clauses, the plaintiff must show that the prison officials acted with 'deliberate indifference.'" *Id.* at 1068.

When a pretrial detainee sues a governmental entity under the Fourteenth Amendment, "the deliberate indifference standard for municipalities is always an objective inquiry." *Id.* at 1076. The objective standard for deliberate indifference for Fourteenth Amendment claims brought by pretrial detainees applies to a failure to address medical needs, as well as a failure to protect pretrial detainees. *Gordon v. County of Orange*, 888 F.3d 1118, 1124 (9th Cir. 2018).

The objective standard is satisfied when a "plaintiff [] establish[es] that the facts available to [entity] policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in violation of the constitutional rights of their citizens." *Castro*, 833 F.3d at 1076.

The elements for a pretrial detainee's claim are:

> "(i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such

19

815103

measures, the defendant caused the plaintiff's injuries." *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018).

The defendant's conduct under the third element must be objectively unreasonable, and it is "more than negligence but less than subjective intent—something akin to reckless disregard." *Id*.

Defendants have not acted with deliberate disregard of COVID-19 under the objective standard.  Defendants have undertaken a number of actions to minimize the threat of COVID-19 at the jails.  Among other things, Defendants have implemented and revised policies that require, among other things, multiple levels of screening of incoming inmates for COVID-19 symptoms; isolating and providing masks to those showing symptoms; providing town hall meetings, demonstrative posters, and videos to educate the detainees about COVID-19; testing for COVID-19; symptom tracking of medical and prison staff; providing hand sanitizer for all staff; providing enhanced cleaning of cells and common areas; and decreasing the jail population by 30%. Here, too, the CDC Guidance is the basis for Defendants' policies.   Clark Dec., ¶¶11, 47.

Courts have held that far less remedial measures were sufficient in the face of deliberate indifference challenges.  *Habibi v. Barr*, No. 20-cv-00618-BAS-RBB, 2020 WL 1864642, at *5 (S.D. Cal. Apr. 14, 2020) (plaintiff did not show inadequate measure by government to prevent spread of COVID-19 due to the following measures: detainees, vendors, and staff are screened for fever, illness, and contact with positive cases; detainees are tested and isolated if they show symptoms; the facility has increased in disinfectant spray, hand sanitizer, soap, and cleaning of the housing units; all social visitations have been suspended and counsel visitations are non-contact; and "cohorting" any detainees that were exposed).

Defendants have implemented the vast majority of these measures, and more,

**DEFENDANTS' OPPOSITION TO EX PARTE APPLICATION FOR TRO**

815103

including multiple screenings of all incoming inmates for symptoms; isolating and providing masks, enhanced cleaning; symptom-tracking of medical staff; providing sufficient hand sanitizer to staff; educating the inmates through posters, videos, and meetings; and decreasing the jail population by 30%.  *See* Section III, *supra*.

Defendants have also not been recklessly disregarding the risk of COVID-19 because they been modifying and improving policies to comply with changing guidelines and recommendations.[11]   Defendants have been modifying and improving their policies to comply with the ever-changing guidance from the local, state, and federal officials.  For instance, Los Angeles first issued *non-binding guidance* that the public should use masks to prevent the spread of COVID-19 on April 1, 2020.[12]  At that time, the federal government maintained that the masks were *not* recommended.[13]  The CDC did not recommend that people should wear cloth or fabric face coverings until April 3, 2020.[14]  The City of Los Angeles mandated masks for the general population in public spaces, such as grocery stores, effective April 10, 2020.[15]  Many Plaintiffs concede that masks were provided shortly after the mask guidance was issued, and on or around the date that masks were required by the City of Los

---

[11] *Cf. Valentine v. Collier*, -- F.3d ---, 2020 WL 1934431, at *5 (5th Cir. Apr. 22, 2020) (without injunction, Texas state prison officials could quickly adopt new procedures based on changes to CDC guidelines).

[12] Kailyn Brown, et al, *Should You Wear a Mask at the Grocery Store?  Coronavirus Advice Keeps Changing*, LA Times, Apr. 1, 2020, https://www.latimes.com/california/story/2020-04-01/should-you-wear-a-face-mask-at-the-grocery-store-ccoronavirus-advice-keeps-changing (last accessed Apr. 26, 2020).

[13] *Id.*

[14] *See* Colin Dwyer and Allison Aubrey, *CDC Now Recommends Americans Consider Wearing Cloth Face Coverings In Public*, NPR, Apr. 3, 2020, https://www.npr.org/sections/coronavirus-live-updates/2020/04/03/826219824/president-trump-says-cdc-now-recommends-americans-wear-cloth-masks-in-public (last accessed Apr. 26, 2020).

[15] Public Order Under City of Los Angeles Emergency Authority, Worker Protection Order, Apr. 7, 2020 (rev. Apr. 16, 2020) https://www.lamayor.org/sites/g/files/wph446/f/page/file/20200416MayorPublicOrderWorkerProtectionRevised041620.pdf (last accessed Apr. 26, 2020).

21

Angeles. *See, e.g.,* Avila Dec. at ¶ 11 (received a mask on April 10); Balderrama Dec. at ¶¶ 13, 19 (received a mask, lost it, and received another mask on April 11); Cullors Dec. at ¶ 12 (received a mask on April 10); Davidson Dec. ¶ 9 (received a mask on April 11); Dunham Dec. at ¶ 8 (obtained a cloth mask on unspecified date); Farmer Dec. ¶ 5 (received a mask on April 15); Haviland Dec. at ¶ 16 (received a mask on April 11). Public health officials were far from universal in their guidance regarding masks until mid-April.  Defendants' failure to provide masks before early April is not deliberate indifference because health officials' guidance supported their actions then.

Plaintiffs state that "[o]ther federal courts have acted quickly to grant extraordinary COVID-19 relief to people in detention, including TROs similar to the one requested here."  TRO at 26:6-12 (footnote citing cases). None of these cases are controlling, and none of these cases ordered the release of state prisoners.  *Banks v. Booth*, 1:20-cv-00849-CKK, 2020 WL 1914896, at *13 (D.D.C. Apr. 19, 2020) (court not ordering release of prisoners); *Cameron v. Bouchard*, No. 2:20-cv-10949-LVP-MJH, Dkt. No. 40, 2020 WL 1929876 E.D. Mich. Apr. 17, 2020) , *as modified on reh'ing* 2020 WL 1952836, at *2 (E.D. Mich. Apr. 23, 2020) (no release of inmates ordered, and on rehearing, court reverse its prior order to provide names of subclass members subject to release because court has not determined it has the authority to release inmates); *Roman v. Wolf*, 5:20-cv-00768-TJH, 2020 WL 1952656 (C.D. Cal. Apr. 23, 2020) (immigrants held a federal facility, not state inmates); *Valentine v. Collier,* No. 4:20-CV-1115, 2020 WL 1899274 (S.D. Tex. Apr. 16, 2020), *injunction stayed pending appeal*, *Valentine v. Collier*, 2020 WL 1934431 (5th Cir. Apr. 22, 2020) (no releases); *Gray v. Cty. of Riverside*, 5:13-cv-0444-VAP-OPx, Dkt. No. 191 (C.D. Cal. Apr. 14, 2020) (same); *Swain v. Junior*, No. 1:20-cv-21457-KMW, 2020 WL 1692668, at *2 (S.D. Fla. Apr. 7, 2020) (same, and ordering that jail provide adequate spacing "to the maximum extent possible considering … current population levels").  Plaintiffs also provide a string cite of cases in footnote 13 for the principle that "courts have also granted other extraordinary relief including habeas corpus,

**DEFENDANTS' OPPOSITION TO EX PARTE APPLICATION FOR TRO**

815103

reversing decisions to detain individuals found to be a safety risk pretrial, and compassionate release." TRO at 26:13-15 n.13. **None** of these cases pertained to a federal court ordering the release of state prisoners or detainees, held on state matters (*i.e.,* not under federal immigration law).

Requests for federal courts to release state, rather than federal, inmates "raise[] serious concerns under core principles of federalism and the separation of powers, especially given their request for sweeping relief in the form of a mandatory injunction." *Money v. Pritzker*, 2020 WL 1820660 at *15 (N.D. Ill. Apr. 10, 2020) (citing *Missouri v. Jenkins*, 495 U.S. 33, 51 (1990)) (apply Eighth Amendment). "The Supreme Court repeatedly has cautioned that federal courts must tread lightly when it comes to questions of managing prisons, particularly state prisons." *Id.* (citing cases). "It is no accident that the federal judiciary only rarely intrudes into the management of state prisons, and only once in history has actually ordered the release of prisoners on a scale anywhere near what Plaintiffs hope to accomplish through this litigation." *Id.*

Moreover, Plaintiffs fail to identify adverse authority.[16]   In the most extreme example, Plaintiffs cite to the District Court's injunction in *Valentine*, but ***fail to disclose that the injunction is stayed pending appeal.*** Two days before the TRO was filed, the Fifth Circuit stayed the injunction in *Valentine*, concluding that Plaintiffs "have not shown a 'substantial risk of serious harm' that amounts to 'cruel and

---

[16] Other District Courts have rejected similar requests for injunctive relief or release from confinement. *See, e.g., Plata v. Newsom*, No. 01-cv-01351-JST, 2020 WL 1908776 (N.D. Cal. Apr. 17, 2020) (denying California state prisoners' injunction to order state to "develop a plan to manage and prevent the further spread of COVID-19 in California state prisons," including reducing population of prison where state's response to COVID-19 was adequate (see *infra*)); *Coleman v. Newsom*, No. 2:90-cv-0520 KJM DBP, 2020 WL 1675775 (E.D. Cal. Apr. 4, 2020) (three-judge panel convened under PLRA denied request to release California state prisoners due to COVID-19 where state's response to COVID-19 was adequate (see *infra*)); *Money v. Pritzker*, 2020 WL 1820660 (N.D. Ill. Apr. 10, 2020) (denying injunctive relief to release medically at-risk class of state prisoners in light of COVID-19 where state's response to COVID-19 was adequate).

**DEFENDANTS' OPPOSITION TO EX PARTE APPLICATION FOR TRO**

unusual punishment'" in light of the jail's efforts to undertake protective measures, and the District Court improperly applied Supreme Court precedent regarding the Eighth Amendment.  2020 WL 1934431, at *3.  The Fifth Circuit noted that the injunction interferes with the ability of the state to implement its "rapidly changing and flexible system-wide approach" in light of a number of guidance changes from the CDC.  *Id.* at *5.

Furthermore, the unfortunate reality is that all the remedial measures in the world will not reduce the risk of infection if the inmates refuse to cooperate or even actively sabotage Defendants' best efforts, which has in fact been happening.  That does not, however, entitled Plaintiffs to a TRO.  *Mission Power Engineering Co. v. Continental Cas. Co.*, 883 F.Supp. 488, 492 (C.D.Ca. 1995) ("It must be established that the moving party is without fault in creating the crisis that requires ex parte relief.")

Defendants have been working tirelessly to adopt policies and protocols that protect the detainees and prisoners, and the Court should defer to Defendants' judgment.  *Norwood v. Vance*, 591 F.3d 1062, 1066 (9th Cir. 2010).  Defendants took "reasonable available measures," *Gordon*, 888 F.3d at 1125, and therefore there is no deliberate indifference under the Fourteenth Amendment.

## 2. The Convicted Inmates Have Not Shown Deliberate Indifference

The convicted inmates must make an objective ***and*** subjective showing of deliberate indifference under the Eighth Amendment.  *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1067-68 (9th Cir. 2016) (en banc). The danger to the prisoner must be, objectively, sufficiently serious.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  Then, the official must "know of and disregard an excessive risk to inmate health or safety."  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "A prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive

24

risk to inmate health or safety." *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1050 (9th Cir. 2002) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Prison officials only must "'take reasonable measures to mitigate the [known] substantial risk[s]' to a prisoner." *Wilk v. Neven*, No. 17-17355, 2020 WL 1949281, at *4 (9th Cir. Apr. 23, 2020) (quoting *Castro*, 833 F.3d at 1067).

When a prisoner's Eighth Amendment claim is based on "involuntary exposure to environmental hazards," the prisoner must make a two-part showing.  Under the objective prong, the plaintiff must show "that it is contrary to current standards of decency for anyone to be exposed against his will to the hazard." *Hines v. Youseff*, 914 F.3d 1219, 1229 (9th Cir. 2019) (quoting *Helling v. McKinney*, 509 U.S. 25, 35 (1993) (internal quotations omitted).  "A prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement ***only*** if he knows that inmates face a substantial risk of serious harm ***and disregards that risk by failing to take reasonable measures to abate it***." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994) (emphasis added).

Plaintiffs cannot show that the conditions at the jails are "contrary to current standards of decency for anyone to be exposed against his will." *Hines*, 914 F.3d at 1229.  Other courts have found that lesser or equal remedial measures to those implemented by Defendants here were satisfactory. *Coleman v. Newsom*, No. 2:90-cv-0520, 2020 WL 1675775, at *3-4 (E.D. Cal. Apr. 4, 2020) (like Defendants' policies here, California state prisons' policies were adequate where they canceled visiting statewide, distributing fact sheets and posters, additional hand-sanitizing dispenser stations, transferred approximately 500 inmates out of dorm housing, suspended transfers between facilities, and conducted temperature checks and symptom screenings of all individuals entering the prisons); *Plata v. Newsom*, No. 01-cv-01351, 2020 WL 1908776, at *4 (E.D. Cal. Apr. 17, 2020) (California state prisons' policies were adequate where produced cloth masks for distribution at prisons, implemented a program that restricts movement and increases sanitation, in

25

815103

1   addition to matters in *Coleman*).

2       The Fifth Circuit also considered this matter in relation to COVID-19.  In

3   *Valentine*, the court stayed an injunction in another COVID-19 state prisoner case

4   because the defendants demonstrated a likelihood of success on the merits.  The Fifth

5   Circuit noted that the defendants had already provided a number of protective

6   measures recommended by the CDC, including "access to soap, tissues, gloves,

7   masks, regular cleaning, signage and education, quarantine of new prisoners, and

8   social distancing during transport." *Valentine v. Collier*, No. 20-20207, 2020 WL

9   1934431, at *3-4 (5th Cir. Apr. 22, 2020).  The injunction would go beyond the CDC

10  guidelines, and the Fifth Circuit concluded that the plaintiffs "have cited no precedent

11  holding that the CDC's recommendations are insufficient to satisfy the Eighth

12  Amendment." *Id.*  Here, too, the CDC Guidance is the basis for Defendants' policies.

13  Clark Dec., ¶¶10, 12-15, 26, 35-36.

14      Even if the objective standard were satisfied, Plaintiffs have not demonstrated

15  that Defendants' acts were deliberately indifferent under the subjective prong.

16  Plaintiffs must show that Defendants were subjectively indifferent, which only exists

17  "if he knows that inmates face a substantial risk of serious harm and disregards that

18  risk by failing to take reasonable measures to abate it." *Hines v. Youseff*, 914 F.3d

19  1219, 1229 (9th Cir. 2019) (quoting *Farmer v. Brennan*, 511 U.S. 825, 847

20  (1994)).   To show deliberate indifference under the subjective standard in the

21  COVID-19 context, there must be evidence that the defendants "subjectively believe

22  the measures they are taking are inadequate." *Valentine,* 2020 WL 1934431, at *4

23  (no deliberate indifference under the subjective standard where prison officials had

24  taken measures "informed by guidance from the CDC and medical professionals—to

25  abate and control the spread of the virus.")[17]

26

27  [17] The Fifth Circuit held that the district court erred by "treating inadequate measures
    as dispositive of the Defendants' mental state.  Such an approach resembles the
28  standard for civil negligence, which *Farmer* explicitly rejected." *Id*. at *4.

**DEFENDANTS' OPPOSITION TO EX PARTE APPLICATION FOR TRO**

815103

Like in *Valentine*, Plaintiffs here present **no evidence** that Defendants believed—much less knew—that their remedial measures were inadequate.  On the contrary, Defendants' efforts demonstrate that they believe that their responses are adequate.  Correctional Health Services ("CHS") and the LASD began preparing for COVID-19 on February 10, 2020.  CHS, which has been assigned a full-time physician who specializes in infectious diseases to provide guidance and clinical oversight, meets daily with LASD leaders to discuss operational matters and discuss best practices to regarding COVID-19 in the jails.  Due to the dynamic nature of this pandemic, Defendants have made many additions and improvements to this plan as the health care community's knowledge of the virus developed. Defendants have also taken remedial actions to alleviate the threat of COVID-19 in the jails, including reducing the prison population by 30%; screening all incoming inmates for symptoms, and isolating those showing symptoms; enhanced cleaning of cells and public areas; and a number of other measures.

Plaintiffs boldly claim that while "courts give latitude and deference to jail and prison officials' decision," that does not apply to COVID-19, and Defendants are "knowingly expos[ing] Plaintiffs, guards, jail staff, and the public to extreme risk."  TRO at 30:11-14.  Not only is this unsupported by any authority in the TRO, it is contrary to well-established law.  *Norwood v. Vance*, 591 F.3d 1062, 1066 (9th Cir. 2010) ("It is well established that judges and juries must defer to prison officials' expert judgments."); *see also Coleman v. Newsom*, No. 2:90-cv-0520, 2020 WL 1675775, at *8 (E.D. Cal. Apr. 4, 2020) ("We emphasize that Defendants have broad authority to voluntarily take steps that may prevent the life-threatening spread of COVID-19 within their prisons, and we recognize the deference that is due to prison authorities to determine which additional measures must be taken to avoid catastrophic results"); *Money v. Pritzker*, No. 20-cv-2093, 2020 WL 1820660, at *22 (N.D. Ill. Apr. 10, 2020) (deference owed to state prison officials relating to handling COVID-19).

**DEFENDANTS' OPPOSITION TO EX PARTE APPLICATION FOR TRO**

815103

In *Norwood*, the Ninth Circuit concluded that a trial court's refusal to provide a jury instruction regarding deference was erroneous in a conditions of confinement case. *Norwood v. Vance*, 591 F.3d 1062, 1067 (9th Cir. 2010). "Prison officials are entitled to deference whether a prisoner challenges excessive force or conditions of confinement." *Norwood v. Vance*, 591 F.3d 1062, 1067 (9th Cir. 2010). While deference does not apply in cases where there is "unnecessary, unjustified, or exaggerated response to the need for prison security," *Shorter v. Baca*, 895 F.3d 1176, (9th Cir. 2018), Plaintiffs do not make that assertion here. In fact, Plaintiffs fail to weigh the need for security at *all* when discussing deference.

As a result, the convicted inmates cannot demonstrate that defendants acted with deliberate indifference under either prong of the Eighth Amendment.

### 3.   Defendants' Release Of Thousands Of Prisoners (But Not Plaintiffs) Is Evidence That Defendants Are *Not* Deliberately Indifferent To The COVID-19 Crisis.

Plaintiffs contend that Defendants have the authority to release prisoners under state law and their failure to do so is evidence of deliberate indifference. TRO 29:3-11. They are wrong.

First of all, Defendants have gone to extraordinary lengths and used every available statutory tool and previous court order to rapidly release over 5,200 inmates accused or sentenced on non-violent, non-serious, or non-sexual crimes since February 28, 2020. This constitutes a reduction of over 30% of the inmate population in a six week period—the largest population reduction due to the COVID pandemic in a jail or prison system nationwide. This was accomplished expressly for the purpose of permitting increased physical distancing and to facilitate other measures to reduce the risk of infection among the inmate population, while still keeping the community safe. *See* Clark Dec. ¶ 10; Corbett Dec. ¶ 2.

For pre-trial inmates, LASD has historically released on a citation most inmates accused of misdemeanor crimes when permitted to do so by California law. LASD,

28

however, does not have that discretion to release those accused of felonies, as those release must be authorized by a Superior Court judge.  Corbett Dec. ¶ 3.  For those arrested on felonies, arraigned and awaiting trial, the LASD's authority to release is restricted by Penal Code §853.85, and must be authorized by the order of a superior court judge.

Due to the COVID pandemic, to facilitate the releases of inmates accused of felonies, LASD worked diligently with the Superior Court and their justice partners to create a system for bail deviation hearings so that pre-trial inmates being held on non-serious, non-violent, non-sexual felony charges could be released with a notice to appear at a later date.  *Id.* ¶ 4.  LASD delivered lists of qualified inmates, i.e., those who were not charged with a serious or violent felony as those terms are defined under Penal Code §§ 667.5 and 1192.7 to the District Attorney's Office and the Public Defender's Office for vetting and bail deviation hearings.  *Id.*

As the CDC and DPH had at that time identified those 65 and older as being at greater risk should they be infected with COVID, LASD identified qualified inmates 60 or older on the first list it sent.  *Id.* ¶ 5.  The LASD delivered its first list on March 20, 2020.  *Id.*  Since then, these lists have grown to over 2,400 people, and the Superior Court has either approved of release stipulations or held hearings with the Public Defender's Office/Alternate Public Defender's Office and District Attorney's Office prior to issuing release orders. LASD then processed these releases, providing the inmate with a notice to appear more than 60 days out in deference to state and local Stay-at-Home orders.  *Id.*

On April 13, 2020, a statewide emergency bail schedule went into effect effectively reducing bail to $0 for all inmates except those arrested for crimes specifically excluded on the schedule, e.g., serious, violent, or sex offenses.  Ex. A to Corbett Dec. ¶ 7.  In response, as the LASD had the authority to re-set bail to $0 for those accused of qualifying crimes but who had not yet been arraigned, the LASD scoured its records in an attempt to locate any such inmates, but did not find any.

29

1   Corbett Dec. ¶ 15. Simultaneously, LASD began working with the Superior Court

2   and its justice partners to identify those accused of qualifying crimes who had already

3   been arraigned so that the Court in its own discretion could re-set the bail to $0.  *Id.*

4        For convicted and sentenced inmates, LASD has employed its authority under a

5   District Court order issued in 1988 in *Rutherford v. Block*, which permits the Sheriff

6   to release certain convicted inmates early, prior to completing their full sentence, to

7   address unconstitutional overcrowding, with express priority given to those with short

8   remaining sentences or non-violent criminal offenses.  Corbett Dec. ¶ 8.

9        In fact, for the first time, in response to the COVID-19 crisis, LASD has

10   expanded its application of its *Rutherford* authority to release inmates in custody for

11   AB109 crimes.  Corbett Dec. ¶ 9. AB109 is the California Public Safety Realignment

12   Act of 2011, which resulted in people serving their time in the County jail for non-

13   serious/non-violent felonies where they previously would have done their time in

14   state prison.  *Id.*  In response to the COVID-19 crisis, eligible AB109 inmates are

15   completing only 70% of their sentences instead of 100%.  *Id*.

16        To radically reduce the number of new inmates received by the County jail

17   system during the COVID pandemic, LASD also issued new booking requirements,

18   re-setting the minimum bail amount for booking of those accused of misdemeanors

19   or arrested on misdemeanor warrants from $25,000 to $50,000, except for domestic

20   violence crimes.  *Id.* ¶ 11. These new requirements were issued to law enforcement

21   agencies countywide rapidly via the Justice Data Interface Controller System

22   ("JDIC").  *Id.*  LASD has also imposed a temporary moratorium on all but the most

23   critical transfers to the Los Angeles County jails from the California Department of

24   Corrections and Rehabilitation and from outside law enforcement agencies who have

25   arrested people on Los Angeles County warrants.  *Id.*

26        Plaintiffs' real complaint, of course, is that Defendants have not

27   released <u>them</u>.  The truth is that the only inmates who remain in county jail are there

28

30

**DEFENDANTS' OPPOSITION TO EX PARTE APPLICATION FOR TRO**

815103

for a reason – namely, they pose an unacceptable threat to public safety.  They were either charged with or convicted of serious, violent, or sex crimes (*e.g.*, Pen.Code §§ 290(c), 667.5, 1192.7); are state prisoners that the LASD is not authorized to release; or were arraigned and granted no bail by a Los Angeles Superior Court Judge.  *See* Section III(A) above, and Allen Dec. ¶5.

Moreover, neither of the statutes cited by Plaintiffs require Defendants to release them.  Penal Code §4012 permits removal of prisoners in cases of infectious disease only after a physician certifies that the disease is liable to endanger the prisoners' health <u>and</u> a county judge issues an order authorizing the sheriff to remove the prisoners.  §4012.  Even then, the statute only permits removal of the prisoners to "a safe and convenient place in the county, or the jail in a continuous county, as their place of confinement . . .  until they can be safely returned to the jail from which they were taken."  *Id*.  It does not allow the <u>release</u> of any prisoners, even pursuant to a state court order, let alone on the sheriff's own authority.

Gov. Code §8658 does not require Defendants to release prisoners, either.  It provides that the person in charge of the penal institution "may" remove inmates from the institution in the event of an emergency endangering the lives of the inmates.  Even then, however, the statute requires the person in charge of the institution to remove the inmates "to a safe and convenient place and there confine them as long as may be necessary to avoid the danger."  §8658.  Only when that is "not possible" may the person in charge of the institution release the inmates.  *Id*.  Plaintiffs have made no showing that the only way to protect inmates from COVID-19 is to release them into the general population, and that is plainly an unsupportable conclusion.  The general population is also at risk for COVID-19 and there are remedial measures well short of mass prisoner releases which Defendants have already implemented.  Indeed, the kind of mass transfers to another institution which are contemplated by §8658 would only increase, not reduce, the risk of infection.  *Plata*, 2020 WL 1908776, at *6.

**DEFENDANTS' OPPOSITION TO EX PARTE APPLICATION FOR TRO**

Far from requiring the mass release of prisoners on the whim of a sheriff without a court order or other proper process, California law actually (and unsurprisingly) prohibits it.  Cal. Penal Code §4004 provides that prisoners confined in a county jail must remain there "until legally discharged, and if the prisoner is permitted to go at large out of the jail, except by virtue of a legal order or process, it is an escape."[18]  In fact, a sheriff who releases a prisoner "of his own motion" and without the requisite court order is actually aiding and abetting an escape.  *Pedersen v. Superior Court*, 149 Cal. 389, 391 (1906) (decided under predecessor statute to §4004).

Given the LASD's massive multi-pronged efforts to reduce the County jail inmate population by unprecedented numbers in response to COVID, and the serious public safety considerations and limitations on the LASD's authority that have kept the remaining inmates in custody, Plaintiffs have not shown, and cannot possibly, show that the failure to release Plaintiffs constitutes deliberate indifference.

In short, Defendants' tireless efforts to implement policies to curb the threat of COVID-19 in the face of the ever-changing situation proves that Defendants were not deliberately indifferent.  Thus, Plaintiffs cannot show any Eighth Amendment or Fourteenth Amendment violations.

### 4.    Plaintiffs Have Not Established A Likelihood Of Prevailing On Their Disability Claims.

Plaintiffs give short shrift to their disability claims (TRO 31:3-11), which is understandable.  They are barred as a matter of law because Plaintiffs failed to exhaust their administrative remedies.  *See* Section IV(A), *supra* .

The claims are defective for other reasons as well.  For example, the California Disabled Persons Act (Complaint, ¶¶274-283) is "concerned solely with *physical*

---

[18]An exception is made "during the pendency of a criminal proceeding," when "the court before which said proceeding is pending may make a legal order, good cause appearing therefor, for the removal of the prisoner from the county jail in custody of the sheriff."  §4004.

815103

access to public spaces." *Wilkins-Jones v. City of Alameda*, 859 F.Supp.2d 1039, 1054-1055 (N.D.Ca. 2012) (emphasis in original). Thus a jail prisoner can maintain a claim under this statute only for denial of physical access such as the ability to access toilets or walkways, *id.*, none of which Plaintiffs allege. They allege the denial of services and accommodations (Complaint, ¶278), to which the statute does not apply. *Id.* And the Bane Act (Complaint, ¶¶284-290) requires Plaintiffs to show that Defendants acted with "deliberate indifference" to their medical needs (*M.H. v. County of Alameda*, 90 F.Supp.3d 889, 897-899 (N.D.Ca. 2013)), a standard Plaintiffs cannot meet for the reasons already stated. *See* Section IV(C)(1)-(2), *supra*.

More broadly, Plaintiff cannot prevail on their disability claims because the federal and state statutes they invoke require a showing that the alleged discrimination was <u>due to their disabilities</u>. *See, e.g.*, *Martin v. California Department of Veteran Affairs*, 560 F.3d 1042, 1048 (9th Cir. 2009) (no ADA claim because plaintiff did not show that defendant discriminated against her "by reason of" her disability); *id.* at 1049 (same; Rehabilitation Act is even stricter than ADA, requiring showing of denial of service "solely by reason of" her disability); *M.S. v. County of Ventura*, 2016 WL 11506613, at *16 (C.D.Ca. Oct. 24, 2016) (no §11135 claim because no showing plaintiff s were discriminated against on the basis of their disability); *id.* at *16 (no Unruh Act claim because no showing that alleged discrimination was due to plaintiffs' disability).

Plaintiffs do not allege, and cannot show, that Defendants discriminated against them <u>because of</u> their medical condition or other disability. There is no allegation, let alone evidence, that Defendants treated Plaintiffs differently than any other group of inmates — for example, giving masks to young and healthy prisoners while withholding them from those who had medical conditions — let alone that any disparate treatment was specifically and solely because of Plaintiffs' medical conditions. Plaintiffs have not shown, and cannot show, a likelihood of success on any of their disability claims.

**DEFENDANTS' OPPOSITION TO EX PARTE APPLICATION FOR TRO**

### D.     Plaintiffs Have Not Met The Other Requirements For A TRO.

Because Plaintiffs have not shown that they are likely to prevail on the merits, it is unnecessary for the Court to consider further the other requirements for issuance of a temporary restraining order. *Garcia v. Google*, 786 F.3d 733, 740 (9th Cir. 2015). Even if the Court did so, however, it would find that Plaintiffs have not satisfied these, either.

### 1.     Plaintiffs Have Not Established That The Requested Relief Is Necessary To Prevent The Irreparable Harm They Assert.

Plaintiffs argue that COVID-19 is a serious disease and the risk of contracting it is heightened by their underlying medical conditions. TRO 32. That may be true, but it is not the question here. The question is whether Plaintiffs have shown that they are likely to contract COVID-19 absent a mass unsupervised prisoner release and the other relief they request. *Sato v. U.S.Bank*, 2014 WL 12571041, at *2 (C.D.Ca. Jan. 21, 2014) (plaintiff seeking TRO must demonstrate that irreparable injury is likely absent the requested relief); *Valentine v. Collier*, 2020 WL 1934431, at *5 (5th Cir. April 22, 2020) ("the question is whether Plaintiffs have shown that they will suffer irreparable injuries even after accounting for the protective measures" already implemented in prisons; since evidence did not satisfy that standard, preliminary injunction in COVID-19 case stayed on appeal).

Plaintiffs have not remotely approached the required showing. Far from such drastic relief being necessary, the measures already taken and being taken by Defendants has ensured there has not been a single inmate death in the jails and only a handful of positive cases, all of which have recovered or are recovering. Clark Dec., ¶9; Chase Dec. ¶29. Indeed, it is arguable that the very relief Plaintiffs seek — such as release into the general population and would actually increase the risk of infection rather than reduce it.

### 2.     Plaintiffs Have Not Established That The Equities Favor Them Or That An Injunction Is In The Public Interest.

34

Nor can Plaintiffs show that the balance of equities favor them or that an injunction is in the public interest.[19]  Plaintiffs assert that without the TRO, they "face severe health risks, including death," while Defendants only face "financial concerns."  TRO at 33:2-8.  Plaintiffs vastly understate Defendants' interests while overstating their own risks.

Defendants' interests are not merely financial, though those are certainly great.[20]  Far more important are Defendants' interests, and thus those of the general public, in the orderly administration of the jails and in maintaining public safety.  *See Woodford v. Ngo*, 548 U.S. 81, 94 (2006) ("It is 'difficult to image an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administrations of its prisons.'") (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 491-92 (1973)); *Valentine v. Collier*, No. 20-20207, 2020 WL 1934431, at *5 (5th Cir. Apr. 22, 2020) (staying district court's injunction mandating extensive protocols at prisons due to COVID-19 because state has strong interest in enacting prison policies).  *See also* §35626(a) (in issuing any prospective relief under PLRA, the court must give "substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.")

Thus, the appellate court in *Valentine v. Collier*, 2020 WL 1934431, at *1 (5th Cir. Apr. 22, 2020) stayed a preliminary injunction issued by the district court which (like the proposed order Plaintiffs seek) would have micromanaged conditions in the

---

[19]These factors merge when the government is the defendant.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

[20]Jaclyn Cosgrove, *Los Angeles County Could See $1-Billion Decline in Sales Tax Revenue Due to Coronavirus*, L.A. Times, Apr. 15, 2020, 5:03pm https://www.latimes.com/california/story/2020-04-15/los-angeles-county-could-see-1-billion-decline-in-sales-tax-revenue-due-to-coronavirus (last accessed Apr. 27, 2020 (County could face $1-billion decline in sales tax revenue by June 30, 2020, and $2-billion decline by end of fiscal 2021; "'These are significant losses which unfortunately will have a major effect on programs that the county administers on behalf of our 10 million residents,' [Los Angeles County Chief Executive Officer Sachi A.] Hamai said.").

815103

prisons. "Among these is a plan within three days to test all . . . inmates for COVID-19, as a well as a new plan to quarantine those who test positive, distribute physical handouts with COVID-19 information to the inmates, clean common surfaces every thirty minutes for fifteen hours each and every day, and to provide masks to all inmates and staff members." *Id*. at \*5.

> "As we've said before about such intrusive orders, this one creates 'an administrative hightmare' for [defendant] 'to comply with the district court's quotas and deadlines.' [Citation.] '[T]he burden upon [defendant] in terms of time, expense, and administrative red tape is too great' while it must respond in other ways to the crisis." *Id*.

The same is true here. Defendants have already responded to the crisis. They have implemented numerous health and safety protocols. *See* Clark Dec., ¶¶12-20; Chase Dec., ¶¶11-14 (robust screening for new arrestees); Clark Dec., ¶¶21-31, Chase Dec., ¶¶21-22, 26-29 (comprehensive isolation, quarantine, and social distancing methods for inmate population); Clark Dec., ¶¶35-45, Chase Dec., ¶¶30-31 (measures to prevent infection spread to and from jail staff); Clark Decl¶¶46-47, Chse Dec., ¶¶15-20 (thorough sanitation practices for jail facilities).

In addition, to reduce overcrowding and permit ease of physical distancing, quarantine, and isolation, they have already released 30% of the jail population. Corbett Dec., ¶ 2. Those who remain in custody are largely violent offenders [Corbett Dec., ¶ 6. Their unsupervised release[21] would certainly present a threat to the general public, not only because of the inmates' criminal history but also because these inmates (who by Plaintiffs' own account have serious health issues) will likely lack appropriate outside medical care and housing, increasing threat of infection to the

---

[21]Plaintiffs assert that conditions "that would require interaction with other people, such as check-ins, should not be imposed" due to the risk of infection *to the former inmates*. TRO 42, n.29. Plaintiffs express no concern about the risk of infection to the general public.

**DEFENDANTS' OPPOSITION TO EX PARTE APPLICATION FOR TRO**

815103

general public (as well as to the inmates themselves.)[22]  Indeed, these inmates could well wind up in another congregate or institutional setting, such as a skilled nursing home, where the infection and death rates is vastly greater than in the jails.[23]

(Plaintiffs' solution to the released inmates' likely lack of housing is to make Defendants find and pay for that housing.  Proposed Order, ¶1(g).  Not only is this wildly impractical, especially under the current conditions, it would certainly cost a great deal more the "hygiene products" and "cleaning agents" which Plaintiffs seem to think would be Defendants' sole out of pocket expense.  TRO 33:3-8).

Plaintiffs lamely suggest that their plans to release inmates and redesign the jails would actually "benefit the jail staff" by decreasing the staff's own risk of infection.  TRO 33:16-19.  Plaintiffs' altruism is commendable, but Defendants have already implemented procedures to accomplish these goals, such as screening of staff's symptoms, providing hand sanitizer to staff, using tents outside facilities for evaluation of symptoms, and providing face shields and masks to personnel working directly with possible or confirmed COVID-19 inmates.  Clark Dec. at ¶ 35.  While ignoring or minimizing the public safety, criminal justice administration, and even financial harms to Defendants from their requested relief, Plaintiffs overstate the

---

[22]*See Plata v. Newsom*, 2020 WL 1908776 at *8 n.9 (N.D.Ca. 4/17/20) (denying emergency relief, including prisoner releases, from state prisons:  "Plaintiffs also do not appear to have considered questions surrounding the potential impact on public health if inmates who might have been exposed to the virus while incarcerated are released without any testing or quarantine measures in place, or whether such measures are feasible.  Nor do Plaintiffs appear to have considered whether individuals whom they contend should be released would have at least the same access to health care services that they do in prison.")  *See also Habibi v. Barr* at *6 (denying TRO for prisoner release based on COVID-19; "Petitioner 's release would needlessly put the public at risk by allowing him to potentially expose others outside the facility to the virus.")

[23]Matt Hamilton, et al,  *As Death Toll Mounts at Nursing Homes, California Gets Help From the National Guard, Adds Rules*, L.A. Times  Apr. 24, 2020 3:10pm (updated 7:28pm) https://www.law.georgetown.edu/wp-content/uploads/2018/07/Rule-18-Handout-1 Secara-1.pdf (last accessed Apr. 27, 2020) ("'In terms of the vulnerable populations, the first priority has to be the skilled nursing facilities,' said Dr. Christina Ghaly, health services director for L.A. County. 'That's where the majority of the outbreaks have occurred.'")

37

815103

harm to themselves.  TRO 33:3-4 (without requested relief, Plaintiffs face "severe health risks, including death.")  While COVID-19 is unquestionably a serious public health danger, it is far from an automatic death sentence.  In fact, not one jail inmate has died from COVID-19.  Clark Dec. ¶ 9.

And while there is a risk of infection at the jails, that risk is not significantly abated in the general public.  As of the morning of April 26, 2020, there were 41 patients with positive tests and 27 who were previously positive but who have recovered in the jails. Clark Dec. ¶ 19.  Los Angeles County alone has well over 40,000 confirmed cases of COVID-19.  In fact, a recent USC/Los Angeles Department of Health antibody test concluded that up to **440,000** people in Los Angeles County may have been infected with COVID-19.[24]

Plaintiffs' cited cases (TRO 33-34) are inapposite.  Not one involves public health or safety, jail administration, or inmate releases.  The COVID-19 cases that do consider these issues strike a balance very different than the one Plaintiffs urge on the Court.  *Plata*, 2020 WL 1908776 at *8 n.9 (N.D.Ca. 4/17/20) (denying emergency relief, including prisoner releases, from state prisons); *Habibi v. Barr* at *6 (same); *Money v. Pritzker*, 2020 WL 1820660, at *19 (N.D. Ill. Apr. 10, 2020) (same).  As the latter court observed in denying a TRO for prisoner releases on COVID-19 grounds:

> "[E]very release order carries with it some risk to the rest of the community. Has the inmate been exposed to the virus while in custody? Does another vulnerable person— perhaps an 80-year old mother with emphysema—live at the residence where the inmate will be released? Does the inmate have a history of mental instability or domestic violence? Are there adequate safeguards—monitoring or

---

[24] Leigh Hopper, *Early Antibody Testing Suggests COVID-10 Infections in L.A. County Greatly Exceed Documented Cases*, USC News, Apr. 20, 2020, https://news.usc.edu/168987/antibody-testing-results-covid-19-infections-los-angeles-county (last accessed Apr. 26, 2020).

815103

1
2
3
4

> supervision—for releasees who are both vulnerable and dangerous? How does the increased activity associated with release orders in the quantities sought by Plaintiffs comport with the mandate for social distancing?" *Id.*

5
6
7

Plaintiffs provide no answers to any of these questions, and their cited cases are inapposite.[25]  Furthermore, questions about inmate health are far from the only ones which must be considered, as *Money* recognized:

8
9
10
11
12
13
14
15
16

> "Other compelling public interest considerations come into play too. . . . Many of [the prisoners] are violent offenders.  Compelling a process to potentially release thousands of inmates on an expedited basis could pose a serious threat to public safety and welfare.  The risk of recidivism comes into play, as do concerns about victims' rights.  The question is not simply what is best for the inmates ― the public has vital interests at stake, too." *Id.* at *20.

17
18

The balance should be struck in favor of those vital public interests, especially at the stage of a TRO being heard on little notice and no adequate opportunity for

19
20
21
22
23
24
25
26
27
28

[25]By way of example and not limitation, Plaintiffs' reliance on *Wilson v. Williams*, No. 4:20-cv-00794, 2020 WL 1940882 (N.D. Ohio Apr. 22, 2020) is misplaced.  That case pertained to the release of federal prisoners, so it did not face the same federalism concerns as this case.  *Money,* 2020 WL 1820660 at *15.  Nor did the <u>federal</u> prisoners have to exhaust <u>state</u> court remedies, which Plaintiffs failed to do.  Additionally, Plaintiffs cite to *Cameron v.* Bouchard for the premise that the district court required the production of a list of possible class and subclass members.  TRO at 30:1-11.  However, this part of the TRO was <u>reversed</u> on rehearing**.**  Because Plaintiffs are not entitled to a release order, there is no purpose in requiring Defendants to provide a list of class and subclass members.  *See Cameron  v. Bouchard,* No. 20-10949, 2020 WL 1952836, at *2  (E.D. Mich. Apr. 23, 2020) (not requiring production of similar type of list until court determines it has the power to release inmates).

39

815103

1   Defendants to respond.

2   **V.      PLAINTIFFS ARE NOT ENTITLED TO THE REQUESTED**

3   **PRISONER RELEASES**

4   As with the question of a bond, it is unnecessary for the Court to consider

5   Plaintiffs' request for a mass prisoner release because Plaintiffs have not shown that

6   they are entitled to a TRO in the first place.  However, Plaintiffs' request is so

7   extraordinary, and so utterly without merit, that Defendants are compelled to point out

8   the innumerable additional reasons why it cannot be granted.

9   First, although Plaintiffs claim that their release request is brought pursuant to

10  §2241 (TRO 35:19-21, 39:11-14), in fact their challenge to jail conditions is a claim

11  under §1983.  *See* Section IV(A), *infra*.  A §1983 claim is not only subject to the

12  exhaustion of administrative remedies requirement (which Plaintiffs do not meet, as

13  shown in Section IV(A), *supra*), as a "civil action with respect to prison conditions" it

14  is further limited by the PLRA's restrictions on prospective and injunctive relief.  18

15  U.S.C. §3626(a)(1)(A); *see Johnson v. Breeden*, 280 F.3d 1308, 1324 (11th Cir. 2002)

16  (§1983 action is a "civil action with respect to prison conditions" within the meaning

17  of the PLRA); *Wolf v. Beauclair*, 2015 WL 5768386, at *8 (D.Idaho Sept. 30, 2015)

18  (§3626 limits the prospective relief available in §1983 lawsuits on prison conditions).

19  Under the PLRA, prospective relief "shall extend no further than necessary" to

20  correct the (alleged) violation of federal rights and no prospective or injunctive relief

21  shall be granted unless the relief "is narrowly drawn, extends no further than

22  necessary to correct the violation of the Federal right, and is the least intrusive means

23  necessary to correct the violation."  §§3626(a)(1), (2).

24  Additionally, a prisoner cannot be released, including by TRO, unless there has

25  been a previous less intrusive order to remedy the violation of federal rights, and the

26  defendant has had time to comply with that prior order.  §3626(a)(3)(A).  Even when

27  those conditions have been met, a prisoner release order still can be issued only by a

28  three judge panel (§3626(a)(3)(B)) and only if that panel finds by clear and

40

convincing evidence that (1) overcrowding was the "primary cause" of the violation of a federal right and (2) no other relief will remedy the situation. §3626(a)(3)(E). It scarcely needs to be said that not a single one of the requirements has been met.

Plaintiffs' request for a mass prisoner release is not only legally defective but lacks any factual support. Their request rests on the false premise that a "high risk" medical condition by itself justifies release. It does not. *United States v. Boone*, 2020 WL 1865202, at *3 (E.D.Ca. April 14, 2020) (denying release for COVID-19 reasons of prisoner who had high risk medical conditions but did not prove she was not a flight risk; "Without more, the fact that Defendant is 57 years old and has high blood pressure does not justify release"); *United States v. McCurin*, 2020 WL 1700030, at *2 (E.D.Ca. April 8, 2020) (same; denying release to prisoner who had high risk medical conditions but had serious criminal history and presented substantial danger to the community; "Without more, the facts that Defendant is aging and has diabetes do not justify release.")

A second false premise is these prisoners would be much safer, and their health better protected, outside the jails than in them. This too is untrue. The community at large is hardly a COVID-free zone, especially for those with high risk medical conditions. There is no showing that these prisoners have access to outside skilled medical care or any other kind of supportive services necessary to safeguard either their health or that of the general community.

These realities have caused numerous courts to deny release on COVID-19 grounds even if the prisoner suffers from high risk medical conditions. As the court observed in *United States v. Ryan*, 2020 WL 1861662, at *3 (C.D.Ca. April 14, 2020), the "mere fact" that the defendant pretrial detainee suffered from asthma, which admittedly placed him "in a clinical population at greater risk of coronavirus infection," did not warrant release because "even with asthma, Defendant is no different from the subset of the public who must also reckon with asthma in the face of potential COVID-19 exposure — a risk as prevalent outside prison as it inside."

**DEFENDANTS' OPPOSITION TO EX PARTE APPLICATION FOR TRO**

815103

Indeed, some courts have found that the risk to a medically vulnerable prisoner may actually be greater in the general population than in prison. For example, the court in *Phea v. Pfeiffer*, 2020 WL 1892427, at *2 (E.D.Ca. April 16, 2020) stated in denying the release on COVID grounds of a convicted state prisoner who suffered from diabetes, high blood pressure, asthma, and heart disease:

> "[P]rison authorities may be able to isolate highly at-risk prisoners, such as petitioner, more easily than isolation or 'social distancing' is achieved in the general population, e.g., housing in administrative segregation, partial lockdowns or transfers. Prisons are certainly able to order their afflicted employees to stay at home, and can probably, more easily find testing opportunities for their essential employees than is yet possible for the general population. Finally, prison and state officials are more likely to know who may be best subject to compassionate release under state laws than is the [Court]."

Plaintiffs also ask the Court to release prisoners notwithstanding any bail previously set by the state courts, the facts supporting those bail decisions, or the safety of the public. TRO 39:15-42:4, Proposed Order ¶1(b). Plaintiffs are not entitled to a mass prisoner release, especially without bail. Plaintiffs assert that the setting of any bail is evidence that "the individual could be released on bond without presenting an undue public safety risk." Proposed Order ¶1(b).

That has not been the law in California for decades. "Before legislative amendments to the Penal Code in 1987, the only permissible purpose of bail was to ensure the defendant's presence in court." *Gray v. Superior Court*, 125 Cal.App.4th 629, 642 (2005). "Now, 'public safety . . . is the primary factor for the court to consider in the setting of bail.'" *Id.*; *see* Cal. Penal Code §1275(a)(1) ("The public safety shall be the primary consideration" in "setting, reducing, or denying bail.")

**DEFENDANTS' OPPOSITION TO EX PARTE APPLICATION FOR TRO**

815103

Thus a very high bail, such as the $1.4 million bail set for plaintiff Avila, indicates that the state court believed he/she was a very great public safety risk.

Indeed, during this health crisis, the California Judicial Council has reinforced the principle that setting or retaining bail <u>does</u> indicate a public safety risk.  Under Emergency Rule 4, adopted April 6, 2020, all prisoners detained on bail have had their bail reduced to zero — <u>except</u> that bail is retained for those whose release <u>is</u> deemed to present an undue risk to public safety because of the seriousness of the crimes with which they are charged.[26]   Plaintiffs completely ignore this statutory structure.  They seek the release of all pretrial detainees who are allegedly medically vulnerable, without limiting either the class or subclass to non-violent offenders.  Complaint, ¶¶158-161.

All pretrial detainees who qualify under Emergency Rule 4 have already had their bail reduced to zero.   The pretrial detainees who remain in custody with bail are those whom California has already deemed to present the very kind of threat to public safety which Plaintiffs airily assert, without authority or proof, does not exist.  The Court should not ignore, much less override, California's determination.

## VI.   <u>CONCLUSION</u>

For the reasons set forth above, Plaintiffs cannot show that they meet any of the requirements for issuance of a temporary restraining order.  The *ex parte* application should be denied in its entirety.

Alternatively, in the event that the Court is inclined to grant any of the requested relief, Defendants respectfully request that before the Court rules, the Court grant Defendants' application for an extension of time to respond more fully for the reasons set forth therein.

---

[26]Examples include unlawful possession of a firearm, threatening death or great bodily injury, violation of protective orders, domestic abuse, stalking, and enumerated sex offenses, and DUIs.  *See* Emergency Rule 4(c)(1)-(13).

43

DATED:  April 27, 2020

GLASER WEIL FINK JACOBS
  HOWARD AVCHEN & SHAPIRO LLP

And

LAWRENCE BEACH ALLEN & CHOI, PC

And

OFFICE OF THE COUNTY COUNSEL

And
LAW OFFICES OF KAREN  JOYNT


By:  _Andrew Baum /s/_____
      ANDREW BAUM
      *Attorneys for Defendants*

**DEFENDANTS' OPPOSITION TO EX PARTE APPLICATION FOR TRO**

815103